MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 009634
MUCKLEROY LUNT, LLC
6077 S. Fort Apache, Ste 140
Las Vegas, NV 89148
Phone: (702) 907-0097
Direct: (702) 534-6272
Fax: (702) 938-4065
martin@muckleroylunt.com

*Attorney for Plaintiffs*

(Additional Counsel on Signature Page)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| IN RE ALLEGIANT TRAVEL CO. STOCKHOLDER DERIVATIVE LITIGATION | Master File No.: 2:18-cv-01864 <br><br> **AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Mark Fullenkamp and Charles Blackburn (collectively "Plaintiffs"), by and through their counsel, derivatively on behalf of nominal defendant Allegiant Travel Co. ("Allegiant" or the "Company"), submit this Amended Verified Consolidated Stockholder Derivative Complaint ("Complaint") against certain current and former officers and directors of the Company (collectively defined herein as the "Individual Defendants") and allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings submitted by Allegiant to the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Allegiant; (iii) other publicly-available information, including court filings and media and analyst reports, concerning Allegiant; and (iv) documents obtained

pursuant to a Freedom of Information Act ("FOIA") request to the U.S. Federal Aviation Administration ("FAA").

## SUMMARY OF THE ACTION

1.     This is a stockholder derivative action asserting claims for breach of fiduciary duty, unjust enrichment, and violations of Section 14 of the Securities Exchange Act of 1934 ("Section 14"), brought on behalf of nominal defendant Allegiant, against the Individual Defendants.

2.     Allegiant bills itself as a leisure travel company, focusing on providing travel services and products to residents of under-served cities in the United States.  The Company offers scheduled air transportation on limited frequency nonstop flights between under-served cities and leisure destinations.  As of May 23, 2018, Allegiant operated a fleet of 99 Airbus aircraft.  The Company also provides air-related services and products in conjunction with air transportation and third-party travel products, such as hotel rooms, ground transportation, and attractions.  Allegiant provides air transportation services through fixed-fee agreements and charter service on a year-round and ad-hoc basis.  The Company also leases spare engines to a third party and offers management solutions to golf courses.

3.     Allegiant was founded in 1997, but quickly went bankrupt.  It was resurrected in 2002 by defendant Maurice J. Gallagher, Jr. ("Gallagher"), one of its major creditors, who has an extensive history with low-cost airlines.  The Company is based in Las Vegas, Nevada.

4.     Allegiant currently operates the ninth largest commercial airline in the United States and is known as a low-cost or budget airline.  Those low prices came at the expense of skimping on safety and maintenance, from at least mid-2014 to the present (the "Relevant Period").

5.     Defendant Gallagher's strategy of saving money on safety and maintenance expenses became a public problem for Allegiant in 2015.  Although Allegiant was rated the most profitable airline in 2015, that same year its fleet had to make at least seventy-seven unexpected landings for serious mechanical failures.  On June 25, 2015, five Allegiant planes failed midair within the span of four hours.  Allegiant had a fleet of eighty-six planes, and forty-two of them broke down midair at least once in 2015.

6.     During this period, the *Tampa Bay Times* analyzed and reported that federal aviation records revealed that Allegiant's planes were four times more likely to fail during flight than those operated by other major U.S. airlines.

7.     Each of the Individual Defendants has an extensive history in the airline industry and was aware of the importance of proper safety for an air carrier, yet failed to correct these widespread problems in a timely fashion.

8.     While negative news stories about safety failures trickled out from local news sources, the Individual Defendants caused Allegiant to make a series of false and misleading statements regarding its safety procedures, the Company's purported compliance with Federal Aviation Administration ("FAA") regulations, and that safety was the Company's first priority. The statements, including that safety was the Company's primary concern, falsely inflated the price of Allegiant stock.  At the same time, rather than correcting the safety issues at Allegiant, the Individual Defendants instead employed a scheme aimed at minimizing the risk of public disclosure of the safety issues.

9.     Several of the Individual Defendants also sold large quantities of stock during this period, with knowledge that the Company's stock price was artificially inflated.

10.     Although thousands of people were likely exposed to local news stories such as those published by the *Tampa Bay Times*, it was not until CBS News aired a segment on its *60 Minutes* program on April 15, 2018, which was viewed by over 10.4 million people, that the truth reached the masses.  The *60 Minutes* segment featured interviews from airline experts, passenger footage, and commentary from journalists.  It told the story of an airline that industry insiders refused to fly because of safety concerns – an airline that was willing to compromise the safety of its passengers in exchange for increased profit.

11.     Three of the Individual Defendants sold $2.3 million worth of Allegiant shares, at artificially-inflated prices, just over a month prior to the airing of the *60 Minutes* segment, at a time when they were certainly aware that CBS News was producing the episode about the Company. CBS News stated that they spent seven months researching and filming the *60 Minutes* segment

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

and although CBS reached out to Allegiant several times during the process, the Company refused to participate in the report.  In total, five of the Individual Defendants sold 308,679 shares of stock while at artificially-inflated prices for total proceeds of over $50.85 million.

12.    Following an announcement that the *60 Minutes* segment would air on April 15, 2018, shares of Allegiant stock fell $18.85 per share, or over 11.4%, representing a decline of over $304 million in market capitalization.  In addition to the loss in value and consumer confidence, the safety failures and statements related thereto have also subjected Allegiant to extensive litigation, including a class action for violations of the federal securities laws, captioned *Checkman v. Allegiant Travel Co., et al.*, No. 2:18-cv-1758, which is pending final approval of a $4 million settlement in this District (the "Securities Class Action"); an action brought by a pilot for wrongful termination stemming from an incident in which he evacuated a smoking plane, captioned *Kinzer v. Allegiant Air, LLC and Allegiant Travel Co.*, No. A-15-727524-C, which recently settled for an undisclosed sum in Clark County, Nevada District Court; and a personal injury action brought by an injured passenger, captioned *Kuhn v. Allegiant Travel Co. and Allegiant Air, LLC*, No 2:18-cv-150, which recently settled for an undisclosed sum in the U.S. District Court for the Western District of Pennsylvania.

13.    This derivative action seeks to remedy the Individual Defendants' wrongdoing on behalf of Allegiant and its stockholders.

### JURISDICTION

14.    The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14 of the Exchange Act.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This Court also has diversity jurisdiction as conferred by 28 U.S.C. § 1332.  Plaintiffs and defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

15.     The Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this district, or is an individual who has sufficient minimum contacts with this district to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Allegiant maintains its principal place of business in this district; (ii) one or more of the defendants either resides in or maintains executive offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district; and (iv) defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

**PARTIES**

17.     Plaintiff Mark Fullenkamp is currently an Allegiant stockholder and has continuously been a stockholder of the Company throughout the Relevant Period.  He is a citizen of Ohio.

18.     Plaintiff Charles Blackburn is currently an Allegiant stockholder and has continuously been a stockholder of the Company throughout the Relevant Period.  He is a citizen of Pennsylvania.

19.     Nominal defendant Allegiant is incorporated under the laws of the State of Nevada and maintains its headquarters at 1201 North Town Center Drive, Las Vegas, Nevada 89144.  The Company's shares are publicly traded on the NASDAQ under the symbol ALGT.  The Company's primary function is operating an American low-cost airline, Allegiant Air.

20.     Defendant Gallagher has been the Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Board") of Allegiant since September 2006.  He has also been Chairman of Allegiant Air since 2001.  In 2015, Gallagher received $3,550,486 in total compensation from Allegiant, bonuses made up $2,926,633 and $600,071 were stock awards.  In

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

1   2016, Gallagher received $3,571,205 in total compensation from Allegiant, bonuses made up

2   $2,850,000 and $699,948 were stock awards.   In 2017, Gallagher received $2,320,613 in total

3   compensation from Allegiant, bonuses made up $1,500,000 and $800,064 were stock awards.

4   Gallagher is named as a defendant in the Securities Class Action.  Gallagher is a citizen of Nevada.

5           21.     Defendant John T. Redmond ("Redmond") has been the President of Allegiant

6   since 2016 and a director since 2014.  He is a member of the Compensation Committee.  In 2016,

7   Redmond received $10,175,198 in total compensation from Allegiant, bonuses made up $250,000

8   and $9,379,248 were stock awards.  In 2017, Redmond received $1,857,125 in total compensation

9   from Allegiant, $1,749,973 of which were stock awards.  Redmond is a citizen of Colorado.

10          22.     Defendant Gregory Anderson ("Anderson") has been Allegiant's Principal

11  Accounting Officer since January 2015 and Senior Vice President of Treasury since January 2017.

12  In those positions, he was responsible for the Company's false and misleading statements that are

13  the subject of the Securities Class Action.   He has worked at Allegiant since January 2010,

14  beginning as a Senior Accountant/Financial Analyst and continuing as the Director of Accounting

15  starting in December 2011.  Anderson is a citizen of Nevada.

16          23.     Defendant Scott Sheldon ("Sheldon") has been Allegiant's Chief Financial Officer

17  ("CFO") since May 2010 and Chief Operating Officer ("COO") since October 2014.  He was

18  Allegiant's Principal Accounting Officer from 2007 to 2010, the Senior Vice President from 2010

19  to January 2017, and has held other accounting positions at the Company dating back to 2004.  In

20  2015, Sheldon received $1,458,497 in total compensation from Allegiant, bonuses made up

21  $633,805 and $600,071 were stock awards.   In 2016, Sheldon received $3,053,257 in total

22  compensation from Allegiant, bonuses made up $719,818 and $2,101,948 were stock awards.  In

23  2017, Sheldon received $1,918,428 in total compensation from Allegiant, bonuses made up

24  $813,100 and $800,064 were stock awards.  In his positions as CFO and COO, he was directly

25  responsible for the Company's false and misleading statements that are the subject of the

26  Securities Class Action and he is a named defendant in the Securities Class Action.  Sheldon is a

27  citizen of Nevada.

28

24.     Defendant Eric Gust ("Gust") has been Allegiant's Vice President of Operations since December 2015.  Gust is a citizen of Nevada.

25.     Defendant Charles W. Pollard ("Pollard") has been a director of Allegiant since 2009.  He is a member of the Audit and Nominating Committees.  Pollard is a citizen of Massachusetts.

26.     Defendant Linda A. Marvin ("Marvin") has been a director of Allegiant since 2013.  She is the Chair of the Audit Committee and a member of the Nominating Committee.  Marvin is a citizen of Nevada.

27.     Defendant Gary E. Ellmer ("Ellmer") has been a director of Allegiant since 2008.  He is a member of Audit, Ethics, Nominating, and Compensation Committees.  Ellmer is a citizen of Missouri.

28.     Defendant Montie R. Brewer ("Brewer") has been a director of Allegiant since October 2009.  He is a member of Nominating and Compensation Committees.  Brewer is a citizen of Massachusetts.

29.     Gallagher, Redmond, Pollard, Marvin, Ellmer, and Brewer are referred to herein as the "Director Defendants."  Gallagher, Redmond, Anderson, Sheldon, Gust, Pollard, Marvin, Ellmer, and Brewer are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     By reason of their positions as officers, directors, and/or fiduciaries of Allegiant and because of their ability to control the business and corporate affairs of Allegiant, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of loyalty, good faith, candor, and due care and are required to use their utmost ability to control and manage Allegiant in a fair, just, honest, and equitable manner.  The Individual Defendants are required to act in furtherance of the best interests of Allegiant and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Allegiant and its stockholders the fiduciary duty to exercise good faith and

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Allegiant, directly and/or indirectly, exercised control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of Allegiant were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Allegiant were required to, *inter alia*:

A.     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, complying with all FAA rules and regulations, and disseminating truthful and accurate statements to the SEC and the investing public;

B.     Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

C.     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

D.     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

E.     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

33.     Each of the Individual Defendants, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the

1  management and administration of the affairs of the Company, as well as in the use and

2  preservation of its property and assets.  The conduct of the Individual Defendants complained of

3  herein involves a knowing and culpable violation of their obligations as directors and officers of

4  the Company, the absence of good faith, and a reckless disregard for their duties to the Company

5  and its stockholders.  The Individual Defendants were, or should have been, aware that their

6  conduct posed a risk of serious injury to the Company.

7      34.  As noted in the Allegiant Travel Company and Subsidiaries Corporate Code of

8  Conduct and Ethics (the "Code"):

9
10      It is our responsibility to conduct ourselves in an ethical business manner and also to ensure that others do the same.  If any one of us violates these standards, we can expect a disciplinary response, which may rise to the level of termination of

11  any employment or other relationship with the company or legal action.  If any breach of the Code is known to any employee or member of management, you are

12  obligated to report violations in accordance with the procedures set out in this Code. By doing so, we ensure that the good faith efforts of all of us to comply with the

13  Code are not undermined.

14
15      The ultimate responsibility for maintaining our Code rests with each of us. As individuals of personal integrity, we can do no less than to behave in a way that

16  will continue to bring credit to our Company and ourselves

17      35.  Under the Code, the Individual Defendants are required "[t]o be honest, fair, and

18  accountable in all business dealings" as follows:

19  **To our customers:** to provide high quality air transportation and leisure travel services

20  consistent with customer requirements. To be the best supplier of knowledge management services we can with emphasis on fair competition and long-lasting

21  relationships.

22  **To our suppliers:** to develop and maintain mutually beneficial relationships based on the principle of fair competition in the marketplace.

23
24  **To society and the local community:** to be a responsible and responsive corporate citizen in a moral, ethical and beneficial manner.

25  **To our shareholders:** to pursue growth and earnings objectives while adhering to ethical standards.

26
27
28

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

**To our employees:** to provide safe working conditions and an environment characterized by fairness, respect for the individual, dignity and equal opportunity.

36.     Allegiant's Audit Committee Charter sets forth the primary duties of the Board's Audit Committee – defendants Marvin (chair), Ellmer, and Pollard.  Those responsibilities include, among other things:

- Oversee the quality and objectivity of the Company's financial statements and the independent audit thereof by, among other things, reviewing and appraising the audit efforts of the Company's independent auditors;

- Oversee that management has maintained the reliability and integrity of the Company's accounting policies and financial reporting and disclosure practices;

- Oversee that management has established and maintained adequate systems of disclosure controls and procedures and internal controls over financial reporting;

- Oversee that management has established and maintained processes to assure compliance by the Company with all applicable laws, regulations and corporate policy;

- Assist the Board oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditors' qualifications and independence, (iv) the performance of the Company's internal audit function and independent auditors; and (v) the Company's overall risk management profile;

- Review the Company's policies and compliance procedures regarding ethics.

37.     Consistent with these functions, the members of the Audit Committee "should encourage continuous improvement of, and should foster adherence to, the Company's policies, procedures and practices at all levels."

## FACTUAL ALLEGATIONS

### A.     The Individual Defendants' Professional Experience in Air Travel

38.     Each of the Individual Defendants has an extensive history in aviation and/or the airline industry.  They each know that the safe transport of passengers to their destinations is the

10

most important goal of an airline company.  Despite this knowledge, the Individual Defendants have caused or allowed Allegiant to carry on a scheme dating back to at least 2015 in which safety was sacrificed in the name of cost cutting and profits.  This scheme put customers at risk and hurt the Company's reputation and bottom line.

***Defendant Gallagher's History at WestAir and ValuJet***

39.  Defendant Gallagher has a long history in the airline industry.  He was a founder of WestAir, which operated as the west-coast commuter and regional airline affiliate of United Airlines from 1978 to 1992.

40.  In 1992, Defendant Gallagher co-founded ValuJet Airlines ("ValuJet").  Like Allegiant, ValuJet was a low-cost carrier that quickly became notorious for its dangerous cost-cutting measures.  ValuJet exclusively purchased used planes from other airlines, provided sparse training to its employees, and used outside contractors for maintenance and other services.  These tactics helped ValuJet develop a poor reputation for lax safety.  In 1995, the United States Department of Defense refused ValuJet's bid to fly military personnel, citing safety concerns.  On February 14, 1996, the FAA's Atlanta field office sent a memo to the main office in Washington, D.C. suggesting that the FAA ground ValuJet.  ValuJet planes made 15 emergency landings in 1994, 57 in 1995, and 57 from January through May 1996.

41.  ValuJet's safety issues came to a head on May 11, 1996, when ValuJet flight 592 from Miami to Atlanta International Airport crashed into the Florida Everglades about ten minutes after takeoff, killing all 110 people on board.  The crash was caused by a fire in the cargo compartment which was ignited by improperly-stored hazardous cargo.

42.  Following the crash of ValuJet flight 592, ValuJet was grounded until September 1996, and its deficient safety policies and violations came to light.  For example, one ValuJet plane flew 140 times with a leaky hydraulic system, one flew 31 times with malfunctioning weather radar, and another was allowed to fly despite engine rust that went unnoticed and later caught fire, destroying the plane.  After this news was revealed, the airline never recovered – its fleet and operations were transferred to AirTran Airways between 1997 and 1999.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

43.     Despite his direct knowledge of the grave consequences of substandard safety policies, Defendant Gallagher has employed frighteningly similar practices at Allegiant.  Due to his long history in the airline industry, Gallagher had detailed knowledge regarding the importance of implementing and maintaining proper safety controls over an airline and the consequences of failing to do so.

### Defendant Redmond's History at Menzies

44.     In addition to his role as President of Allegiant, Defendant Redmond currently serves as a Senior Vice President of Americas at Menzies Aviation plc. ("Menzies"), which provides landside and airside services for airlines at over 200 airports around the world.  Menzies offers third-party staffing for airlines, including a wide array of services such as baggage and ramp handling, passenger greeting and concierge work, cabin cleaning, plane de-icing, transporting cargo, and aircraft refueling.

45.     Due to his long history in the airline industry, Redmond had detailed knowledge regarding the importance of implementing and maintaining proper safety controls over an airline and the consequences of failing to do so.

### Defendant Anderson's History of Accounting at Allegiant and US Airways

46.     Defendant Anderson has been an airline accountant since May 2009.  He initially worked as an accountant for US Airways from May 2009 to January 2010, when he moved to Allegiant.  He started at Allegiant as a Senior Accountant/Financial Analyst from January 2010 to December 2011, when he was promoted to Director of Accounting.  In January 2015, he became a Vice President and Principal Accounting Officer and was then promoted to Senior Vice President of Treasury in January 2017.

47.     Due to his extensive history of airline accounting, Defendant Anderson had detailed knowledge regarding the importance to an airline's bottom line of maintaining proper safety procedures and the consequences of failing to do so.  He was also aware of the consequences for issuing false and misleading statements to the investing public.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

*Defendant Sheldon's History of Accounting at Allegiant*

48.    Defendant Sheldon has worked in an accounting capacity at Allegiant since January 2004.   He joined the Company as Accounting Manager and was promoted to Director of Accounting in May 2005.   Sheldon was Allegiant's Principal Accounting Officer from 2007 to May 2010.   In that role, he oversaw all accounting, tax, and financial reporting and financial planning and analysis.   He became Senior Vice President in May 2010 and held that role until January 2017.   Recently, he served as Interim CFO from May 26, 2017, to October 24, 2017, and is currently the CFO and COO.

49.    Due to his extensive history in leadership roles, defendant Sheldon was had detailed knowledge of the importance of safety to an airline's bottom line, the consequences of unsafe practices, and the consequences of issuing false and misleading statements to the investing public.

*Defendant Gust's History in Airline Safety and Operational Leadership Positions*

50.    Defendant Gust has worked in the airline industry since February 1995 and since that time has been in leadership roles specifically tasked with airline safety and/or operations.   For fifteen years he was the Vice President of Flight Operations at Mesa Airlines – a regional carrier for American Airlines and United Airlines.   Then Gust joined Allegiant as Vice President of Safety and Security in October 2010.   He was promoted to his current role as Allegiant's Vice President of Operations in December 2015.

51.    Due to his tenure in leadership roles responsible for airplane operation and safety, he had detailed knowledge regarding the importance of adequate safety policies and the consequences of operating without such policies.   Additionally, he is directly responsible for overseeing safety procedures at Allegiant.

*Defendant Pollard's History in the Airline Industry*

52.    Prior to joining the Allegiant Board in June 2009, Defendant Pollard had a long history in the airline industry.   From 1987 to 1997, Pollard served in senior management positions, including CEO and President, at World Airways, Inc., the oldest U.S. charter airline.   In 1997, he joined Omni Air International, Inc., a passenger charter carrier, where he served in various

13
AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

positions including Managing Director, President, CEO, and Vice Chairman until 2009.  He also served as a director of Air Partner plc until 2014 and AeroMechanical Services Ltd. until 2011 and is currently a director of Aircastle Limited.  Air Partner plc is a private jet charter company. AeroMechanical Services Ltd. provides real-time data and satellite communications for aircraft operators.   Aircastle Limited acquires, leases, and sells commercial jet aircraft to airlines throughout the world.

53.    Based on Pollard's extensive experience in air travel, he had detailed knowledge regarding the importance of adequate safety policies and the consequences of operating without such policies.

***Defendant Marvin's History of Accounting at Allegiant and Other Airlines***

54.    From September 1988 to June 1996, Defendant Marvin was involved in the airline industry in various finance and accounting roles with Business Express/Delta Connection and WestAir/United Express.

55.    Defendant Marvin has been with Allegiant since its restructuring in 2001.  Initially, she was CFO of Allegiant from September 2001 to September 30, 2007.  She was also Managing Director and Principal Accounting Officer until September 30, 2007.  Next, she was Executive Officer of Allegiant until December 31, 2007.  She then rejoined the Company as a director on January 29, 2013.

56.    Due to this extensive history accounting for airlines, Defendant Marvin had detailed knowledge regarding the importance of maintaining proper safety procedures on an airline's bottom line and the consequences of failing to do so.  She also was aware of the consequences of issuing false and misleading statements to the investing public.

***Defendant Ellmer's History with the Airline Industry***

57.    Defendant Ellmer has worked with airplanes for forty-five years.  Starting in 1973, he worked in the U.S. Marine Corps as a mechanic and crew member aboard UH-1 helicopters and as a flight engineer and instructor on KC-130 tanker aircraft.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

58.     He entered the commercial airline industry in 1980 and since that time has gained extensive and diverse airline management experience.  Ellmer's prior commercial experience includes a stint as President and COO of Business Express Airlines and maintenance and engineering positions at McDonnell-Douglas and Hughes Helicopter.  He also served as Vice President of Maintenance and Engineering at WestAir Commuter Airlines/Mesa Airlines.  From 1998 to 2002, Ellmer served in various officer positions for American Eagle Airlines, Business Express Airlines, and WestAir Commuter Airlines.  He served as the President and COO of its Executive Airlines and American Eagle Caribbean unit from August 2002 to April 2006.  From April 2006 to August 2006, Ellmer served as Vice President of Business Development for American Eagle Airlines.  He then joined ATA Airlines, Inc. in September 2006 as Senior Vice President of Operations and General Manager of Charter.  He has also served as Senior Vice President for Operations of Global Aviation Holdings, Inc. (alternatively named Global Aero Logistics, Inc.) since September 2007 and served as its General Manager of Charter.  Ellmer was responsible for flight and technical operations as well as Global Aviation's charter business.  He served as the COO at ATA Airlines, Inc. from September 2007 to February 2008.  And finally, Ellmer has been a director of Allegiant since May 2008.

59.     Due to his extensive experience around planes and in the commercial airline industry, he had detailed knowledge regarding the importance of adequate safety policies and the consequences of operating without such policies.

### Defendant Brewer's History as an Airline Executive

60.     Like the other Individual Defendants, Defendant Brewer has extensive experience in the commercial airline industry.  Early in his career he worked at Northwest Airlines, Republic Airlines, Braniff, and Trans World Airlines.  Brewer then served as a Senior Vice President of Planning at United Airlines.  In that role, he planned and developed over 20 hub operations worldwide, managed low-cost airline operations as President of United Shuttle, and successfully restructured the route networks of three carriers.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

61.     Next, he joined Air Canada as Executive Vice President of Commercial in April 2002.  He served as the chief architect and led the implementation of Air Canada's new business model including the successful simplified fare structure.  He was responsible for all commercial aspects of Air Canada including Air Canada Jazz, Air Canada Jetz, Air Canada Vacations, new businesses, and a strategic direction of network planning, marketing, and scheduling.  He also acted as a key negotiator in the founding of Star Alliance.  Defendant Brewer was the CEO and President of Air Canada from December 2004 to April 1, 2009.

62.     In addition to executive experience, Defendant Brewer has also served on a variety of airline and air travel-related boards of directors.  He was a director of Swiss International Air Lines AG from October 2013 until January 2018.  He serves as a member of the advisory board at Everbread Ltd. and Thayer Ventures, two travel technology companies.  He serves as a member of the Board of Governors of the International Air Transport Association.  He serves as the Vice Chairman of the Canadian Tourism Commission.  He served as a director of Aer Lingus Group DAC from January 25, 2010 until September 02, 2015.  He served as a director at Aer Lingus Limited until September 1, 2015.  He served as a director of Air Canada from March 8, 2005 to April 1, 2009.  And finally, he has been a director of Allegiant since October 2009.

63.     Due to his extensive experience as an executive and director in the commercial airline industry, he had detailed knowledge regarding the importance of adequate safety policies and the consequences of operating without such policies.

**B.     <u>Safety Issues at Allegiant</u>**

64.     Allegiant was initially founded in January 1997 under the name WestJet Express. After a trademark dispute, the Company changed its name to Allegiant Air.  The airline received FAA and DOT certification for scheduled and charter domestic operations on June 19, 1998. Allegiant also has the authority for charter service to Canada and Mexico.  After two years of operation, Allegiant filed for Chapter 11 bankruptcy protection.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

65.     Defendant Gallagher was one of Allegiant's major creditors and subsequently gained control of the business.  Gallagher restructured the Company to a low-cost model, which focused on smaller markets that larger airlines did not serve.

66.     In March 2002, Allegiant emerged from bankruptcy and began to acquire McDonnell Douglas MD-80 aircrafts.  From 2002 to 2004, Allegiant flew primarily from thirteen small cities to Las Vegas and offered bundled air and hotel packages.

67.     The Company went public in November 2006 and began to expand to additional cities including Phoenix-Mesa, Arizona; Fort Lauderdale-Hollywood, Florida; and Bellingham, Washington.  By 2014, Allegiant expanded to additional cities including Grand Rapids, Michigan; Honolulu, Hawaii; Cincinnati, Ohio; and San Diego, California.

68.     Allegiant buys its planes second-, third-, or even fourth-hand and currently operates the oldest commercial aircraft fleet in the United States.  The current average age of a plane in Allegiant's fleet is twenty-two years.  An old fleet is not necessarily dangerous, but older planes require a greater level of care and maintenance to ensure that they remain safe.  Throughout the Relevant Period, the Individual Defendants caused Allegiant to cut corners on required maintenance to reap higher profits.  This is the same strategy that Defendant Gallagher employed at ValuJet which eventually led to its demise.  The lack of proper maintenance has led to high numbers of emergency landings.

69.     In the summer of 2015, Allegiant experienced a series of midair breakdowns.  On June 25, 2015, five Allegiant flights were interrupted by midair failures in a four-hour period.  Since October 2015, Allegiant has been under close FAA supervision due to this chain of incidents.

70.     In 2015, Allegiant planes had to make at least seventy-seven unexpected landings for serious mechanical failures.  Allegiant has a fleet of eighty-six planes, forty-two of which had a midair breakdown at least once in 2015.  One plane made an emergency landing in Birmingham, Alabama on a flight scheduled from St. Petersburg, Florida to Omaha, Nebraska due to a problem

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

with the air circulation fan.  The incident revealed that the same MD-80 plane had at least four serious mechanical failures in the fifteen months prior to the emergency landing.

71.     This series of incidents was caused, at least in part, by the fact that Allegiant utilized the oldest fleet in the industry and outsourced maintenance of its planes at many airports.

72.     Allegiant was one of only three U.S. carriers still using the MD-80 as part of their regular fleet until the Company recently retired them on December 3, 2018.  Allegiant's MD-80s were more than twice as likely to break down as MD-80s flown by American Airlines or Delta. Allegiant's MD-80s broke down approximately 8.2 times per 10,000 flight hours, while American's MD-80s only broke down 3.4 times and Delta's only 2.4 times.

73.     After one of Allegiant's MD-80s aborted takeoff in Las Vegas in 2015, the FAA accidentally sent its unredacted report to the *Tampa Bay Times*.  The FAA's report revealed "deliberate and systemic acts of noncompliance" in the airline's maintenance procedure and found that the aircraft had flown 261 flights without a pin part necessary for a safe flight causing an "unacceptable safety risk" and that Allegiant's response was "causal to the flights flown in an unairworthy condition."

74.     In 2015, *Inc.* magazine reported that Allegiant was the most profitable airline in America.  However, the Company's profits were inflated by cost-cutting practices such as maintaining the industry's oldest fleet and skimping on necessary safety and maintenance expenses.

### Flight 864 and the Wrongful Termination of Captain Kinzer

75.     On June 8, 2015, passengers and crew aboard Allegiant flight 864 from St. Petersburg, Florida bound for Hagerstown, Maryland began smelling smoke in the cabin.  Captain Jason Kinzer, in accordance with his regulatory duty and his common law obligation to provide a high degree of care for the safety of his passengers, declared an emergency to local air traffic control and returned to St. Petersburg airport for an emergency landing.

76.     After landing, Captain Kinzer told Air Traffic Control that the plane would stop and wait for fire rescue to inspect it before taking further action.  Fire rescue reported smoke coming

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

1   out of the plane's engine and urged the crew to shut the engine down.  Captain Kinzer and his crew

2   shut the engine down and engaged the plane's onboard fire extinguisher.

3         77.    However, Captain Kinzer and his crew learned that the burning smell had not been

4   resolved.  Captain Kinzer then acted for the safety of his passengers and crew and in accordance

5   with his training and responsibility and ordered the cabin crew to prepare for an evacuation and

6   alerted air traffic ground control.

7         78.    The identified speaker on the radio channel authorized the evacuation, but one

8   speaker who refused to identify himself or his authority told Captain Kinzer to "hold off your

9   evacuation."  Captain Kinzer and air traffic control asked for the mystery man to identify himself,

10  but he would not, and simply repeated, "I'm telling you not to evacuate yet."

11        79.    After waiting approximately one additional minute, Captain Kinzer asked one final

12  time for the unidentified speaker to identify himself and when he failed to do so, Captain Kinzer

13  evacuated the plane.

14        80.    While Captain Kinzer appears from the air traffic control transcript and witness

15  accounts to have acted in the best interests of Allegiant's passengers, Allegiant management took a

16  different view of the incident.  On July 23, 2015, Captain Kinzer received a letter of termination

17  from Allegiant's System Chief Pilot due to his evacuation of the smoking aircraft.  The termination

18  letter alleged that Captain Kinzer "ordered an evacuation that was entirely unwarranted and, as a

19  result, your conduct and decision-making on June 8, compromised the safety of your crew and

20  your passengers and led directly to the injuries."

21        81.    Captain Kinzer filed suit for wrongful termination on December 7, 2015, in Clark

22  County District Court, and the matter, captioned *Kinzer v. Allegiant Air, LLC and Allegiant Travel

23  Co.*, No. A-15-727524-C, settled on the verge of trial for an undisclosed sum.  The lawsuit and its

24  settlement have caused substantial costs and negative press for the Company.

25        82.    Following Captain Kinzer's termination, one of his flight attendants, Natalee

26  Negron, wrote an email to Defendant Gallagher that questioned the decision.  Her email read as

27  follows:

28                                          19

I just feel this undying urge to reach out to you on the topic of what I feel to be the wrongful termination of a Captain.

All other parties that were involved that day were returned to duty with no additional training, which makes me wonder what the Captain did that was so wrong he received the harshest punishment, especially hearing from Flight Ops management that the evacuation went as trained.

I feel as though safety definitely was the deciding factor to evacuate that day. But I honestly just felt a need to express that a Captain that had safety in the front of his mind is no longer with the Company. I truly hope that this decision was made with the utmost caution and consideration of the facts.

I truly hope I'm not stepping out of place with this email. Forgive me if I [am].

83. Defendant Gallagher forwarded the email to defendant Sheldon, and Allegiant's Vice President of In-Flight Services with a note, "please talk to me." During the course of Captain Kinzer's lawsuit, Gallagher has claimed that he has no memory of the email or of forwarding it to his executives.

84. The emergency evacuation garnered great media attention and the Allegiant pilots' union has also stated that the firing was intended by Allegiant management to send a warning that the Company would not risk being embarrassed by major safety incidents that could bring light to the Individual Defendants' broader safety and maintenance failures.

***The CtW Activist Investor Letter***

85. On January 26, 2016, CtW Investment Group ("CtW"), a large stockholder that manages approximately $250 billion in pension funds and had a substantial position in Allegiant stock, sent a letter to the Allegiant Board (the "CtW Letter"). The letter called for the removal of Defendant Marvin and brought the safety issues and the Board's oversight role in reigning them in to its direct attention:

Dear Allegiant Board Members:

At the annual shareholder meeting in June, public shareholders signaled a clear lack of confidence in former CFO Linda Marvin's leadership of the Audit Committee. Concerned at the Audit Committee's approval of $9.3 million in highly questionable related transactions between the company and CEO Maurice Gallagher, and troubled by Ms. Marvin's lengthy professional association with Gallagher, 47% of public shareholders opposed her re-election. Recent negative

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

publicity over airplane safety and ongoing investigations into in-flight incidents by the Federal Aviation Administration lend urgency to Ms. Marvin's swift replacement to ensure rigorous, independent oversight of regulatory compliance by our Audit Committee; and to the initiation of a broader overhaul of board composition and committee structure.

Accordingly, we request that the board immediately: (1) engage an outside search firm to recruit new independent directors to replace Ms. Marvin and to expand the overall size of our board, (2) reconstitute a majority of the Audit Committee with newly recruited directors; and (3) establish a standalone safety committee of the board – the prevalent governance practice across the industry. These reforms are vital to assuring customers and shareholders of Allegiant's safety and compliance procedures, especially given both the company's prodigious growth and reliance on using and acquiring older aircraft.

In addition, (4) we request the suspension of all related transactions with CEO Gallagher, including the $2.5 million annual sponsorship of his son's NASCAR team, until the Audit Committee has been thoroughly overhauled.  It is incredible that the current committee – which also includes two other long-time associates of CEO Gallagher, John Redmond and Gary Ellmer – can exercise appropriate independence and objectivity in assessing transactions which "blur the lines between personal and corporate investment," as Institutional Shareholder Services put it in recommending against Ms. Marvin.

86.    The CtW Letter included an attack on the independence of Defendant Marvin and criticized her and her cohorts' service on the Audit Committee:

**Former CFO Linda Marvin Lacks the 'Critical Distance' from CEO Gallagher to Serve as Audit Committee Chair and Should Leave the Board**

It may be true that Ms. Marvin's experience as Allegiant's CFO until 2007 "adds valuable knowledge to [the] board," as you state in the proxy, but this comes at far higher costs to the Audit Committee's independence and objectivity.  With the committee's primary purpose being to bolster investor confidence in the company's numbers, its legal and regulatory compliance, and related party transactions, shareholders require absolute assurance in the objectivity and independence of its members; even the perception that those qualities are tainted undermine its role.  For this reason, it is exceedingly rare to have a former employee, let alone a previous CFO, serving on this key committee.

Our analysis of analysis of the Russell 3000 indicates that there are just six other instances of a former CFO (or CEO) of equal or more recent employment as Ms. Marvin serving on the Audit Committee.  And just one of those serves, like Ms. Marvin, as chair of the Audit Committee.  Besides the risk of excessive deference to management that comes with any former executive serving as an independent director, having a former CFO head the Audit Committee sets up the awkward

situation in which the same individual is responsible for independently overseeing the processes and controls that they may well have put in place as CFO or oversee compliance issues that could have developed under the previous tenure.   At a minimum, the risk is in having Ms. Marvin oversee the performance of a former deputy; current CFO Scott Sheldon, we note, served as Director of Accounting during Ms. Marvin's tenure as CFO.  Compounding this challenge is the fact that Mr. Sheldon is the nephew of former Allegiant director and long-time business associate of CEO Gallagher, Timothy Flynn; together CEO Gallagher and Mr. Flynn founded ValuJet and WestAir and are partners, along with Audit Committee member John Redmond (see below), in the investment consortium owning our company's headquarters.

Considering Ms. Marvin's extensive professional history with Mr. Gallagher – serving as an executive under Gallagher at WestAir and MPower, in addition to her role as CFO of Allegiant – it is difficult to view her appointment to the board in 2013 stemming from anything else but her longstanding relationship with Gallagher. (Indeed, we note that at least until 2014, they had lived within a mile of each other for over a decade.)

Unfortunately, similar independence concerns attach to Gary Ellmer and John Redmond, two of the three other Audit Committee members.  Mr. Ellmer, who like Ms. Marvin has no other public board service, served alongside Mr. Gallagher at WestAir.   Mr. Redmond, meanwhile, continues the board's relationship with business partners of CEO Gallagher.  Mr. Redmond, like former director Timothy Flynn (2006 to 2013), is an eleven percent partner alongside CEO Gallagher (30%) in the limited liability company that owns the company's headquarters and adjacent property.

87.    The CtW further publicly criticized the Board's composition, structure, and policies:

**Board Structure and Practices Have Failed to Keep Pace with Allegiant's Growth and Must be Reformed**

While shareholders have benefited from the company's prodigious growth, as revenue has more than quadrupled since the initial public offering and the company's valuation has grown to more than $3.4 billion, shareholders have been ill-served by the board's failure to concomitantly develop its governance structure to better reflect its changed structure.

Allegiant may have ceased to be a controlled company in 2007, but the board's composition, oversight and responsiveness have failed to keep pace with this critical shift to majority public ownership.   To start, the board needs a more expansive and robust director recruitment process.  Besides the lengthy ties Ms. Marvin and Messrs. Redmond and Ellmer share with CEO Gallagher, outlined above, we note that Montie Brewer was initially recommended to the board in 2009

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

by CEO Gallagher. It thus appears that at least four of our five independent directors were identified as candidates by virtue of their relationship to CEO Gallagher. Moreover, while we think industry experience is vital for a board, with only one member of the board coming from a professional background outside of the industry – and that director being Mr. Redmond –Allegiant needs to dramatically widen the talent pools from which it selects directors. Rather than a strength, the board's concentration of experience is suggestive of a highly constricted recruitment process.

The integrity of this entire process is further undermined by Ms. Marvin and Mr. Ellmer making up two-thirds of the Nominating Committee (Mr. Brewer being the other member), the absence of a designated chair and the committee having met just once in each of the past seven years (2008 – 2014). We note that according to a 2013 Ernst & Young study, a mid-cap company's nominating committee meets on average 4 times year. The same study also finds that the average mid-cap board size is ten and for mid-cap airlines is eleven - or in either case almost twice the size of our board. It is clear to us that the board's size, composition and performance are badly in need of an upgrade.

88.    The CtW Letter concluded by recounting the past year's safety issues and called for the creation of a standalone safety committee, which still does not exist two and a half years later:

**F.A.A. Compliance Failures, Safety Scares, Aging Fleet, Heighten Concerns over the Audit Committee and Indicate the Need for a Standalone Safety Committee**

The past year has seen a string of prominent safety incidents involving Allegiant flights, prompting several FAA investigations and a wave of negative publicity for our company (including landing Allegiant in the Wall Street Journal's "Crisis of the week" column). And last week, we note, COO Steve Harfst abruptly resigned after less than 18 months at the company.

Questions have also been raised over the adequacy of disclosures surrounding regulatory compliance, while the company's own pilots have pointed to a corporate culture where profits come before safety. The emergency landing in Fargo, ND, in July of an Allegiant flight running low on fuel should be a wakeup call. The incident not only follows a string of in-flight safety incidences over the prior months, but occurred on a flight piloted by two licensed executives, one being our director of flight safety, and appears to have been wholly avoidable if the pilots had adequately reviewed, as they are required before each flight, an FAA Notice to Airmen, which indicated that the Fargo Airport was closed due to a Blue Angels display. Besides the emergency itself, Allegiant was criticized in the Wall Street Journal for its public response to the incident, as several "crisis experts" expressed concern at the company's overly defensive posture in addressing passenger and investor concerns over safety, particularly given the rash of incidents on company flights.

23

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

As of September 8, 2015, the Las Vegas Review Journal reported 17 "unusual incidents" in 2015 involving Allegiant flights, including emergency landings, flight diversions or aborted takeoffs, while the FAA says it has "several" ongoing regulatory investigations. The company had a further five emergency landings out of Florida in the last week of the year.

Separately, according to a New York Times article, Allegiant pilots have identified at least 65 incidents in the period from September 2014 to March 2015, where flights were forced to divert, return to gates or abort takeoff because of mechanical or engine problems. In a report sent to Congress and the F.A.A., the pilots contend that a combination of poorly trained mechanics, insufficient spare parts, and an aging fleet is "creating a dangerous paradigm that could eventually lead to an accident resulting in serious injury and loss of life."

In the same article, the New York Times reported on previously undisclosed problems in the airline's maintenance and training programs identified in 2013 during a routine F.A.A. inspection. Determining the current training was not effective in identifying systemic deficiencies or distinguishing between major and minor repairs, the F.A.A. forced a six-month shut down of the company's training programs and a freeze in new plane deliveries. Although Allegiant's SEC filings routinely warn of the material risks from possible shortages of both pilots and aircraft, there can also be risks from failures to meet regulatory standards.

With a key responsibility of the Audit Committee being to ensure that management has established and maintained processes to assure compliance with key regulations impacting the company, particularly those that could have significant impact on the company's financials, these developments heighten the urgency for bolstering the committee's independence from CEO Gallagher. They also underscore the need to establish a board safety committee. Almost all of Allegiant's US peers have standalone committees to oversee management's internal control processes and other activities regarding operational safety and compliance with applicable laws and regulations, rather than subsume the responsibility under the general mandate of the audit committee, which has other significant responsibilities. Indeed, considering that a key element of Allegiant's business model is the reliance on older aircraft, which require more extensive maintenance, a board committee that focuses exclusively on safety would appear long overdue.

(Internal footnotes and citations omitted).

89.    Despite public warnings from a major activist stockholder, the Individual Defendants opted to keep Marvin, Redmond, and Ellmer on the Audit Committee, failed to reshape or expand the Board, failed to create a Safety Committee, and opted to allow the safety and mechanical failures to continue.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

*Teamsters Union Report on Allegiant's Maintenance-Related Issues*

90.     On April 20, 2015, the *New York Times* published an article titled "Pilots Fault Allegiant on Safety as Talks Stall." It told how, in 2013, a routine FAA inspection found problems with Allegiant's maintenance and safety programs, and, dating back to at least 2014, Allegiant pilots reported the alarming rate of safety issues occurring at the airline to their union. By April 2015, the Teamsters Aviation Mechanics Coalition had compiled a report of 65 incidents of aircraft mechanical failure between September 2014 and March 2015. Based on these incidents, the union concluded that Allegiant had poorly trained mechanics, insufficient spare parts, and a fleet well beyond its service life. The union alleged that this created "a dangerous paradigm that could eventually lead to an accident resulting in serious injury and loss of life." Following this report, Allegiant's pilots threatened to strike in an effort to force the Company to adhere to safety protocols. In the *New York Times* article, former National Transportation Safety Board member, John Goglia, stated, "For a small fleet, that's an awful lot of problems," and "They are running on the safety margin."

91.     On March 7, 2016, the Teamsters Aviation Mechanics Coalition issued an updated Union Report on Maintenance-Related Issues ("Teamsters Report") covering the period September 2015 through January 2016. The Teamsters Report found that Allegiant had experienced at least 98 separate and preventable maintenance issues in the five-month period. There were 35 engines issues, such as failures to start, clogged filters, and two instances of catastrophic engine failures in which the engine came apart. The Teamsters Report also found four incidents of smoke in the cabin and three instances of pressurization problems. The Teamsters Report also found the following new issues:

- Little or no documentation during shift turnover: It is critical that maintenance crews carefully document their work so that after a shift change, the mechanics assigned to the next shift know where to pick up. When there is little or no shift turnover, mechanics do not have the information necessary for a successful transition.

- Improper use of minimum equipment list (MEL) and dispatch procedures. A fleet is able to operate with certain functions that do not work so long as

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

maintenance follows a certain procedure, known as MEL and dispatch procedures. But at Allegiant Air, the TAMC [(Teamsters Aviation Mechanics Coalition)] found maintenance teams were not consistently or accurately following MEL and dispatch procedures.

- Sub-standard maintenance expertise. Many maintenance crews lack adequate experience to properly repair and dispatch aircraft. Allegiant Air flies into secondary and tertiary airports, where the company relies on contracted maintenance crews. Many of these crews do not have the necessary experience working on MD-80s, the bulk of Allegiant's fleet.

92. The Teamsters Report noted that "the likelihood is high that there are additional and similar unreported incidents." It also noted the following continuing problems that were previously observed in the September 2014 through March 2015 report:

- Training for maintenance crews is inadequate.

- There is a lack of process to document equipment failures. Specifically, mechanics at Allegiant Air do not have the equipment needed to pull up the maintenance manual and are left having to work with manual references faxed from maintenance control or, in some instances, just verbal instructions.

- Mechanics report a culture of "just move the metal" and feel pressure to get the aircraft to the next station. This has been confirmed by pilot reports of mechanics asking them if they can "just take the aircraft as it is."

- There is a lack of spare parts. In some instances the spare parts that are available are not reliable. Because of this, mechanics are required to "cannibalize" parts from another aircraft because adequate in-stock spares are not available.

- There is inadequate tooling and equipment. Mechanics have reported that critical jobs, such as the lubrication of stabilizer jack screws, cannot be performed due to a lack of training on equipment and unavailable equipment.

93. Even though the Teamsters Report cited specific incidents to back up its claims, later that day Allegiant responded by stating, "The Teamsters Aviation Mechanics Coalition has never inspected a single Allegiant aircraft and has no firsthand knowledge of our operation."

***Additional Safety Incidents***

94. On May 5, 2016, an Allegiant flight from Punta Cana, Dominican Republic bound for Pittsburgh, Pennsylvania experienced severe turbulence and conducted an emergency landing

at Fort Lauderdale-Hollywood International Airport in Florida.  Seven people were injured by the turbulence, including three passengers and four flight attendants.  Two of the passengers experienced head injuries.  The incident led to the filing of a lawsuit on February 2, 2018 in the Western District of Pennsylvania.  The plaintiff, Lori Kuhn, alleges that Allegiant improperly handled the situation.  She was thrown from her seat and hit her head on the ceiling of the plane, and suffered head, neck, and brain injuries.  Ms. Kuhn alleges that the plane's radar systems should have detected the turbulence and avoided it, and at the very least, the airline failed with respect to safety procedures because passengers should have been warned and were not.  Ms. Kuhn stated that she continues to have medical problems and her suit seeks compensatory damages, costs, and attorneys' fees.  The case, captioned *Kuhn v. Allegiant Travel Co. and Allegiant Air, LLC*, No 2:18-cv-150 (W.D. Pa.), recently settled for an undisclosed amount.

95.    Action News Jacksonville reported on 127 FAA investigations into safety issues on Allegiant flights out of Florida from 2005 to 2016.  The investigations found numerous mechanical failures that caused emergency landings, aborted takeoffs, and flight diversions due to maintenance failures.

96.    On August 17, 2016, Allegiant Flight 436 aborted its take-off from McCarran International Airport in Las Vegas, Nevada due to an un-commanded early rotation at about 120 knots indicated airspeed.  An investigation by the FAA found that maintenance procedures had not been followed, which resulted in a nut becoming detached from an elevator boost cylinder.  The aircraft had made 216 flights in this unairworthy condition and placed passengers, crew, and the airline's reputation at risk each time.

97.    In November 2016, the *Tampa Bay Times* reported on Allegiant's history of midair failures.  The article included an analysis of federal aviation records, which showed that Allegiant's planes were four times more likely to fail during flight than those operated by other major U.S. airlines.  The *Tampa Bay Times* also found the following facts, which Allegiant did not dispute:

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

- Forty-two of Allegiant's eighty-six planes broke down in mid-flight at least once in 2015. Among them, fifteen were forced to land because of failing engines, nine by overheating tail compartments, and six by smoke or the smell of something burning.

- After certain systems on Allegiant planes fail, the company repairs them and puts the planes back in service, only to see the same systems fail again. Eighteen times last year, key parts such as engines, sensors and electronics failed once in flight, got checked out, and then failed again, causing another unexpected landing.

- Allegiant's jets are an average of twenty-two years old. The average age of planes flown by other carriers is twelve. Experts say planes as old as Allegiant's require the most rigorous maintenance in the industry. But Allegiant doesn't staff its own mechanics at 107 of the 118 airports it flies to.

- Allegiant relies most heavily on McDonnell Douglas MD-80s, an aging model retired by all but two other major U.S. carriers. The company's MD-80s fail twice as often as those operated by American Airlines and three times as often as those flown by Delta.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

1      98.     The failures between January 2015 and September 2016 are illustrated as follows:



13      99.     Following the *Tampa Bay Times* report, defendant Gallagher admitted, "I can look

14   at what we did (in 2015) and it wasn't acceptable.  I don't disagree with the thrust of your

15   numbers. . . .  We want to be well-known as being reliable and on time, and obviously safe, and

16   that's an important part of our brand.  And we're going to make sure we do those things.  But if

17   you stub your toe, step up and own it and move on."  Gallagher also responded directly to the

18   report by stating, "Well, you have to appreciate, you're breaking pretty new ground here with this

19   stuff.  This industry historically has not talked about safety.  There's no public upside to going out

20   and talking about it."

21      100.    Defendant Gallagher's responses are contradictory to his public stance throughout

22   2015.  Previously, Gallagher called such claims "baseless assumptions and accusations" and stated

23   that the story "repeats the faulty premise that something is wrong with Allegiant.  Let me be clear:

24   there is not."

25      101.    Despite Defendant Gallagher's change of tone, Allegiant's safety issues have

26   continued.  For instance, on April 8, 2018, an Allegiant plane carrying 155 passengers and six

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

crew slid off a runway in Sioux Falls, South Dakota.  Passengers were forced to exit the plane through the rear stairs and go out into the snow before being transported to the terminal in buses.

102.   On April 13, 2018, CBS News announced that it would air a segment during *60 Minutes* two days later, criticizing Allegiant's safety and maintenance record.  This news caused Allegiant's stock to drop $14.20 or over 8.5%, representing a decline of over $229 million in market capitalization.

103.   On April 15, 2018, the *60 Minutes* segment aired during prime time on CBS.  The episode was viewed by more than 10.4 million.  The segment, titled "Allegiant Air:  The Budget Airline Flying Under the Radar," featured Steve Kroft investigating Allegiant, "a discount carrier known more for its ultra-low fares than its high record of in-flight breakdowns."  The segment revealed to the American public that: (a) Allegiant's aircraft had a high number of serious mechanical incidents between mid-2015 and October 2017; (b) Allegiant lacks the infrastructure and personnel to adequately maintain their aircraft; and (c) Allegiant discouraged pilots from reporting safety and maintenance issues.  The transcript of the *60 Minutes* segment is attached hereto as Exhibit A.  It touched on many of the topics explained above, including:

- Allegiant has the oldest fleet in the nation, consisting mainly of MD-80s;

- Allegiant had over 100 serious mechanical failures that continued at least between January 2016 and October of 2017;

  o  These included midair engine failures, smoke and fumes in the cabin, rapid descents, flight control malfunctions, hydraulic leaks, and aborted takeoffs;

- Industry experts feel that Allegiant is abnormally unsafe and do not fly it themselves or recommend that friends or family fly on the airline;

- Aviation experts believe that "Allegiant's problems come from the confluence of its aggressive business model and a safety culture they find to be lagging;"

- Allegiant lacks the maintenance infrastructure of larger carriers, has few of its own mechanics, and relies primarily on contractors.  Additionally, the Company lacks "feet on the ground" to properly monitor airplane maintenance;

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

- Many Allegiant planes had recurring issues and others were returned to service before they were ready;

- Allegiant pilots feel that Allegiant management (including the Individual Defendants) seems to denigrate the pursuit of safety, some pilots even feel that Allegiant is trying to gain a competitive cost advantage by softening safety standards adhered to by the major airlines;

- Allegiant pilots also reported management telling them to illegally not record safety issues, the Captain Kinzer is prime example of this type of conduct; and

- The former FAA employee interviewed knows not to fly Allegiant.

104. The Individual Defendants clearly knew about the widespread safety and maintenance issues plaguing the airline and did nothing. In fact, they took steps to push Allegiant in the direction which led to the *60 Minutes* report and the incidents described within it.

105. Immediately following the *60 Minutes* report, rather than acting to fix the deficiencies that had been exposed, the Individual Defendants enlisted Defendant Gust to cover them up. In response to the *60 Minutes* segment, Vice President of Operations Gust issued the following statement on behalf of the Company:

> It is unfortunate and disappointing that CBS 60 Minutes has chosen to air a false narrative about Allegiant and the FAA. Not only do we expect our team members to adhere to all company procedures and policies -- including safety procedures -- but many positions are subject to statutory and regulatory obligations. The violation of those obligations would trigger not only punitive action from Allegiant, but could also result in enforcement action from regulatory agencies, loss of a certification, and even criminal charges. To suggest that Allegiant would engage in the practice of asking team members to violate company and regulatory obligations is offensive and defamatory.

> CBS produced a one-sided narrative by cherry-picking interviews and ignoring publicly-available facts. For example, the show's star interviewee, John Goglia, is not an un-biased commentator; he is a paid expert working for a former Allegiant pilot who has sued Allegiant. That pilot, Jason Kinzer, claims that he was wrongfully terminated after an evacuation. In fact, Kinzer was terminated because he unnecessarily evacuated a plane "at great risk to the crew and passengers" even though there "***was no smoke, fire, or an aircraft malfunction,***" and, during a post-flight investigation, he refused to "acknowledge his mistakes" or "demonstrate[] that he was capable of learning and growing from the event going forward." (See Defendants' Revised Motion for Summary Judgment, Eighth Judicial District Court,

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

Clark County, NV, Case No. A-15-727524-C.)  Surprisingly, the 60 Minutes presentation of Mr. Kinzer's case omits this publicly-available side of the story.

The FAA exercises rigorous oversight of Allegiant, as they do all airlines operating in the United States.  Allegiant complies with all FAA requirements and participates in numerous voluntary safety programs to ensure we operate to the highest standards.  Additionally, we expect our team members to follow all company policies and practice strict adherence to FAA regulations and guidelines.  Several anonymous, non-disciplinary reporting systems are available through Allegiant as well as through the FAA for team members to report safety concerns.  Notably, none of the concerns allegedly expressed by Allegiant team members during the 60 Minutes episode were found to have been reported through any of these appropriate channels.

Allegiant's team members safely operate thousands of flights each week, which will transport more than 14 million passengers this year.  We have safely carried nearly 90 million passengers since beginning operations in 2001.  Our workforce is made up of more than 4,000 dedicated and hard-working people who wake up every day thinking about how to move our customers safely from one place to another.

Captain Eric Gust is Allegiant's vice president of operations, responsible for the airline's flight operations, safety and security teams. In this role he oversees all system pilots and pilot training operations, regulatory compliance and flight standards, and the safety and security of all operations, team members and passengers.

(Emphasis added).

106.   Several of the claims in Gust's response to the *60 Minutes* report are false.  For example, the Air Traffic Control Transcript of the Captain Kinzer incident recounted multiple people viewing or detecting fire and smoke in the cabin, which was caused by an aircraft malfunction.  Further, defendant Gust's response did not have the desired effect of lessening the harm to the Company's reputation.  Numerous viewers of the *60 Minutes* segment thanked the producers for alerting them to the danger of flying on Allegiant.  Some examples of these responses included, but were not limited to:

• @Allegiant Thank God for 60 Minutes, was about to book passage to FtLaudale this summer on your airline but no more, ever, ever-

   o Karpus & Trotsky (@LavishPolack) – April 15, 2018

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

- It really stinks that those of us in rural markets with few travel options can now never fly Allegiant ever again. But thank God that #60minutes is literally saving our lives.

    o   Rebecca F. Miller (@FlatheadMama) – April 15, 2018

- Welp, won't be flying #Allegiant air. Thanks for the heads up #60minutes

    o   CheekyChopsNJ TM     (@BitCheekyNJ) – April 15, 2018

- "Please start breathing through your shirts." Welp, not flying @allegiant anymore. #60Minutes

    o   Chris Clonts (@CClonts) – April 16, 2018

107.   On April 16, 2018, U.S. Senator Bill Nelson from Florida called for an investigation into how the FAA handles Allegiant's safety issues. Senator Nelson was the top Democrat on the Senate Committee on Commerce, Science and Transportation.

108.   The fallout from the *60 Minutes* report also caused the Department of Transportation's inspector general, in May 2018, to ramp up an investigation of Allegiant and American Airlines that commenced in June 2017. The review initially focused on the FAA's oversight of American' and Allegiant's maintenance, but Department of Transportation officials stated that initial reviews and requests from Congress members have prompted them to "adjust the scope of this audit." The inspector general will expand the audit and review the FAA's independent reviews and the complaints it receives from its hotline.

109.   Allegiant's old fleet of planes has continued to cause problems for the Company. On June 14 and 15, 2018, Allegiant cancelled twelve flights to and from St. Pete-Clearwater International Airport due to a delay in receiving new aircraft. The cancellations continued over several days, and Allegiant came under fire for repaying customers with vouchers worth far less than they originally paid for their flights. For example, one customer paid $435 for his ticket and only received a $225 voucher.

110.   Then, on July 5, 2018, a flight departing Cedar Rapids, Iowa was forced to make an emergency landing due to smoke in the cabin. A passenger said, "The plane started taking off and

my wife started smelling an electrical smoke.  We looked around as we were taking off and started seeing haze from smoke."

### C.  Defendants Obtain Shareholder Approval For An Incentive Compensation Plan While Concealing Allegiant's Safety Problems

111.  On May 12, 2016, defendants Gallagher, Brewer, Ellmer, Marvin, Pollard, and Redmond issued a definitive proxy statement soliciting shareholder votes in advance of the Company's annual meeting to be held June 30, 2016.  In the proxy statement, these Individual Defendants solicited shareholder votes in favor of management proposals including the approval of the Company's 2016 Long-Term Incentive Plan ("2016 LTIP").

### D.  Certain Defendants Illegally Sell Allegiant Stock to Reap the Benefit of Material Non-Public Information

112.  With the knowledge that Allegiant's stock price was artificially inflated and that they caused Allegiant to fail to maintain proper safety and maintenance procedures, Gallagher, Anderson, Sheldon, Redmond, and Ellmer (collectively, the "Insider Selling Defendants"), in contravention of their fiduciary duties and for their own benefit, illegally sold more than $50.85 million worth of their personally-held Allegiant stock when they were in possession of material non-public information.  Over $2.3 million worth of the sales occurred after the Individual Defendants learned about the subject matter of the *60 Minutes* segment and that it was set to air in the near future.

113.  Defendant Gallagher was aware of material, adverse, and non-public information regarding Allegiant's safety deficiencies and the Company's statements related thereto.  While in possession of this information, Gallagher sold 504,845 shares of Allegiant stock between June 2014 and May 2018, at artificially-inflated prices, for proceeds of approximately $83,073,245.  Gallagher sold 12,465 shares for proceeds of over $2 million one month before the *60 Minutes* segment aired.

114.  Defendant Anderson is Allegiant's Principal Accounting Officer and Senior Vice President of Treasury.  Anderson was aware of material, adverse, and non-public information

regarding Allegiant's safety deficiencies and the Company's statements related thereto.  While in possession of this information, Anderson sold 3,150 shares of Allegiant stock between May 23, 2017, and March 13, 2018, at artificially-inflated prices, for proceeds of approximately $507,238.77.  Anderson sold 1,650 shares for proceeds of almost $300,000 approximately one month before the *60 Minutes* segment aired.

115.    Defendant Ellmer is a member of the Allegiant Board and Audit, Ethics, Nominating, and Compensation Committees.  Ellmer was aware of material, adverse, and non-public information regarding Allegiant's safety deficiencies and the Company's statements related thereto.  While in possession of this information, Ellmer sold 3,420 shares of Allegiant stock between June 2014, and May 2018, at artificially-inflated prices for proceeds of approximately $569,257.  Ellmer sold 120 shares for proceeds of over $21,000 approximately one month before the *60 Minutes* segment aired.

116.    Defendant Redmond is Allegiant's President and a member of the Board.  Redmond was aware of material, adverse, and non-public information regarding Allegiant's safety deficiencies and the Company's statements related thereto.   While in possession of this information, Redmond sold 7,500 shares of Allegiant stock between August 3, 2015, and August 12, 2015, at artificially-inflated prices for proceeds of approximately $1,679,895.00.

117.    Defendant Sheldon is Allegiant's CFO and COO.  Sheldon was aware of material, adverse, and non-public information regarding Allegiant's safety deficiencies and the Company's statements related thereto.  While in possession of this information, Sheldon sold 20,188 shares of Allegiant stock between August 3, 2015, and October 27, 2017, at artificially-inflated prices for proceeds of approximately $3,349,480.

118.    The insider sales total over $91.5 million in proceeds and were executed while Allegiant's stock price was artificially inflated due to the unlawful conduct alleged herein.

**E.     The Individual Defendants Breached Their Fiduciary Duties**

119.    The Company's improper safety and maintenance functions and dissemination of false and misleading statements related thereto were the direct result of the Individual Defendants'

breaches of fiduciary duties.  Specifically, as discussed herein, the Individual Defendants' false and misleading statements artificially inflated Allegiant's stock price by misrepresenting and concealing the truth that:  (a) Allegiant lacked adequate systems to ensure its aircraft were being properly maintained; and (b) Allegiant was not operating responsibly and ethically or providing safe working conditions for its employees.

120.    The Individual Defendants knew for years about the Company's improper safety and maintenance procedures, yet failed to correct them.  As such, the Individual Defendants knew of the reporting problems but did nothing to rectify or prevent them.

121.    First, the Individual Defendants breached their fiduciary duties by knowingly employing improper reporting practices at the Company in violation of applicable regulations and rules, and then knowingly disseminated false and misleading filings resulting therefrom.  Indeed, the Individual Defendants' false and misleading statements, as alleged above, have subjected Allegiant to the Securities Class Action.

122.    Second, the above misrepresentations had the effect of artificially inflating Allegiant's stock price, which the Insider Selling Defendants were aware of.  In contravention of their fiduciary duties and for their own benefit, the Insider Selling Defendants unloaded more than $6.4 million worth of their personally held Allegiant stock at artificially-inflated prices.

123.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with the Securities Class Action, the Captain Kinzer wrongful termination action, the Kuhn personal injury suit, lost ticket sales, and increased regulatory scrutiny.

**F.    Systematic Issues Continue To This Day**

124.    Plaintiffs obtained documents from the FAA pursuant to a FOIA request.   Those documents demonstrate that pervasive safety and maintenance problems persist to this day and present significant risks to the Company's operations.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

125.    Similarly, media reports confirm that Allegiant aircraft continue to suffer from emergency landings and incidents due to maintenance problems.   The website AeroInside publishes a long list of airline incidents for Allegiant.[1]   There are numerous other press reports of emergency landings for Allegiant aircraft.   For example, in June 2019, federal safety regulators proposed a fine of more than $715,000 against Allegiant, saying that the airline failed to fix properly an engine that put out hotter than normal exhaust fumes.[2]   In the same month, another Allegiant flight made an emergency landing in Las Vegas due to smoke in the cockpit and plane cabin.[3]   In July 2019, Fox Carolina reported that an Allegiant flight made an emergency landing at Asheville Regional Airport in North Carolina shortly after takeoff when an indicator light came on in the cockpit.[4]   In January 2020, and Allegiant Air flight from Ohio to Florida with 151 passengers and six crew made an emergency landing at Asheville Regional Airport, North Carolina, after an indicator light came on in the cockpit.[5]

126.    Plaintiffs sought records concerning FAA actions and/or investigations of Allegiant between March 2015 and November 2019 (i.e., the date of the request) and received over 600 records from just one of three offices handling the request.

127.    Specifically, the FAA recorded 125 unplanned landings in that period, including 52 emergency landings due to maintenance problems. For example:

(a)      On April 2, 2015, the pilot returned Allegiant flight AAY962 to St. Pete—Clearwater International Airport ("PIE") due to an unspecified light indication in the cockpit.

---

[1] https://www.aeroinside.com/incidents/airline/allegiant.
[2] Associated Press, "FAA Proposes $715,000 Fine for Allegiant Over Engine Work," The Morning Call, June 17, 2019, found at https://www.mcall.com/business/mc-biz-faa-allegiant-fine-20190616-oiv3rva4ereq7d2edof73beszy-story.html
[3] Almendra Carpizo, "Allegiant Air Flight Makes Emergency Landing Due to Smoke in the Cockpit," Vision Safe, June 9, 2019, found at https://www.visionsafe.com/2019/06/09/allegiant-air-flight-makes-emergency-landing-due-to-smoke-in-the-cockpit/.
[4] Dal Kalsi, "Official:  Allegiant Flight Makes Safe Emergency Landing at Ashville Regional Airport," July 1, 2019, Fox Carolina, found at https://www.foxcarolina.com/news/official-allegiant-flight-makes-safe-emergency-landing-at-asheville-regional/article_1ff80a82-9c1f-11e9-989c-1721759ab248.html.
[5] Associated Press, "Report: Allegiant Flight in Emergency Landing, No Injuries," U.S. News and World Report, January 2, 2020, found at https://www.usnews.com/news/us/articles/2020-01-02/report-allegiant-flight-in-emergency-landing-no-injuries.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

Maintenance later found the left thermostat base gasket leaking and a broken right pack distribution duct.

(b)      On July 3, 2015, the crew smelled burning rubber when Allegiant flight departing PIE was 33,000 feet above sea level.  They also heard a grinding noise coming from the center pedestal close to the throttle quadrant.  After the crew turned off the auto throttles, the burning smell dissipated, but a vibration started.  The crew shut off the engine and declared an emergency landing.  When maintenance later performed an inspection, they found the first stage compressor to be severely damaged and replaced the engine.

(c)      On August 3, 2015, a breakdown of engine #1 caused Allegiant flight MY848, en route to Richmond International Airport, to divert to Piedmont Triad International Airport.  While the flight was cruising at 33,000 feet, the auto throttle quadrant started making a grinding sound and there was a faint smell of rubber.  When descending, the #1 engine began to roll back and produced thrust.  The crew started an inflight shutdown and declared an emergency when they felt a vibration.  An on-scene investigation showed that the engine had ingested a solid object damaging the intake fans and surrounding intake ducting.

(d)      On February 1, 2017, Allegiant flight AAY172 declared an emergency because of a nose gear indication, and the flight crew made a low approach for a tower visual.  The controller advised that the gear appeared down.  Though the pilot was able to return the aircraft to Gerald R. Ford International Airport, the flight crew was unable to steer with either tiller.  When maintenance later troubleshot the system, they found water in a steering servo connector.

(e)      On July 3, 2017, an engine failed during ascent from Springfield-Branson National Airport.  The crew declared an emergency and returned to the airport, and the left engine was later replaced.

(f)      On July 26, 2017, Allegiant flight No. AA532, headed to Cincinnati from Las Vegas, was diverted for maintenance and returned to Las Vegas.  Maintenance records show that during takeoff, a loud noise and accompanying vibrations were felt throughout the cabin and were centered on the right hand wing root area.  An inspection showed that the support between

the zero and one left hand slats was worn and broken and that the securing nut for the pin and bearing pin assembly were very loose and almost missing.

(g)     On July 18, 2018, an Allegiant aircraft made an emergency landing due to loss of engine power in the right engine.  Maintenance found metal in the master chip detector, main oil filter, and fuel filter and replaced the engine due to a gearbox failure.

(h)     An Allegiant aircraft's engine controls had been failing since August 21, 2019 but minimum equipment listed and reinstalled repeatedly with different numbers.  The minimum equipment list ("MEL") is an aircraft-specific document which describes the equipment that may be allowed to be inoperable and any procedures required for the aircraft to operate under specific conditions while maintaining airworthiness.  On August 28, 2019, the aircraft engine experienced an inflight shutdown.  On September 2, 2019, the aircraft engine failed during thrust reduction and an attempted restart failed; the crew declared an emergency landing.  Inspectors later found the left engine hydromechanical unit was leaking fuel in the wiring harness.

128.    In addition, the FAA recorded over 192 instances where an Allegiant flight aborted takeoff due to maintenance problems with the aircraft.  For example:

(a)     On or about April 8, 2015, an Allegiant aircraft leaving Orlando Sanford International Airport ("SFB") aborted takeoff because the right engine pressure ratio gauge was stuck, indicating that the engine was not making power and the spool up time or acceleration time was slow on the right engine.  Maintenance personnel performed performance runs and reset the engine control unit before the aircraft was returned to service.

(b)     Around May 2015, an Allegiant aircraft departing IND aborted takeoff at 79 knots because the electronic centralised aircraft monitor ("ECAM") cautioned "Door L Aft Cabin." Maintenance found a broken proximity switch on the left aft passenger/crew door.

(c)     In October 2015, an Allegiant aircraft leaving McCarran International Airport ("LAS") in Las Vegas aborted takeoff because "engine turbine wheel 4th stage completely exited through the aft end of the engine assembly, with signs of post shutdown fire in the combustion section."   The 2nd and 3rd stage turbines also sustained significant damage.

1    Passengers deplaned through the aft exit stairwell, and components of the turbine wheels were

2    found over an 800-foot area on the runway.

3                    (d)    On March 5, 2016, Allegiant flight No. 891 departing Fort Wayne aborted

4    takeoff because the #2 engine failed when the aircraft reached 110 knots.  When the FAA arrived

5    at the airport, the engine change crew was changing the #2 engine.  The tach generator housing and

6    nose cone had broken off at all the mounting bolt locations and remained in the engine inlet.

7                    (e)    Around March 2017, flight crew aboard an Allegiant flight departing PIE

8    felt an abrupt jolt and yaw to the left during takeoff roll at approximately 90 knots, and the pilots

9    aborted the takeoff.  The crew taxied to the gate with the #1 engine shut down, and maintenance

10   reported a #1 engine failure, contained within cowling and liners.  Metal debris exited the exhaust

11   section, and several pieces of blades and vanes were recovered.  Further inspection showed that the

12   T-3 blade had failed, resulting in downstream failures in the turbine.

13                   (f)    On March 29, 2017, the flight instrument panel went dark on Allegiant

14   flight No. 652 departing SFB, and pilots were unable to change course, altitude, or navigation

15   frequency.

16                   (g)    On July 20, 2017, the flight crew aboard Allegiant flight No. AA533 pulled

17   the Fire-T handle when the right engine seized during takeoff.  Maintenance found that an

18   approximately 5" x 12" piece of the engine inlet acoustic material had delaminated and was

19   ingested by the engine.

20                   (h)    On August 13, 2017, the left engine compressor stalled, causing Allegiant

21   flight 1218Z leaving SFB to abort takeoff.  A later inspection revealed fan blades with damaged

22   seals and a damaged case rub strip.

23                   (i)    On May 18, 2018, pilots heard the left pneumatic air cycle kit ("pack") fail

24   aboard Allegiant flight No. AAY742 leaving SFB.  Maintenance crew found a loose sense line and

25   replaced two pressure switches and both primary and second heat exchangers on the left pack.

26   Though the aircraft was returned to service, the same problem occurred the next day and the NC

27   pressure regulator was replaced.

28

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

(j)     In June 2018, crew outside Allegiant flight No. AAY624 noticed black smoke coming from the auxiliary power unit ("APU") exhaust.  When the panel was pulled back, they saw flames and informed the captain.  Passengers were deplaned through the jetbridge, and maintenance later reported that the fire started from the bottom of the hot section area.

(k)     On September 14, 2018, Allegiant flight No. AAY1798 departing Jefferson County, Kentucky, aborted takeoff due to a hydraulic failure and loss of nose steering, and the aircraft was towed back to the gate.  When the aircraft was inspected, the maintenance provider reported a severe hydraulic leak in the left hand gear well and found a failed flexible hydraulic line.

(l)     On October 20, 2018, passengers reported that they smelled smoke while Allegiant flight No. AAY2132 was on the runway departing SFB.  Maintenance found that the APU had a significant oil leak and replaced the APU, the left and right water separator coalescer bags, and the right PRSOV.

(m)     On November 21, 2018, Allegiant flight No. AAY2228 departing SFB aborted takeoff due to poor wheel rotation and taxied back to the gate.  Inspectors later found that the hub cap pins for one of the wheels were not secured.

(n)     In September 2019, a brake failure caused an Allegiant aircraft to abort takeoff in Las Vegas.  The plane was returned to service after the brake system was reset to normal operating condition, but the same problem occurred on September 9, 10, 12, 13, and 14.

129.    The records also show 141 instances of maintenance problems. Among other issues, the records reflect the following FAA violations:

(a)     On February 15, 2018, a ramp inspection of an Allegiant aircraft revealed several discrepancies: (i) Right wing emergency exit door placards partially missing and or not legible, contrary to federal regulations; and (ii) #1 Right Hand service door was partially missing the emergency exit door placard, contrary to federal regulations.  On March 21, 2018 an email was sent from the Allegiant Certificate Management Unit (CMU) to their Director of Quality concerning the issues mentioned above.  On April 16, 2018 Allegiant responded that it had

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

conducted an investigation into the matter to determine the root cause of the findings and develop comprehensive fixes.  Upon receipt and review of Allegiant's Regulatory Compliance Reports, the Certificate Management Team ("CMT") rejected the "comprehensive fix" as inadequate to address the concerns raised by the FAA.  Allegiant met with CMT and revised its compliance report to mitigate human factors.

(b)     On April 13, 2018, an Allegiant aircraft exceeded left engine exhaust gas temperature, and when the flight landed at SFB, maintenance entered the following discrepancy on the Allegiant Maintenance Log: "Left engine exceeded take off parameters."  The quality control inspector subsequently took corrective action and cleared the situation in the maintenance log, placing his quality inspection stamp on the document.  During the course of an investigation, it was determined that between April 14, 2018 through April 23, 2018 Allegiant dispatched and operated the aircraft in scheduled revenue commercial air transportation for 28 flights with an un-approved/un-authorized maintenance deferral and in an un-airworthy condition.  On June 11, 2018, the Pacific Certificate Management Office sent a letter stating that "The ART deferral is to be utilized when the ART system is inoperative only and is an inappropriate corrective action for an EGT exceedance."  The FAA found federal regulations violations and initiated civil penalties.

(c)     On October 10, 2018, the FAA recorded that Allegiant mechanics were "pencil whipping" their assigned inspections and work; that is, they completed records without actually performing the maintenance. Though mechanics were assigned a 4A 1 check maintenance, an investigation showed that the lubrication procedures for their assigned task card either were not done properly or not done at all. The mechanics improperly filled out and signed off on their task card and improperly signed off on the aircraft logbook without completing the maintenance task.

## DERIVATIVE AND DEMAND ALLEGATIONS

130.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

132.   Plaintiffs are owners of Allegiant common stock and were owners of Allegiant common stock at all times relevant hereto.  As a result of the facts set forth herein, Plaintiffs have not made any demand on the Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

133.   At the time this action was commenced, Allegiant's Board consisted of six directors:   Gallagher, Redmond, Pollard, Marvin, Ellmer, and Brewer.   These directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute the action for the following reasons:

A.   Demand is futile as to all Director Defendants because as directors of the Company they directly participated in and approved of the Company's lax safety and maintenance procedures, as well as the filing of and dissemination of false and misleading information as alleged herein, and therefore are substantially likely to be held liable for the misconduct complained of herein;

B.   Demand is futile as to all Director Defendants because they face a substantial likelihood of liability for breaching their fiduciary duties for knowingly and deliberately approving the Company's dangerous cost-cutting safety measures despite their multiple decades' worth of knowledge of air travel and the airline industry (as described above).   Even after Allegiant was sued in the Securities Class Action and the Company purchased new aircraft, the Director Defendants still evade maintenance procedures to this day, thereby endangering Allegiant's passengers.   The Director Defendants put profits ahead of the safety of the Company's passengers and crew and in turn endorsed illegal actions;

C.   Demand is futile as to all Director Defendants because they face a substantial likelihood of liability for violating  Section 14 of the Securities Exchange Act of 1934 by misrepresenting their activities in connection with risk and safety management in order to obtain shareholder approval of the 2016 LTIP which each of them was personally enriched by.  In addition to facing a substantial likelihood of liability for their violations of Section 14, each of the Director Defendants would be interested in a demand regarding the violations because they each received compensation under the 2016 LTIP as a direct result of the shareholder vote approving it.

D.   Demand is futile as to Gallagher because he faces a substantial likelihood of liability as he is named as a defendant in the Securities Class Action, and

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

any investigation of this misconduct could potentially increase his liability in that case, and therefore Gallagher is conflicted from investigating the Company's misconduct and cannot independently consider a demand;

E.   Demand is futile as to Marvin, Ellmer, and Pollard (as well as Redmond as a former member) because as Audit Committee members their purpose, pursuant to the Audit Committee Charter, was to assist the Board in fulfilling its oversight responsibilities with respect to financial reports and other financial information.  In this regard, the Audit Committee was to serve on the independent and objective body to oversee, *inter alia*:  (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditors' qualifications and independence, (iv) the performance of the Company's internal audit function and independent auditors; and (v) the Company's overall risk management profile.  Marvin, Ellmer, Pollard, and Redmond as Audit Committee members and pursuant to the Audit Committee Charter, had the responsibilities to, *inter alia*:

•   Oversee the quality and objectivity of the Company's financial statements and the independent audit thereof by, among other things, reviewing and appraising the audit efforts of the Company's independent auditors;

•   Oversee that management has maintained the reliability and integrity of the Company's accounting policies and financial reporting and disclosure practices;

•   Oversee that management has established and maintained adequate systems of disclosure controls and procedures and internal controls over financial reporting;

•   Oversee that management has established and maintained processes to assure compliance by the Company with all applicable laws, regulations and corporate policy;

In performing their duties as Audit Committee members, Marvin, Ellmer, Pollard, and Redmond knew that the Company's financial statements were inaccurate and misleading, yet they knowingly approved the filing and dissemination of the financial statements, and therefore face a substantial likelihood of being held liable for breaching their fiduciary duties;

F.   Demand is futile as to Gallagher, Redmond, and Ellmer because they face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith for engaging in illegal insider trading of Allegiant securities as described herein, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action; and

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

G.   Demand is futile as to Marvin because she has a long-standing and lucrative business relationship with Defendant Gallagher that has existed since 1988. Defendant Marvin began her career working in aviation alongside Defendant Gallagher at WestAir as a Controller until 1994. Defendant Gallagher was at all times the principal owner, an executive officer, and a director of WestAir, from 1983 to 1992. When defendant Gallagher moved on to found Mpower Communications Corp. in 1996, he brought Defendant Marvin onboard to serve in various high-level positions at his communications company, culminating in her serving as CFO from 1998 to 1999, as well as a Senior Vice President of Finance from 1999 to 2001. Defendant Gallagher went on to form Allegiant, and once again, Defendant Marvin followed him to the Company, serving as Allegiant's CFO and Principal Accounting Officer from September 2001 to September 2007 and a part-time consultant from September 2007 to May 2008, before taking on her current position as a director. As noted in the CtW letter, Defendants Gallagher and Marvin have a uniquely interdependent business relationship, even living within one mile from each other for over a decade. Defendant Marvin will remain loyal to Defendant Gallagher as a result of the lucrative positions she received and to avoid losing future lucrative opportunities.

H.   Demand is futile as to Redmond because he has an interwoven business relationship with Defendant Gallagher that prevents him from independently considering a demand against him. Defendant Redmond is part of a partnership with Gallagher that owned the property that Allegiant leased as its headquarters in Las Vegas. Redmond owns 11% of the partnership and Gallagher owns 30%. Although the Company terminated the lease in May 2015, it paid $1.3 million to settle litigation against the owners. During the term of the lease, defendants Gallagher and Redmond received substantial benefits from their joint ownership in the property leased by Allegiant.

I.   Demand is futile as to Ellmer because of his preexisting professional relationship with Defendant Gallagher that prevents him from independently considering a demand against him. From 1988 to 1994, Ellmer served as Vice President of Maintenance and Engineering at Gallagher's WestAir.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

134.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

135.   The Individual Defendants each owed Allegiant and its stockholders the fiduciary duties of loyalty, good faith, candor, and due care in the managing and administering of the Company's affairs.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

136.    The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of Allegiant.

137.    The Individual Defendants breached their fiduciary duties owed to Allegiant and is stockholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties as set forth above.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.   They also failed properly to oversee Allegiant's business, rendering them personally liable to the Company.

138.    Each of the Individual Defendants had actual or constructive knowledge that Allegiant was engaging in a scheme to keep safety and maintenance costs low – sacrificing the safety of its customers and crew – in order to achieve high profits.  The Individual Defendants continued to allow the scheme to occur and the weak policies to remain, thereby harming the Company and its customers and crew.

139.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties of loyalty, good faith, candor, and due care, Allegiant has sustained, and continues to sustain, significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company

## COUNT II

### Against the Insider Selling Defendants for Breach of
### Fiduciary Duties of Loyalty and Good Faith Regarding Insider Stock Sales

140.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

141.    At the time of the stock sales set forth herein, Gallagher, Anderson, Sheldon, Redmond, and Ellmer knew, but did not disclose publicly, that the Company had improper safety and airplane maintenance practices, that the Company's stock price was inflated, and that the Company was being scrutinized by the FAA and several investigatory news organizations. Gallagher, Anderson, Sheldon, Redmond, and Ellmer made the stock sales described herein on the basis of their knowledge of the material non-public information described herein.

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

142.   Gallagher, Anderson, Sheldon, Redmond, and Ellmer's sales of Allegiant common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

143.   Since the use of the Company's inside information for their own gain constitutes a breach of Gallagher, Anderson, Sheldon, and Ellmer's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds Gallagher, Anderson, Sheldon, Redmond, and Ellmer obtained thereby.

## COUNT III

**Against the Insider Selling Defendants for Unjust Enrichment Regarding Insider Stock Sales**

144.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

145.   Gallagher, Anderson, Sheldon, Redmond, and Ellmer were unjustly enriched by the proceeds of their illegal sales of Allegiant common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

146.   To remedy Gallagher, Anderson, Sheldon, Redmond, and Ellmer's unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their illegal sales of Allegiant common stock.

## COUNT IV

**Against the Director Defendants for**
**Violations of Section 14 of the Securities Exchange Act of 1934**

147.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

148.   Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. §240.14a-9.   Specifically, the Company's proxy

statement filed May 12, 2016 violated §14(a) and Rule 14a-9 because it misrepresented the Board's actual activities with respect to risk management and safety while soliciting votes to approve a compensation plan that would result in payments from the Company to those same individuals.

149. The Individual Defendants knew, or in the exercise of reasonable care, should have known that the statements contained in the proxy statement were materially false and misleading.

150. The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The proxy statement solicited shareholder votes for approval of the 2016 LTIP, and the 2016 LTIP was approved on the basis of the representations in the proxy statement. The proxy statement was an essential link in the Individual Defendants' ability to receive incentive compensation under the 2016 LTIP.

151. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the proxy statement by the millions of dollars in incentive compensation it has paid to defendants under the 2016 LTIP.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B. Imposing a constructive trust in favor of the Company for the proceeds the Insider Selling Defendants each received from their sales of Allegiant common stock, as alleged herein;

C. Ordering the Insider Selling Defendants to disgorge to the Company all proceeds derived from their sales of Allegiant common stock alleged herein;

D. Directing Allegiant to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from reoccurrence of the damaging conduct described herein;

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

E.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

F.      Awarding to Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

DATED:  March 24, 2020                          Respectfully submitted,


                                                __/s/ Martin A. Muckleroy_____
                                                MARTIN A. MUCKLEROY, ESQ.
                                                Nevada Bar No. 009634
                                                **MUCKLEROY LUNT, LLC**
                                                6077 S. Fort Apache, Ste. 140
                                                Las Vegas, NV 89148
                                                Telephone: (702) 907-0097
                                                Facsimile: (702) 938-4065
                                                Email: martin@muckleroylunt.com

                                                *Liaison Counsel for Plaintiffs*

                                                **BRAGAR EAGEL & SQUIRE, P.C.**
                                                David J. Stone
                                                Melissa A. Fortunato
                                                885 Third Avenue, Suite 3040
                                                New York, NY  10022
                                                Telephone:  212-308-5858
                                                Facsimile:  212-486-0462
                                                Email: stone@bespc.com
                                                        fortunato@bespc.com

                                                **GLANCY PRONGAY & MURRAY LLP**
                                                Matthew M. Houston
                                                Benjamin I. Sachs-Michaels
                                                712 Fifth Avenue
                                                New York, New York 10019
                                                Telephone: (212) 935-7400

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

E-mail: mhouston@glancylaw.com
             bsachsmichaels@glancylaw.com

and


**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 210-9160
E-mail: rprongay@glancylaw.com

*Co-Lead Counsel for Plaintiffs*

AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Mark Fullenkamp, hereby verify that I have authorized the filing of the attached

Amended Consolidated Derivative Complaint, that I have reviewed the Amended Consolidated

Derivative Complaint and that the facts therein are true and correct to the best of my knowledge,

information and belief. I declare under penalty of perjury that the foregoing is true

and correct.

March 6, 2020

*Mark A Fullenkamp*
Mark A Fullenkamp (Mar 6, 2020)

Mark Fullenkamp