# EXHIBIT "2"

# Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment

# EXHIBIT "2"

**Electronically Filed**
**11/27/2018 1:52 PM**
**Steven D. Grierson**
**CLERK OF THE COURT**

1    COMP

2    ALDRICH LAW FIRM, LTD.
     JOHN P. ALDRICH (SBN #6877)
3    7866 West Sahara Avenue
     Las Vegas, NV 89117
4    Telephone: (702) 853-5490
     Facsimile: (702) 227-1975
5    E-mail: jaldrich@johnaldrichlawfirm.com

6    ROBBINS ARROYO LLP
     BRIAN J. ROBBINS
7    STEPHEN J. ODDO
     600 B Street, Suite 1900
8    San Diego, CA  92101
     Telephone: (619) 525-3990
9    Facsimile: (619) 525-3991
     E-mail: brobbins@robbinsarroyo.com
10          soddo@robbinsarroyo.com

11   Attorneys for Plaintiff

12          IN THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
                          IN AND FOR CLARK COUNTY
13

14   CHARLOTTE WOOLERY, Derivatively on          Case No.  A-18-785044-C
     Behalf of ALLEGIANT TRAVEL COMPANY,
15                                                Dept. No.      Department 18
                    Plaintiff,
16                                                VERIFIED STOCKHOLDER
            v.                                    DERIVATIVE COMPLAINT FOR
17                                                BREACH OF FIDUCIARY DUTY,
     MAURICE J. GALLAGHER, JR., JOHN              WASTE OF CORPORATE ASSETS, AND
18   REDMOND, SCOTT SHELDON, GARY                 UNJUST ENRICHMENT
     ELLMER, MONTIE BREWER, LINDA A.
19   MARVIN, and CHARLES W. POLLARD,

20                  Defendants,

21          -and-

22   ALLEGIANT TRAVEL COMPANY, a Nevada
     corporation,
23
                    Nominal Defendant.
24                                                DEMAND FOR JURY TRIAL

25

26

27

28

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

### <u>NATURE AND SUMMARY OF THE ACTION</u>

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Allegiant Travel Company ("Allegiant" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Allegiant's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Allegiant to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Founded in 1997, Allegiant is a leisure travel company providing low-fare air travel to underserved cities in the United States.  The Company in its current form emerged from bankruptcy in 2002 through the influx of capital from creditors, which included the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") defendant Maurice J. Gallagher, Jr. ("Gallagher").  Defendant Gallagher continues to exert tremendous influence and control over the operations of Allegiant's airline and the decisions of the Board as the Company's largest individual stockholder.

3.      Prior to taking the reins at Allegiant, defendant Gallagher had founded several low-cost, small fleet airlines, including ValuJet Airlines, Inc. ("ValuJet").  Swapping safety and maintenance for greater profit margins, ValuJet garnered a disreputable reputation for lax safety protocols and maintenance operations with both its customers and the Federal Aviation Administration (the "FAA"), which regulates all aspects of civil aviation in the U.S.  This record culminated in tragedy.  In 1996, ValuJet Flight 592 crashed into the Everglades in Florida.  All 110 passengers and crew perished.  With ValuJet's reputation permanently devastated, the FAA

1    grounded the airline that same year.

2      4. Since defendant Gallagher gained control of Allegiant, the Company has adopted

3    a similar business model to ValuJet that devalued safety, maintenance, and training to increase

4    the Company's bottom line.  To keep fare costs low but profit margins high, the Company

5    farmed its maintenance operations to contractors and subcontractors with little to no oversight.

6    The Company purchased aging aircraft, some of them manufactured decades ago, with an

7    average fleet age nearly double its competitors.  Further, the Company's airplane maintenance

8    staff are chronically understaffed and undertrained in proper safety protocols.

9      5. As a result of the Company's illicit and dangerous business model, which the

10   Individual Defendants (as defined herein) directed or allowed, Allegiant has suffered from

11   systemic and repeated safety and maintenance issues that have endangered the Company's

12   customers and employees.  Since at least 2014, Allegiant's flights have experienced recurrent

13   mid-air engine failures, smoke and fumes in the passenger cabins, rapid descents, flight control

14   malfunctions, hydraulic leaks, and aborted takeoffs, jeopardizing the lives of those on board.

15     6. The perilous events plaguing Allegiant drew the attention of the *Tampa Bay*

16   *Times* (the "*Times*"), located near the Company's hub at St. Pete-Clearwater International

17   Airport.  Starting in June 2015, the *Times* published a comprehensive series of articles describing

18   harrowing mid-air mechanical malfunctions that prompted emergency landings and toxic

19   smoked-filled passenger cabins, among other events.  The *Times'* award-winning investigative

20   reporting culminated in a November 2016 report titled "Breakdown at 30,000 Feet," which

21   revealed what Company fiduciaries had long concealed: Allegiant is "four times as likely to

22   make unexpected landings after midair mechanical problems than other U.S. airlines," including

23   American Airlines, Delta Airlines, and JetBlue Airways.  A subsequent *Times* editorial indicated

24   that the Company had put short-term profits over passenger safety by pushing rapid growth and

25   minimizing expenses.  In an effort to downplay this negative publicity, defendants responded to

26   the newspaper that same month, stating that the *Times*' findings were "unsubstantiated" and

27   "incendiary."

28

7.     In January 2016, an investment group representing major union pension funds invested in Allegiant sent a letter of concern directly to the Board.  The investment group's letter to the Board detailed Allegiant's rampant safety issues and the Audit Committee's lack of independence despite its oversight role over the Company's regulatory compliance and disclosure controls.  The letter urged the Board to increase its oversight of "management's internal control processes and other activities regarding operational safety and compliance with applicable laws and regulations, rather than subsume the responsibility" to the Company's conflicted Audit Committee headed by defendant Gallagher's long-time and loyal associate, defendant Linda A. Marvin ("Marvin").

8.     The Individual Defendants failed to heed any of these warning signs.  Instead, in the Company's Annual Reports on Forms 10-K filed with the SEC, the Individual Defendants assured the public that Allegiant practiced the utmost care in its maintenance and training practices to assure the safety of its airline.  Nothing was farther from the truth.

9.     By 2017, CBS News had caught wind of the rampant illicit wrongdoing occurring at the highest levels of Allegiant.  The national news organization's prominent program, *60 Minutes*, conducted a seven month investigation on the continued safety and maintenance issues at the low-cost airline.  The investigation included various attempts to reach out to the Company for a response.  Despite this impending report, the Company continued to operate its airline with an unsafe fleet, further endangering passengers and crew.

10.     The *60 Minutes* report aired in April 2018, revealing an "alarming number of aborted takeoffs, cabin pressure loss, emergency descents and unscheduled landings" according to investigators.  Like the *Times*, *60 Minutes* determined that Allegiant had experienced mid-air mechanical failures at a rate well above any other airline in the U.S.  In the wake of the CBS News announcement and airing, Allegiant's stock plunged more than 14%, or $23.25 per share by April 17, 2018, to close at $142 per share compared to $165.25 per share on April 12, 2018, just before CBS announced its report.  The news erased more than $373.5 million in market capitalization in less than a week.

11.     Defendants, however, did not fare as poorly as the Company.  Certain Individual Defendants have unlawfully reaped over $50.3 million in illegal insider trading proceeds of Company stock.  In addition, during this time, the Individual Defendants collectively pocketed millions of dollars in executive and director compensation not justified by Allegiant's actual performance while under their stewardship.

12.     Further, as a direct result of this unlawful course of conduct, Allegiant is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the District of Nevada on behalf of investors who purchased Allegiant's shares.  The Company also settled lawsuits on behalf of injured passengers on Allegiant flights, as well as a wrongful termination lawsuit on behalf of an Allegiant pilot fired after following proper safety protocol.

13.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over plaintiff's claims for violations of applicable law and jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this County, or is an individual who has sufficient minimum contacts with this County to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court because a substantial amount of the transactions at issue in this case, including the defendants' primary participation in the wrongful acts and violation of fiduciary duties owed to Allegiant took place and/or had an effect in this County.

## THE PARTIES

**Plaintiff**

16.     Plaintiff Charlotte Woolery was a stockholder of Allegiant at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Allegiant stockholder.

**Nominal Defendant**

17.    Nominal defendant Allegiant is a Nevada corporation with principal executive offices located at 1201 North Town Center Drive, Las Vegas, Nevada.  Allegiant is a leisure travel company focused on providing travel services and products to residents of under-served cities in the United States. Allegiant is certified by the U.S. Department of Transportation as a "Scheduled Air Carrier" with authority to fly scheduled and charter airline operations throughout the U.S.  The Company also has authority for charter service to Canada and Mexico. As of December 31, 2017, the Company consisted of approximately 4,658 employees, whether employed on a full-time, part-time, or temporary basis.

**Defendants**

18.    Defendant Gallagher is Allegiant's CEO and has been since August 2003; Chairman of the Board and has been since September 2006; and a director and has been since June 2001.  Defendant Gallagher is also the majority owner of the Company and has been since June 2001.  Defendant Gallagher is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").   Defendant Gallagher knowingly, recklessly, or with gross negligence: (i) failed to implement a system of internal controls to ensure the safety of Allegiant's passengers and employees; (ii) improperly caused or allowed a business model that prioritized profit margins over public safety; and (iii) made improper and misleading representations in the Company's SEC filings concerning the safety, maintenance, and training programs at the Company.  While in possession of material, nonpublic information concerning Allegiant's true business health, defendant Gallagher sold 280,463 shares of his stock for $45,716,133.54 in proceeds.  Allegiant paid defendant Gallagher the following compensation as an executive:

| Year | Bonus | Stock Awards | All Other Compensation | Total |
|------|-------|--------------|------------------------|-------|
| 2017 | $1,500,000 | $800,064 | $20,549 | $2,320,613 |
| 2016 | $2,850,000 | $699,948 | $21,257 | $3,571,205 |
| 2015 | $2,926,633 | $600,071 | $23,782 | $3,550,486 |

19.     Defendant John Redmond ("Redmond") is Allegiant's President and has been since September 2016 and a director and has been since April 2014.  Defendant Redmond was also a director from October 2007 to June 2013.  Defendant Redmond was also a member of the Audit Committee and Compensation Committee from April 2014 to September 2016.  Defendant Redmond knowingly, recklessly, or with gross negligence: (i) failed to implement a system of internal controls to ensure the safety of Allegiant's passengers and employees; (ii) improperly caused or allowed a business model that prioritized profit margins over public safety; and (iii) made improper and misleading representations in the Company's SEC filings concerning the safety, maintenance, and training programs at the Company.  While in possession of material, nonpublic information concerning Allegiant's true business health, defendant Redmond sold 7,500 shares of his stock for $1,679,895 in proceeds.  Allegiant paid defendant Redmond the following compensation as an executive:

| Year | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|-------|--------------|---------------|------------------------|-------|
| 2017 | - | $1,749,973 | - | $107,152 | $1,857,125 |
| 2016 | $250,000 | $9,379,248 | $474,900 | $71,050 | $10,175,198 |

20.     Defendant Scott Sheldon ("Sheldon") is Allegiant's Executive Vice President and has been since January 2017; Chief Operating Officer ("COO") and has been since October 2017; and Chief Financial Officer ("CFO") and has been since May 2010.  Defendant Sheldon was Interim COO from May 2017 to October 2017; Senior Vice President from May 2010 to January 2017; Principal Accounting Officer from October 2007 to May 2010; Director of Accounting from May 2005 to October 2007; and Accounting Manager from January 2004 to May 2005.  Defendant Sheldon is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Sheldon knowingly, recklessly, or with gross negligence: (i) failed to implement a system of internal controls to ensure the safety of Allegiant's passengers and employees; (ii) improperly caused or allowed a business model that prioritized profit margins over public safety; and (iii) made improper and misleading representations in the Company's SEC filings concerning the

safety, maintenance, and training programs at the Company.   While in possession of material, nonpublic information concerning Allegiant's true business health, defendant Sheldon sold 14,446 shares of his stock for $2,433,301.54 in proceeds.  Allegiant paid defendant Sheldon the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2017 | $254,583 | $813,100 | $800,064 | $50,681 | $1,918,428 |
| 2016 | $195,000 | $719,818 | $2,101,948 | $36,491 | $3,053,257 |
| 2015 | $195,000 | $633,805 | $600,071 | $29,621 | $1,458,497 |

21.     Defendant Gary Ellmer ("Ellmer") is Allegiant's Lead Independent Director and has been since April 2018 and a director and has been since May 2008.  Defendant Ellmer was also Allegiant's Lead Independent Director from January 2015 to April 2016.  Defendant Ellmer is a member of the Audit Committee has been since May 2008 and a member of the Compensation Committee and has been since at least May 2017.  Defendant Ellmer knowingly or recklessly: (i) failed to implement a system of internal controls to ensure the safety of Allegiant's passengers and employees; (ii) improperly caused or allowed a business model that prioritized profit margins over public safety; and (iii) made improper and misleading representations in the Company's SEC filings concerning the safety, maintenance, and training programs at the Company.  While in possession of material, nonpublic information concerning Allegiant's true business health, defendant Ellmer sold 3,120 shares of his stock for $519,739.12 in proceeds.  Allegiant paid defendant Ellmer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2017 | $40,000 | $136,100 | $176,100 |
| 2016 | $40,000 | $151,500 | $191,500 |
| 2015 | $40,000 | $178,020 | $218,020 |

22.     Defendant Montie Brewer ("Brewer") is an Allegiant director and has been since October 2009.  Defendant Brewer was Allegiant's Lead Independent Director from April 2017 to April 2018.  Defendant Brewer is a member of the Compensation Committee and has been since January 2010.  Defendant Brewer knowingly or recklessly: (i) failed to implement a system of internal controls to ensure the safety of Allegiant's passengers and employees; (ii) improperly

caused or allowed a business model that prioritized profit margins over public safety; and (iii) made improper and misleading representations in the Company's SEC filings concerning the safety, maintenance, and training programs at the Company.  Allegiant paid defendant Brewer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $40,000 | $136,100 | $176,100 |
| 2016 | $40,000 | $151,500 | $191,500 |
| 2015 | $40,000 | $178,020 | $218,020 |

23.    Defendant Marvin is an Allegiant director and has been since January 2013. Defendant Marvin was also Allegiant's CFO from September 2001 to September 2007 and a part-time consultant from September 2007 to May 2008. Defendant Marvin is also Chairwoman of the Audit Committee and has been since at least April 2016 and has been a member since April 2013.  Defendant Marvin knowingly or recklessly: (i) failed to implement a system of internal controls to ensure the safety of Allegiant's passengers and employees; (ii) improperly caused or allowed a business model that prioritized profit margins over public safety; and (iii) made improper and misleading representations in the Company's SEC filings concerning the safety, maintenance, and training programs at the Company.  Allegiant paid defendant Marvin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $40,000 | $136,100 | $176,100 |
| 2016 | $40,000 | $151,500 | $191,500 |
| 2015 | $40,000 | $178,020 | $218,020 |

24.    Defendant Charles W. Pollard ("Pollard") is an Allegiant director and has been since June 2009.  Defendant Pollard was also Allegiant's Lead Independent Director from April 2016 to April 2017.  Defendant Pollard is also a member of the Audit Committee and has been since June 2009 and a member of the Compensation Committee and has been since at least April 2014.  Defendant Pollard knowingly or recklessly: (i) failed to implement a system of internal controls to ensure the safety of Allegiant's passengers and employees; (ii) improperly caused or allowed a business model that prioritized profit margins over public safety; and (iii) made improper and misleading representations in the Company's SEC filings concerning the safety,

maintenance, and training programs at the Company.   Allegiant paid defendant Pollard the

following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $40,000 | $136,100 | $176,100 |
| 2016 | $40,000 | $151,500 | $191,500 |
| 2015 | $40,000 | $178,020 | $218,020 |

25.    The defendants identified in ¶¶18-20 are referred to herein as the "Officer

Defendants." The defendants identified in ¶¶18-19, 21-24 are referred to herein as the "Director

Defendants." The defendants identified in ¶¶19, 21, 23-24 are referred to herein as the "Audit

Committee Defendants."   The defendants identified in ¶¶18-21 are referred to herein as the

"Insider Selling Defendants."  Collectively, the defendants identified in ¶¶18-24 are referred to

herein as the "Individual Defendants."

<u>**DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

**Fiduciary Duties**

26.    By reason of their positions as officers and directors of the Company, each of the

Individual Defendants owed and owe Allegiant and its stockholders fiduciary obligations of

trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to

control and manage Allegiant in a fair, just, honest, and equitable manner.   The Individual

Defendants were and are required to act in furtherance of the best interests of Allegiant and not

in furtherance of their personal interest or benefit.

27.    To discharge their duties, the officers and directors of Allegiant were required to

exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the financial affairs of the Company.   By virtue of such duties, the officers and

directors of Allegiant were required to, among other things:

a.    devise and implement a system of internal controls sufficient to ensure

that Allegiant's customers are safe while flying the Company's airline;

b.    monitor and oversee a system of internal controls sufficient to ensure that

Allegiant's customers are safe while flying the Company's airline;

c.      ensure that the Company timely and accurately informed customers regarding any persistent safety issues;

d.      establish effective corporate governance and reporting structures to inform themselves about data security risks and enable them to oversee safety and risk management;

e.      conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

f.      remain informed as to how Allegiant conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties Under Allegiant's Corporate Code of Conduct and Ethics**

28.      The Individual Defendants, as officers and directors of the Company, must comply with the Allegiant Travel Companies and Subsidiaries Corporate Code of Conduct and Ethics (the "Code").  The Code provides that the Individual Defendants must conduct themselves with personal integrity, stating:

It is our responsibility to conduct ourselves in an ethical business manner and also to ensure that others do the same.  If any one of us violates these standards, we can expect a disciplinary response, which may rise to the level of termination of any employment or other relationship with the company or legal action.  If any breach of the Code is known to any employee or member of management, you are obligated to report violations in accordance with the procedures set out in this Code.  By doing so, we ensure that the good faith efforts of all of us to comply with the Code are not undermined.

The ultimate responsibility for maintaining our Code rests with each of us.  As individuals of personal integrity, we can do no less than to behave in a way that will continue to bring credit to our Company and ourselves.

29.      Further, the Code mandates that the Individual Defendants act with honesty, fairness, and accountability in all business dealings.  The Code states:

**To our customers:** to provide high quality air transportation and leisure travel services consistent with customer requirements.  To be the best supplier of

- 10 -

knowledge management services we can with emphasis on fair competition and long lasting relationships.

**To our suppliers:** to develop and maintain mutually beneficial relationships based on the principle of fair competition in the marketplace.

**To society and the local community:** to be a responsible and responsive corporate citizen in a moral, ethical and beneficial manner.

**To our shareholders:** to pursue growth and earnings objectives while adhering to ethical standards.

**To our employees:** to provide safe working conditions and an environment characterized by fairness, respect for the individual, dignity and equal opportunity.

**Additional Duties of the Audit Committee Defendants**

30.    In addition to these duties, under its Charter, the Audit Committee owed specific duties to Allegiant to assist the Board in overseeing that management has "established and maintained processes to assure compliance by the Company with all applicable laws, regulations and corporate policy."  Moreover, the Audit Committee is charged with overseeing that there is an adequate system of disclosure controls and procedures.

**Breaches of Duties**

31.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Allegiant, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

32.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in the illicit acts discussed herein that posed harm to the Company's customers and employees, and devastated the public's trust in Allegiant, improper practices that wasted the Company's assets, and caused Allegiant to incur substantial damage.

33.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Allegiant, were able to and did, directly or indirectly, exercise control

over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Allegiant has expended, and will continue to expend, significant sums of money.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

35.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Allegiant, regarding the Individual Defendants' management of Allegiant's operations; (ii) fail to timely and accurately inform customers regarding safety issues with the Company's fleet; (iii) facilitate defendants Gallagher, Sheldon, Redmond, and Ellmer's illicit sale of over $50.3 million of  their personally held shares while in possession of material, nonpublic information; and (iv) enhance the Individual Defendants' executive and directorial positions at Allegiant and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

36.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

37.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial

1 condition, and future business prospects.

2      38.    The Individual Defendants accomplished their conspiracy, common enterprise,

3 and/or common course of conduct by causing the Company to purposefully or recklessly release

4 improper statements.  Because the actions described herein occurred under the authority of the

5 Board, each of the Individual Defendants was a direct, necessary, and substantial participant in

6 the conspiracy, common enterprise, and/or common course of conduct complained of herein.

7      39.    Each of the Individual Defendants aided and abetted and rendered substantial

8 assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

9 commission of the wrongdoing complained of herein, each Individual Defendant acted with

10 knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that

11 wrongdoing, and was aware of his or her overall contribution to and furtherance of the

12 wrongdoing.

13 <u>**SUBSTANTIVE ALLEGATIONS**</u>

14 **Defendant Gallagher's History Swapping Safety for Profit in the Airline Industry**

15      40.    Prior to acquiring Allegiant, defendant Gallagher founded a pair of airlines,

16 gaining exposure to the safety controls required to operate in the industry and the consequences

17 when not followed.  Defendant Gallagher started in the airline industry when he founded

18 WestAir Commuter Airlines ("WestAir") in 1978.  He served in various executive roles within

19 WestAir until Mesa Air acquired the company in May 1992.

20      41.    After leaving WestAir, defendant Gallagher co-founded ValuJet with an

21 investment group in 1992.  From its inception through 1997, defendant Gallagher served on

22 ValuJet's board of directors.  ValuJet was a low-cost alternative airline that operated scheduled

23 domestic and international flights in the Eastern U.S. and Canada.  It quickly became one of the

24 fastest growing low-cost carriers, earning $21 million in 1994 alone.

25      42.    Profits came to ValuJet at the expense of costs associated with maintaining a

26 safety record.  Under defendant Gallagher's leadership, ValuJet gained a reputation for lax safety

27 and quality assurance standards.  The company became notorious for its shortcomings in vital

28 safety matters such as record keeping, maintenance, training, and cockpit discipline.  ValuJet

also bought used aircraft from around the world, making the company's fleet one of the oldest in the U.S. with an average of twenty-six years of service per aircraft.   Defendant Gallagher's airline also did not have its own maintenance operations, farming spare parts and subcontracting the maintenance to several companies, companies that then subcontracted the work to other companies, making it difficult for ValuJet to monitor or oversee their practices.   When ValuJet bid the U.S. Department of Defense ("DOD") for a contract to fly military personnel in 1995, the DOD rejected the company, writing instead a scathing report that noted serious quality assurance deficiencies in the ValuJet's procedures.

43.    ValuJet's lapses in effective safety measures drew the attention of the FAA.   In February 1996, the FAA in Atlanta sent a memo to the agency's Washington, D.C. office seeking "immediate FAR-121 [Federal Aviation Regulations' operating requirements] rectification of this airline," or an immediate grounding of the company's fleet.   The FAA later noted multiple, exponentially-increasing safety incidences from 1994 to 1996, including fifteen emergency landings in 1994, fifty-seven in 1995, and fifty-seven from just January to May 1996 alone.   The FAA responded by restricting ValuJet's operations, ordering it to seek approval before the company could add new aircraft or cities to its network.

44.    ValuJet's increasing safety issues culminated on May 11, 1996, when ValuJet Flight 592 suffered a high-profile crash.   The DC-9 was flying from Miami, Florida to Atlanta, Georgia, when it plunged into the Florida Everglades, killing all 110 passengers onboard.   An onboard fire caused the airplane to crash, which was started by illegally stowed chemical oxygen generators.   A ValuJet subcontractor stowed the generators without safety caps.   A subsequent investigation found that ValuJet failed in its oversight and supervision of the subcontractor and found other systemic flaws.

45.    Under renewed scrutiny, the FAA grounded ValuJet after the Flight 592 crash until September 1996.   The public learned that ValuJet engaged in cost-cutting practices that favored profit over passengers' safety.   ValuJet allowed airplanes to fly with leaky hydraulic systems, malfunctioning weather radar, and rusted engines, among other issues.

**Background of Allegiant**

46.     Allegiant was founded in 1997, conducting scheduled and charter domestic operations.  The Company filed for Chapter 11 bankruptcy protection in 2000, a little more than two years into its operations.  Defendant Gallagher was among the Company's major creditors, gaining control of its operations as CEO and Chairman in the wake of the bankruptcy.

47.     The Company emerged from the bankruptcy process in 2002, offering cheap flights from several small cities to Las Vegas, as well as bundled air and hotel packages.  By November 2006, Allegiant became public and expanded its operations to cities in Arizona, Florida, and Washington.  By 2014, the Company added operations in Michigan, Hawaii, Ohio, and California.

48.     Defendant Gallagher transformed the Company into the same cost-cutting business model he oversaw at ValuJet.  Similar to ValuJet, Allegiant purchases airplanes with long-service lives, with the average flight time for its fleet being twenty-two years.  The fleet was one of the oldest of any airline in the U.S., with the average service life nearly double of its competitors.  To service and operate these airplanes, Allegiant employed an average of thirty-five employees per airplane, as opposed to the industry-standard of fifty.  As to maintenance, the Company contracted with outside organizations to provide major maintenance, as well as component and engine overhaul and repair, and did not invest in facilities or equipment to perform maintenance.

49.     As the airline expanded, issues began to surface with Allegiant's maintenance and training programs, which were cut at the expense of greater profit margins.  In 2013, a routine FAA inspection known as the Air Carrier Evaluation Program, noted problems with these areas and temporarily shut down the airline's training programs for pilots, mechanics, and flight attendants.  In its inspection, the FAA noted that Allegiant's repair program did not properly distinguish "minor" from "major" repairs and did not adequately track structural defects in its aircraft, and that the Company failed to identify "systematic deficiencies."  The FAA also froze the delivery of new planes until the Company addressed these issues.

**Allegiant Experience Safety Issues Since at Least 2014**

50.     Starting in at least 2014, the lack of proper oversight of maintenance caused Allegiant aircraft to return to the gate or be aborted altogether due to mechanical issues at an alarming rate.  Issues first came to the surface when Allegiant pilots began reporting issues in September 2014 to their union, the Airline Professional Association Teamsters Local 1224.  By April 2015, the Teamsters Aviation Mechanics Coalition had compiled a report on behalf of the pilots' union (the "Union Report"), finding that Allegiant experienced sixty-five incidents of aircraft mechanical failure in the short period between September 2014 and March 2015.  The Union Report concluded that Allegiant had poorly trained mechanics, insufficient spare parts, and a fleet well beyond its service life "creating a dangerous paradigm that could eventually lead to an accident resulting in serious injury and loss of life."  As a result of the Union Report's findings, Allegiant's pilots threatened to strike in an effort to get the Company to adhere to safety protocols.  In a *New York Times* article about the Union Report titled "Pilots Fault Allegiant on Safety as Talks Stall," dated April 20, 2015, a former member of the National Transportation Safety Board stated that Allegiant was "running on the safety margin."

51.     The *Times*, reporting near Allegiant's hub at the St. Pete-Clearwater International Airport, caught onto the story of the Company's ongoing safety deficiencies.  In a June 8, 2015 article titled "Plane Makes Emergency Landing in St. Pete," the *Times* reported that an Allegiant plane headed to Maryland was forced to land due to an electrical burning smell detected in the cabin.  St. Petersburg Fire Rescue took four passengers, including one flight attendant, to local hospitals to treat injuries.

52.     On June 28, 2015, the *Times* published an article titled "Allegiant Air Cancels More Flights, Including Several in Florida."  The *Times* reported that the airline had to make two emergency landings at the Pinellas airport and issue a series of flight cancellations, stranding passengers in the month of June 2015.

53.     On July 4, 2015, the *Times* published an article revealing that "[f]or the third time in a month, an Allegiant Air flight has been forced to make an emergency landing at St. Pete-Clearwater International Airport."  Passengers on the flight noted that the Allegiant personnel

withheld that mechanical problems had triggered the emergency landing.  The article also reported on several incidences requiring emergency landings in the previous month, stating:

> An Allegiant flight made an emergency landing at St. Pete-Clearwater on June 17 for what the airline called a "pressurization" issue with the aircraft.

> And on June 8, another Allegiant flight made an emergency landing eight minutes after taking off from St. Pete-Clearwater after smoke was seen in the cabin. Passengers disembarked on emergency slides.

54.     Another Allegiant flight made an emergency landing in North Dakota on July 23, 2015.  The *Times* obtained the recording from the tower at Fargo's Hector International Airport, where the air traffic controller rebuked Allegiant for its failure to provide notice in accordance with FAA regulations.  A *Times* article published on the event stated:

> The Federal Aviation Administration has scolded Allegiant Air for an emergency landing at a closed airport in Fargo, N.D., in a ruling that appears to contradict the airline's statements about the flight.

> The FAA issued a reprimand called a "letter of correction" to the Las Vegas-based airline saying the July 23 flight from Las Vegas to Fargo "did not appear to have adequate fuel" for such a trip, according to information released this week.

55.     On August 3, 2015, another Allegiant flight made an emergency landing in Greensboro, North Carolina, on its way from Florida to Virginia.  A *Times* article published that same day quoted passengers that said they "smelled smoke and heard a popping noise."  The article revealed that the airplane suffered catastrophic engine failure in its left engine at 33,000 feet.  The article's author also interviewed an aviation consultant that said the rash of emergency landings at the Company was cause for alarm, pointing to the Company's flawed maintenance program.  The August 3, 2018 *Times* article stated:

> This is the latest in a string of incidents for the budget airline since June, which include three emergency landings at St. Pete-Clearwater International Airport.  An Allegiant flight headed to Fresno, Calif., made an emergency landing at the McCarran International Airport in Las Vegas on Saturday after reports of a left engine fire, according to Las Vegas media reports.

> Last week, an Allegiant flight made an emergency landing at a closed airport in Fargo, N.D., because it was running low on fuel.

"The first thing I'd question is the maintenance.  If this company is making money, there's no reason to skimp on the cost of maintenance," said David G. McAdams with Midwest Aviation Consulting in Kentucky.  "If it were me, I'd be concerned."

56.     Another Allegiant flight was on its takeoff roll on August 17, 2015, when the nose of the plane prematurely rose from the runway.  The *Times* later reported in an article on August 28, 2015, that the pilot was forced to abort the flight.  Allegiant admitted in a report to the FAA that the aircraft's tail elevator malfunctioned.  The FAA later determined that the component actually fell off and jammed the elevator in one position.  The *Times* reported stated:

The FAA said it is investigating the latest incident in Las Vegas, which aviation experts said was both rare and potentially disastrous.

Allegiant said the malfunction was caused by an aircraft elevator found on the tail of the aircraft.  A device that moves one of the plane's two elevators had disconnected, Allegiant said.  The FAA said the component had actually "fallen off," which jammed the elevator in one position.

The flight at Las Vegas' McCarran International Airport with 158 passengers and six crew members was bound for Peoria, Ill.

John Cox, a St. Petersburg resident who is a former U.S. Airways pilot and a former safety official at the Air Line Pilots Association, said an elevator failure is exceptionally rare.  A failure in a flight, he said, could lead to difficulty controlling the aircraft.

"I've never seen it nor do I know of anyone who has ever seen it to that level of severity," Cox said of an elevator malfunction.  "It would scare me to have one do that.  I think the crew reacted well to an unexpected event.  If the plane had gotten airborne, it could have been hard to control."

Cox said a critical flight control like the elevators are essentially designed never to fail.  In fact, he said, an elevator malfunction such as this one isn't even tested in flight simulators during pilot training given its rarity.

The aircraft was a McDonnell Douglas MD-83 that was manufactured in 1991.  The MD-80 series aircraft is the workhorse of the Allegiant fleet.  MD-80s compose 48 of the airline's 76 aircraft, according to airfleets.net.

57.     On October 12, 2015, the *Times* reported that an Allegiant California-bound plane was evacuated in Las Vegas.  The aircraft caught fire on the tarmac, "the second plane fire at the airport in as many months and the latest in a string of issues for the low-fare carrier," the *Times* reported.  The article stated:

- 18 -

A California-bound Allegiant Air flight was evacuated in Las Vegas after an engine caught fire on the tarmac, the second plane fire at the airport in as many months and the latest in a string of issues for the low-fare carrier.

Allegiant Air flight 516 was preparing to take off for Fresno at McCarran International Airport on Sunday afternoon when a fire was reported in the right engine.

None of the 160 passengers and six crew members was injured. All were bused back to the terminal and passengers were put on a different plane that later departed Las Vegas.

***The airline said the pilot aborted takeoff and reported the fire as the plane was rolling down the runway after indications of a mechanical issue.*** The plane taxied to a remote area and was met by firefighters.

**The Emergency Landing of Flight 864 and Termination of Its Pilot**

58.     As reported by the *Times*, the Company's Flight 864 from Florida to Maryland experienced an emergency landing on June 8, 2015.  Passengers on the flight had reported smelling smoke in the cabin, prompting the pilot, Captain Jason Kinzer, to declare an emergency to local air traffic control in the interest of passengers' safety.  The aircraft made an emergency landing at the St. Pete-Clearwater airport, where the crew waited for St. Petersburg Fire Rescue to inspect the plane.  At the urging of the fire rescue team, Captain Kinzer shut down the aircraft's engines and used the onboard fire extinguisher.

59.     When Flight 864 continued to smoke, Captain Kinzer made the decision to prepare an evacuation in accordance with safety regulations and his training, as well as the safety of the passengers and crew onboard.  When Kinzer alerted the airport's air traffic control to the evacuation, an unidentified person came over the frequency instructing to "hold off on your evacuation."  The voice did not belong to the air traffic controller, who quickly chastised the person on the frequency.  Without giving the source of authority, the unidentified person repeated the command to not evacuate.

60.     Captain Kinzer requested that the unidentified person provide a reasoning not to evacuate.  Met with silence, the air traffic ground controller reiterated the need to identify who was requesting to hold off the evacuation.  Once again, Captain Kinzer and air traffic's requests went unanswered.

1      61.    Alarmed by the smoke in the passenger cabin, Captain Kinzer ordered an

2  evacuation.  Captain Kinzer performed a personal check of the passenger cabin to ensure all

3  passengers had safely evacuated.  Captain Kinzer noticed a paraplegic passenger who stated he

4  could not walk, and lifted the passenger out of his seat and carried him to the exit with a flight

5  attendant.  Following this, Captain Kinzer checked the cabin for any remaining passengers.

6      62.    Allegiant responded to Captain Kinzer's safe evacuation of Flight 864 by

7  terminating him.  As grounds for his firing, the Company's management claimed that Captain

8  Kinzer did not take into account "the Company's assets, ground equipment, fuel and the personal

9  time of our employees and customers."

10      63.    Defendant Gallagher was aware of Captain Kinzer's termination.  A flight

11  attendant on the Flight 864, Natalee Negron, wrote an e-mail directly to defendant Gallagher

12  upon learning of Kinzer's dismissal.  In her e-mail, Ms. Negron stated that "safety definitely was

13  the deciding factor to evacuate that day."  Noting that Captain Kinzer had "safety in the front of

14  his mind," Ms. Negron expressed hope that the firing decision "was made with the utmost

15  caution and consideration of the facts."  Defendant Gallagher forwarded the e-mail to the COO

16  and Vice President of In-Flight Services, but he refused to reverse course.

17      64.    Captain Kinzer filed a wrongful termination lawsuit against Allegiant on

18  November 13, 2015, in the Nevada District Court for Clark County, captioned *Kinzer v.*

19  *Allegiant Air, LLC*, No. 2:15-cv-02306.  The case settled on October 17, 2018, the same day the

20  trial was scheduled to start.

21  **Allegiant Continues to Experience Safety Issues with Its Fleet**

22      65.    On December 3, 2015, Allegiant Flight 815 bound for St. Pete-Clearwater

23  International Airport from Raleigh-Durham International Airport declared an emergency and

24  returned to its origin airport.  A *Times* article released the next day stated that the smell of smoke

25  had filled the cabin as a result of "some kind of mechanical problem."

26      66.    The Company experienced several emergency landings over the holidays.  On

27  January 4, 2016, the *Times* wrote a piece about five emergency landings out of Florida.  The

28  *Times* report stated:

One of the five was a Dec. 26 flight that departed St. Pete-Clearwater International Airport bound for Missouri that declared an emergency for an undisclosed "maintenance issue."

The other four flights departed Sanford, northeast of Orlando, from Dec. 24 to Dec. 31 and suffered a variety of mechanical issues.

67.     On January 8, 2016, the *Times* reported on the experiences of a former aircraft mechanic.  The former mechanic described Allegiant's dangerous maintenance practices at its facility at Orlando's Sanford International Airport.  The article stated:

OCALA — Veteran aircraft mechanic Greg Marino worked at Allegiant Air for just two weeks before he quit because of what he said are the airline's dangerous maintenance practices.

Marino said mechanics at the airline's facility in Sanford often lapsed into bad maintenance habits.  He said they failed to follow proper procedure in diagnosing aircraft problems and routinely misused a Federal Aviation Administration program that allowed planes, under some conditions, to fly with inoperative components or systems.

Marino said the airline needlessly delayed repairs in the push to keep planes flying, eroding the margin of safety.

*   *   *

Emails show that Marino wanted to meet with Allegiant personnel to go over his concerns about the airline's safety culture.  But he said Allegiant never took him up on the offer.

"I don't need this," he said.  "I don't need the job.  It is going to take a crash to get everybody's attention on this baloney.  Allegiant has lost control of its product in house.  Their maintenance is nothing short of obscene.

**Allegiant's Board Receives Warnings of Safety and Corporate Governance Issues from Major Investors**

68.     On January 26, 2016, an investment management firm, CtW Investment Group ("CtW"), published a letter to Allegiant's Board on behalf of its pension fund investors that own over 50% of the Company's outstanding stock.  The CtW letter highlighted for the Board a lack of independence from defendant Gallagher within the Audit Committee.  In particular, CtW noted that prior to taking on her role as Chairwoman of the Audit Committee, defendant Marvin served as Allegiant's CFO, and expressed concern that she cannot independently oversee

defendant Sheldon, the current CFO and defendant Marvin's former deputy.   The CtW letter stated:

> Dear Allegiant Board Members:
>
> At the annual shareholder meeting in June, public shareholders signaled a clear lack of confidence in former CFO Linda Marvin's leadership of the Audit Committee.  Concerned at the Audit Committee's approval of $9.3 million in highly questionable related transactions between the company and CEO Maurice Gallagher, and troubled by Ms. Marvin's lengthy professional association with Gallagher, 47% of public shareholders opposed her re-election.  Recent negative publicity over airplane safety and ongoing investigations into in-flight incidents by the Federal Aviation Administration lend urgency to Ms. Marvin's swift replacement to ensure rigorous, independent oversight of regulatory compliance by our Audit Committee; and to the initiation of a broader overhaul of board composition and committee structure.
>
> Accordingly, we request that the board immediately: (1) engage an outside search firm to recruit new independent directors to replace Ms. Marvin and to expand the overall size of our board, (2) reconstitute a majority of the Audit Committee with newly recruited directors; and (3) establish a standalone safety committee of the board – the prevalent governance practice across the industry.  These reforms are vital to assuring customers and shareholders of Allegiant's safety and compliance procedures, especially given both the company's prodigious growth and reliance on using and acquiring older aircraft.
>
> In addition, (4) we request the suspension of all related transactions with CEO Gallagher, including the $2.5 million annual sponsorship of his son's NASCAR team, until the Audit Committee has been thoroughly overhauled.  It is incredible that the current committee – which also includes two other long-time associates of CEO Gallagher, John Redmond and Gary Ellmer – can exercise appropriate independence and objectivity in assessing transactions which "blur the lines between personal and corporate investment," as Institutional Shareholder Services put it in recommending against Ms. Marvin.

69.     The CtW letter questioned the Company's characterization of defendant Marvin as independent, noting how "exceedingly rare to have a former employee, let alone a previous CFO, serving on [a] key committee."   The letter also expressed alarm about the independence of the remaining Audit Committee members, defendants Redmond and Ellmer.   The CtW letter continued:

> ***Former CFO Linda Marvin Lacks the 'Critical Distance' from CEO Gallagher to Serve as Audit Committee Chair and Should Leave the Board***

It may be true that Ms. Marvin's experience as Allegiant's CFO until 2007 "adds valuable knowledge to [the] board," as you state in the proxy, but this comes at far higher costs to the Audit Committee's independence and objectivity.  With the committee's primary purpose being to bolster investor confidence in the company's numbers, its legal and regulatory compliance, and related party transactions, shareholders require absolute assurance in the objectivity and independence of its members; even the perception that those qualities are tainted undermine its role.  For this reason, it is exceedingly rare to have a former employee, let alone a previous CFO, serving on this key committee.

Our analysis of analysis of the Russell 3000 indicates that there are just six other instances of a former CFO (or CEO) of equal or more recent employment as Ms. Marvin serving on the Audit Committee.  And just one of those serves, like Ms. Marvin, as chair of the Audit Committee.  Besides the risk of excessive deference to management that comes with any former executive serving as an independent director, having a former CFO head the Audit Committee sets up the awkward situation in which the same individual is responsible for independently overseeing the processes and controls that they may well have put in place as CFO or oversee compliance issues that could have developed under the previous tenure.  At a minimum, the risk is in having Ms. Marvin oversee the performance of a former deputy; current CFO Scott Sheldon, we note, served as Director of Accounting during Ms. Marvin's tenure as CFO.  Compounding this challenge is the fact that Mr. Sheldon is the nephew of former Allegiant director and long-time business associate of CEO Gallagher, Timothy Flynn; together CEO Gallagher and Mr. Flynn founded ValuJet and WestAir and are partners, along with Audit Committee member John Redmond (see below), in the investment consortium owning our company's headquarters.

Considering Ms. Marvin's extensive professional history with Mr. Gallagher -- serving as an executive under Gallagher at WestAir and MPower, in addition to her role as CFO of Allegiant – it is difficult to view her appointment to the board in 2013 stemming from anything else but her longstanding relationship with Gallagher.  (Indeed, we note that at least until 2014, they had lived within a mile of each other for over a decade.)

Unfortunately, similar independence concerns attach to Gary Ellmer and John Redmond, two of the three other Audit Committee members.  Mr. Ellmer, who like Ms. Marvin has no other public board service, served alongside Mr. Gallagher at WestAir.  Mr. Redmond, meanwhile, continues the board's relationship with business partners of CEO Gallagher.  Mr. Redmond, like former director Timothy Flynn (2006 to 2013), is an eleven percent partner alongside CEO Gallagher (30%) in the limited liability company that owns the company's headquarters and adjacent property.

70.     Due to the Audit Committee's approval of various related party transactions with defendant Gallagher, the CtW letter demanded that the Board suspend further approval of the

- 23 -

transactions until the Company put in place a reconstituted Audit Committee.  The CtW letter stated:

> ***Related Party Transactions with CEO Gallagher Should be Suspended until a Newly Composed Audit Committee Can Vet Appropriateness of Payments***
>
> Equaling nearly a third of the 2014 Selling, General and Administrative expense (the line item under which many of these costs are recorded) and equivalent to 10% of net income, the $9.3 million in new related transactions with CEO Gallagher disclosed in this year's proxy are both highly material and seemingly at odds with the company's very low cost structure.
>
> Particularly troubling is the apparently superfluous, tangential nature of many of these transactions to Allegiant's business – indeed, the company refers to several of these as "noncore special projects" – and yet they are potentially valuable personal benefits to CEO Gallagher.  Most glaring is the company's sponsorship of CEO Gallagher son's NASCAR career to the tune of $2.5 million and the $2.8 million paid to Alpine Labs, co-founded by CEO Gallagher, for the production of a TV game show filmed on Allegiant flights.  Together, these expenses equal 88% of the company's advertising budget.  (See appendix for a breakdown of the related transaction concerns.)
>
> Until a reconstituted Audit Committee is in place to independently and objectively evaluate the merits and terms of these transactions, we request the suspension of all corporate funding of CEO Gallagher's NASCAR team and the production of any further Game Plane episodes.  We are not aware of any company disclosures quantifying the returns to these investments and note that on the topic of Game Plane, company VP Brian Davis told the Los Angeles Times that he didn't know whether the game show had played a direct role in boosting the carrier's popularity or profit.

71.    The composition of Allegiant's Board, which by CtW's assessment included nonindependent members, prompted CtW to demand the adoption of stronger governance.  The CtW letter stated:

> ***Board Structure and Practices Have Failed to Keep Pace with Allegiant's Growth and Must be Reformed***
>
> *       *       *
>
> Allegiant may have ceased to be a controlled company in 2007, but the board's composition, oversight and responsiveness have failed to keep pace with this critical shift to majority public ownership.  To start, the board needs a more expansive and robust director recruitment process.  Besides the lengthy ties Ms. Marvin and Messrs.  Redmond and Ellmer share with CEO Gallagher, outlined above, we note that Montie Brewer was initially recommended to the board in 2009 by CEO Gallagher.  It thus appears that at least four of our five independent

directors were identified as candidates by virtue of their relationship to CEO Gallagher.  Moreover, while we think industry experience is vital for a board, with only one member of the board coming from a professional background outside of the industry – and that director being Mr. Redmond –Allegiant needs to dramatically widen the talent pools from which it selects directors.  Rather than a strength, the board's concentration of experience is suggestive of a highly constricted recruitment process.

The integrity of this entire process is further undermined by Ms. Marvin and Mr. Ellmer making up two-thirds of the Nominating Committee (Mr. Brewer being the other member), the absence of a designated chair and the committee having met just once in each of the past seven years (2008 – 2014).  We note that according to a 2013 Ernst & Young study, a mid-cap company's nominating committee meets on average 4 times year.  The same study also finds that the average mid-cap board size is ten and for mid-cap airlines is eleven - or in either case almost twice the size of our board.  It is clear to us that the board's size, composition and performance are badly in need of an upgrade.

72.    Further, the CtW letter urged reform in the Company's safety protocols. Particularly, CtW took note of the *New York Times* article that reported at least sixty-five safety incidents from September 2014 to March 2015 and the Audit Committee's failure to address the problems.  The CtW letter asserted:

*F.A.A. Compliance Failures, Safety Scares, Aging Fleet, Heighten Concerns over the Audit Committee and Indicate the Need for a Standalone Safety Committee*

The past year has seen a string of prominent safety incidents involving Allegiant flights, prompting several FAA investigations and a wave of negative publicity for our company (including landing Allegiant in the Wall Street Journal's "Crisis of the week" column).  And last week, we note, COO Steve Harfst abruptly resigned after less than 18 months at the company.

Questions have also been raised over the adequacy of disclosures surrounding regulatory compliance, while the company's own pilots have pointed to a corporate culture where profits come before safety.  The emergency landing in Fargo, ND, in July of an Allegiant flight running low on fuel should be a wakeup call.  The incident not only follows a string of in-flight safety incidences over the prior months, but occurred on a flight piloted by two licensed executives, one being our director of flight safety, and appears to have been wholly avoidable if the pilots had adequately reviewed, as they are required before each flight, an FAA Notice to Airmen, which indicated that the Fargo Airport was closed due to a Blue Angels display.  Besides the emergency itself, Allegiant was criticized in the Wall Street Journal for its public response to the incident, as several "crisis experts" expressed concern at the company's overly defensive posture in addressing passenger and investor concerns over safety, particularly given the rash of incidents on company flights.

As of September 8, 2015, the Las Vegas Review Journal reported 17 "unusual incidents" in 2015 involving Allegiant flights, including emergency landings, flight diversions or aborted takeoffs, while the FAA says it has "several" ongoing regulatory investigations.  The company had a further five emergency landings out of Florida in the last week of the year.

Separately, according to a New York Times article, Allegiant pilots have identified at least 65 incidents in the period from September 2014 to March 2015, where flights were forced to divert, return to gates or abort takeoff because of mechanical or engine problems.  In a report sent to Congress and the F.A.A., the pilots contend that a combination of poorly trained mechanics, insufficient spare parts, and an aging fleet is "creating a dangerous paradigm that could eventually lead to an accident resulting in serious injury and loss of life."

In the same article, the New York Times reported on previously undisclosed problems in the airline's maintenance and training programs identified in 2013 during a routine F.A.A. inspection.  Determining the current training was not effective in identifying systemic deficiencies or distinguishing between major and minor repairs, the F.A.A. forced a six-month shut down of the company's training programs and a freeze in new plane deliveries.  Although Allegiant's SEC filings routinely warn of the material risks from possible shortages of both pilots and aircraft, there can also be risks from failures to meet regulatory standards.

With a key responsibility of the Audit Committee being to ensure that management has established and maintained processes to assure compliance with key regulations impacting the company, particularly those that could have significant impact on the company's financials, these developments heighten the urgency for bolstering the committee's independence from CEO Gallagher.  They also underscore the need to establish a board safety committee.  Almost all of Allegiant's US peers have standalone committees to oversee management's internal control processes and other activities regarding operational safety and compliance with applicable laws and regulations, rather than subsume the responsibility under the general mandate of the audit committee, which has other significant responsibilities.  Indeed, considering that a key element of Allegiant's business model is the reliance on older aircraft, which require more extensive maintenance, a board committee that focuses exclusively on safety would appear long overdue.

73.     In response, members of the Board pointed fingers instead of addressing the issues contained in the CtW letter.  In a letter to the editor of the *Times* in the wake of the CtW letter, defendant Gallagher accused the newspaper of quoting supporters of the union representing Allegiant pilots.  "Misleading the public about safety is a common tactic of the Teamsters," defendant Gallagher wrote.

74.     Formally, neither Allegiant nor the full Board responded to the *Times*' request for comment about the CtW letter.  Instead, defendant Gallagher stated to the *Las Vegas Review-*

*Journal* that the letter "is yet another tactic that the Teamsters have employed to apply pressure to the company through unfounded public allegations, circumventing our mediated negotiations."

**Despite Negative Publicity, Union Report, and CtW Letter, Pervasive Safety Issues Continue at the Company**

75.     On January 22, 2016, the *Times* published an article titled "One Allegiant Air Plane Had Four Emergency Landings Within Six Weeks."  On multiple occasions, there were reports of smoke or fumes from the same airplane, forcing emergency landings.  Industry experts quoted in the article noted how exceptionally rare it is to have this number of incidents for one airplane.  The article stated:

> Allegiant Air Flight 815 had just departed North Carolina on Dec. 3 with 94 passengers bound for St. Pete-Clearwater International Airport when an alarming gray haze began to fill the cockpit and passenger cabin.

> Pilots declared an emergency, telling the tower to notify fire rescue crews "to roll the trucks."  The haze dissipated on landing at Raleigh-Durham, N.C., and the problem was traced to a malfunctioning air-conditioning system.

> Mechanics knew the aircraft quite well: This was the fourth emergency landing by the same aircraft in little more than a month.

> The emergency landings by the MD-88 — tail number 403NV — occurred from Oct. 25 to Dec. 3 on flights headed to Florida, all after reports of smoke or fumes in the aircraft.  Some of the incidents may have been because of the same recurring problem, according to interviews and Federal Aviation Administration records.

> The aircraft also made an emergency landing in August due to engine trouble that did not involve a report of smoke.

> Industry veterans say such a high number of incidents for one aircraft in such a short period of time is exceptionally rare, and the incidents will undoubtedly raise renewed concern about Allegiant's maintenance operations.

76.     A *Times* article published the next day on January 23, 2016, reported on the resignation of the COO Steve Harfst.  The article linked the resignation to the rash of maintenance and safety issues at the Company.  The article stated:

> More than a week before Allegiant Air's chief operating officer abruptly resigned, John Goglia questioned the airline's response to five emergency landings during the last week of 2015.

All five were flights departing Florida.

* * *

The abrupt resignation of Allegiant chief operating officer Steve Harfst a week ago after just 13 months in the job left some industry watchers questioning whether his was the first head to roll as a consequence of the airline's highly publicized maintenance and operational difficulties during 2015.

77.     Instead of taking responsibility, the Company blamed the pilots' union, the International Brotherhood of Teamsters, for the aspirations cast against the Company.   A February 3, 2016 *Times* article titled "Allegiant Air Says Mechanic's Report of Lax Safety Culture Unfounded" cited an interview with the new COO Jude Bricker, who stated that the increased media and regulatory scrutiny of Allegiant "might be linked to the pilots' union" due to a contract fight between the union and the Company.

78.     On February 4, 2016, the *Times* reported that an Allegiant flight landing in Pennsylvania blew its tires.   The flight, carrying 158 passengers on board, had earlier been suspended in Orlando, Florida.

79.     On February 12, 2016, the *Times* published an article titled "Allegiant Flight From St. Pete-Clearwater Makes Emergency Landing in Birmingham."   In the article, a passenger on Allegiant Flight 872 reported that the quarter-century old aircraft had to make an emergency landing in Alabama.   The crew reported smoke in the cockpit and the smell of an electrical fire.   The article stated:

Passenger Nick Janovsky realized something was amiss with Allegiant Air Flight 872 when he witnessed a scene that seldom occurs on a commercial aircraft cruising at 30,000 feet:

Flight attendants, looking upset, running in the cabin.

The crew told passengers they were making an emergency landing.   Within minutes, the aircraft descended so abruptly and rapidly that children in the cabin began to wail.   "Everybody was just freaking out," Janovsky said.

Flight 872, which departed St. Pete-Clearwater International Airport at 8:19 a.m. Friday bound for Omaha, Neb., made an emergency landing in Birmingham, Ala., because the crew noticed an unusual electrical odor, Allegiant told reporters. Janovsky said the crew told passengers the emergency was caused by "the smell of an electrical fire."

The Federal Aviation Administration, which is investigating, said in a written statement the crew reported "smoke in the cockpit."

The aircraft, a 27-year-old MD-83, landed safely at Birmingham-Shuttlesworth International Airport with 153 passengers and six crew members.  No injuries were reported.

\* \* \*

The plane, he said, shuddered uncomfortably during the rapid descent.  At some point, all electricity to the passenger cabin appeared to go out.  The small fans above passengers' heads stopped working, and even the seat belt sign went out. Flight attendants communicated with passengers using handheld megaphones rather than the plane's public-address system.

In about 10 minutes, the aircraft landed and stopped on the runway. Janovsky said he saw fire trucks and emergency vehicles surround the plane. Passengers, however, were not taken off.  The crew said little to passengers as they waited for 20 minutes.

"That was a problem," he said. "Everybody assumed the airplane was on fire."

\* \* \*

***"It was terrifying," he said. "Allegiant's like the Russian roulette of the skies."***

80.    On February 16, 2016, the *Times* reported that a flight from Fargo, North Dakota, to Las Vegas, Nevada, was canceled due to maintenance issues.  The aircraft that Allegiant chose to replace the grounded flight with was also grounded according to the *Times* for maintenance issues.

81.    The *Times* published an article on February 25, 2016 titled "Allegiant Air Flight Aborts Takeoff at St. Pete-Clearwater Airport After Engine Fails."  The article stated:

An Allegiant Air flight aborted takeoff Thursday afternoon at St. Pete-Clearwater International Airport after an engine failure.

Flight 904, bound for Kansas City, Mo., was rolling down the runway at 3:10 p.m. when its left engine suffered a malfunction called a compressor stall, according to the pilot's communication with the airport tower.  This sort of malfunction is caused by abnormal airflow through the engine.

82.    On March 6, 2016, the *Times* reported another Company airplane flying from Indiana to Florida experienced engine failure and aborted takeoff.  The article stated:

An Allegiant Air flight with service from Fort Wayne, Ind., to St. Petersburg-Clearwater International Airport aborted takeoff Saturday morning due to mechanical problems, an Allegiant official said.

Passengers on the MD-80 jet were told that an engine blew out, WTSP-TV reported.

Flight 891 carried 153 passengers and six crew members Allegiant said.

The MD-80 stopped on the runway, returned to the gate, and passengers waited for a new jet for the flight to Florida, WTSP said.

83.     On March 7, 2016, the Teamsters Aviation Mechanics Coalition issued an updated Union Report, recording ninety-eight safety and maintenance issues from September 2015 to January 2016.  The updated Union Report found that Allegiant lacked a process to document equipment failures, lacked adequate tools and spare parts for its maintenance crews, and maintenance crews lacked adequate experience in repairing airplanes.  The updated Union Report also determined that training for maintenance crews was inadequate and the overall safety culture was poor.

84.     On March 18, 2016, the *Times* published an article titled "Are Maintenance Problems at Allegiant Air the Result of an Airline Growing Too Fast?"  The article posed that the Company's rapid expansion has caused "a dangerous situation in which it can't keep up with maintenance."  The article stated:

David Stuckenberg has flown thousands of hours as an Air Force pilot and a passenger on commercial airliners.  He said a flight on Allegiant Air last month was his worst flying experience ever.

The takeoff from St. Pete-Clearwater International Airport aborted at high speed, announced by a loud boom from a failing engine.  It took more than three hours for Allegiant to find a replacement plane.  Airline employees provided little information to passengers, who did not know if they would take off again in five minutes or five hours.  A 90-minute wait on a customer service phone line ended when an employee hung up on him.

\*   \*   \*

Some airline safety advocates question whether Allegiant, a budget carrier that flew more than 1.4 million passengers at the Pinellas airport last year, is showing signs of stress caused by its rapid growth, possibly creating a dangerous situation in which it can't keep up with maintenance.

They draw a parallel between Allegiant and ValuJet, the upstart airline whose gaudy expansion troubled the Federal Aviation Administration in the months leading to the 1996 Everglades crash that killed 110 people.

- 30 -

Such comparisons may be particularly uncomfortable for Allegiant, whose CEO, Maurice Gallagher Jr., was ValuJet's co-founder.

"It appears Allegiant is following the same recipe for disaster ValuJet followed," said Mary Schiavo, a former U.S. Department of Transportation inspector general who questioned ValuJet safety and wrote a book on aviation safety, Flying Blind, Flying Safe.  "The airline is designed as a cash cow.  The things that passengers are seeing are indicative of the overall condition of the airline.  They're clues. And they're valued clues."

85.    The *Times* published an article on March 24, 2016, detailing an Allegiant flight's four attempts to get off the ground.  The *Times* article reported on a flight from Florida to Michigan that went through four different airplanes to finally get passengers to their destination due to various mechanical problems.  The article stated:

It took four tries and as many airplanes, but an Allegiant Air flight from Florida finally took off for Michigan.

Orlando television station WESH reports that a flight bound for Grand Rapids, Mich., finally took off Thursday morning from Orlando Sanford International Airport.

The first plane got off the ground Wednesday afternoon but was forced to return to the airport a half-hour later because of a sensor issue.

Passengers were put on a second plane, but they sat on the tarmac and had to return to the gate because of a mechanical problem.

They got on a third plane that had to return to the gate Wednesday night because of cabin lights problems.

86.    On April 29, 2016, the *Times* published an article that reported on engine failure on an Allegiant flight, forcing an emergency landing in Phoenix, Arizona.  The article stated:

The failure of the No. 2 engine on Flight 175 occurred immediately after the pilots aborted a landing due to a gust of wind and as they powered up both engines to gain altitude for a "go-around," according to an Allegiant memo on the incident and a recording of air traffic control communications.

87.    On May 5, 2016, seven passengers were injured during an Allegiant flight from the Dominican Republic to Pittsburgh, Pennsylvania, when the airplane experienced severe turbulence that forced the flight to conduct an emergency landing at the Fort Lauderdale-Hollywood International Airport in Florida.  A passenger, Lori Kuhn, filed a lawsuit on February 2, 2018, in the U.S. District Court for the Western District of Pennsylvania, captioned *Kuhn v.*

*Allegiant Travel Co.*, No. 2:18-cv-000150-NBF (W.D. Pa.).  The plaintiff passenger alleged that the airplane's radar systems failed to detect the turbulence to avoid it, and the Company failed to adhere to safety procedures during the incident, causing her head, neck, and back injuries.  The case settled out of court on August 15, 2018.

88.     The *Times* reported on yet another emergency landing on June 1, 2016.  Due to a mechanical problem, Allegiant Flight 871 flying from Illinois made on emergency landing at St. Pete-Clearwater International Airport.  The *Times* report stated:

> An Allegiant Air flight made an emergency landing at St. Pete-Clearwater International Airport Wednesday after suffering a mechanical problem, according to WFLA-Ch. 8.

> An Allegiant spokesperson confirmed for the station that Flight 871 from Moline, Ill., made the emergency landing at the Pinellas County airport, its scheduled destination, at 12:19 p.m.  The airline apparently did not identify the nature of the mechanical issue that caused the emergency nor say how many passengers and crew were aboard.

> The airline told WFLA that the plane landed safety and that it is investigating the mechanical problem.

89.     On July 20, 2016, the *Times* reported on Captain Jason Kinzer's wrongful termination lawsuit.  As detailed herein, Captain Kinzer conducted an emergency landing of Flight 864, prompting Allegiant to fire him.  The *Times* reported on pretrial testimony that his firing sent a dangerous message to other Company pilots that profit superseded public safety.  The article stated:

> Allegiant Air's termination of a pilot who ordered the evacuation of an aircraft last year at St. Pete-Clearwater International Airport endangers the public because other pilots might hesitate in an emergency for fear of being second-guessed.

> That is according to pretrial testimony of Allegiant pilots, made public late Monday, in the lawsuit against Allegiant filed by the fired pilot, Jason Kinzer, in Nevada state court.  Pilots also said they would have done the same as Kinzer if presented with the same circumstances — evacuate the airplane.

> Pilot Cameron Graff testified that Kinzer's dismissal was a warning by the Las Vegas-based airline to its pilots, who were then engaged through their union in bitter contract negotiations with Allegiant.

> "It's my opinion that Capt. Kinzer was terminated to quell the pilot group, to silence the pilot group, to … keep the pilots from reporting safety events, emergencies, those type of events," said Graff, a pilots' union leader.

"That type of message I would say is dangerous to the public safety because it puts pilots in a position where they don't report safety issues, they don't report mechanical issues.  They may even hesitate at a time they need to evacuate … and having more on their minds that, 'Am I going to be second-guessed for getting these people off the airplane safely? And will I be terminated?' "

That had real world implications last August, according to testimony, when an Allegiant aircraft's elevator — a critical control surface on the plane's tail — jammed during a flight's takeoff roll, causing the aircraft's nose to rise prematurely at a speed of more than 130 mph.

The pilot successfully aborted takeoff, later reporting that the aircraft probably would have crashed if it had become airborne.

Allegiant pilot Michael Bastianelli testified in the Kinzer case that he spoke to the pilot who aborted that takeoff.

"He told us his first thought (was) … 'If I initiate this abort, I'm going to get called in for another meeting,' " Bastianelli said.  "And he said — he's very upset about that because he lost three to four seconds of time as that thought went through his head, and that ate up an extra thousand foot of runway or so."

90.     On August 17, 2016, an Allegiant flight taking off from McCarran International Airport in Las Vegas, Nevada, aborted.  The FAA later determined that the maintenance procedures for the airplane were not maintained, causing a nut to detach from an elevator boost cylinder.  The FAA also found that the condition existed for at least 216 flights, risking the lives of passengers and crew each time.

91.     On November 2, 2016, the *Times* published a comprehensive report titled "Breakdown at 30,000 Feet."  In the article, the *Times* released the results of its investigation that found Allegiant's aircraft are "four times as likely to fail during flight as those operated by other major U.S. airlines," including seventy-seven unexpected landings in 2015 due to serious mechanical failures.  According to the *Times*, mechanical issues that threatened passenger safety were rampant at Allegiant, surpassing all other airlines.  Listing the report's findings, the *Times* stated:

Then they traveled to Las Vegas and met with Allegiant executives for a series of interviews. The airline did not dispute the newspaper's findings, which included:

- Forty-two of Allegiant's 86 planes broke down in mid-flight at least once in 2015.  Among them were 15 forced to land by failing engines, nine by overheating tail compartments and six by smoke or the smell of something burning.

- After certain systems on Allegiant planes fail, the company repairs them and puts the planes back in service, only to see the same systems fail again. Eighteen times last year, key parts such as engines, sensors and electronics failed once in flight, got checked out, and then failed again, causing another unexpected landing.

- Allegiant's jets are, on average, 22 years old. The average age of planes flown by other carriers is 12. Experts say planes as old as Allegiant's require the most rigorous maintenance in the industry. But Allegiant doesn't staff its own mechanics at 107 of the 118 airports it flies to.

- Allegiant relies most heavily on McDonnell Douglas MD-80s, an aging model retired by all but two other major U.S. carriers. The company's MD-80s fail twice as often as those operated by American Airlines and three times as often as those flown by Delta.

\* \* \*

The average U.S. airline has about three unexpected landings caused by mechanical problems for every 10,000 times it flies, the *Times* found.

Southwest had the lowest rate of problems last year. It had about one in 10,000 flights end in an unexpected landing.

JetBlue was in the middle of the pack. It had about three flights end in unexpected landings.

American Airlines had one of the highest rates. It had five.

Allegiant had 12.



92.    The *Times* followed this report with an editorial on November 11, 2016, titled "Addressing Allegiant's Mechanical Failures."  The editorial's author lamented that the Company had put profits over passenger safety by pushing rapid growth, yet minimizing expenses.  The editorial stated:

> Smoke-filled cabins, overheating engines, emergency landings.  These are among the recurring problems at Allegiant Air, which brought more than a million passengers through St. Pete-Clearwater International Airport last year and continues to expand.  But that success cannot come at the expense of safety.  The airline has pledged to improve reliability, a promise that must be fulfilled before tragedy strikes.
>
> *       *       *
>
> An investigation by the Tampa Bay Times found that Allegiant flights are four times as likely as those of other major carriers to make unexpected landings due to midair mechanical problems.  ***The culprits: a push to grow quickly, a business model that relies on old planes, not staffing its own mechanics at out-of-the-way airports and a scattershot maintenance operation.***
>
> Times reporters documented how the company makes repairs when planes break down and puts them back into service only to see them fail again.  Routine maintenance is not properly documented and regular inspections get missed.  Older planes are not inherently unsafe, but they do require meticulous upkeep.  The record of breakdowns on Allegiant planes suggests that's not happening.

93.     Demonstrating defendants' awareness of the *Times*' comprehensive report on the Company, defendant Gallagher issued a response on behalf of the Company published in the *Times* on November 16, 2016.  In the editorial, defendant Gallagher asserted that the *Times* "makes a number of unsubstantiated, incendiary assertions offensive to our highly-skilled team of dedicated professional in its editorial."

94.     A December 21, 2016 *Times* article highlighted the connections between Allegiant and ValuJet, which shared a similar business model.  The article, titled "At Allegiant, a Board and Business Model With Roots in ValuJet," described ValuJet's practice of using second-hand aircraft as an extremely profitable enterprise until the May 11, 1996 crash of Flight 592 that killed all 110 passengers on board.  The article found that defendant Gallagher used the "basic business blueprint – relying on used airplanes to fuel rapid growth – to transform Allegiant Air from a tiny charter service into one of the largest carriers in the U.S."  Quoting aviation safety experts and former ValuJet employees, the article stated:

> Former federal aviation experts, including those who investigated the 1996 crash, say Allegiant toes the line between mechanical reliability and profitability in some ways that remind them of ValuJet.
>
> To compare the two airlines, the Tampa Bay Times reviewed securities filings and hundreds of pages of federal reports on the deadly crash and interviewed aviation experts, former federal officials and ValuJet and Allegiant employees.
>
> Five key ValuJet figures, including three of the company's four founders, made their way to Allegiant as it emerged out of bankruptcy.
>
> At ValuJet, the company grew so fast that it was not able to hire enough qualified mechanics and inspectors.  Under Gallagher's tenure as chief executive officer, Allegiant has expanded to nearly 120 cities, an expansion that even he acknowledged put a strain on its operations.
>
> Like ValuJet did before it, Allegiant built up its fleet with second-hand planes from foreign companies that wound up breaking down more often than those flown by other major carriers.
>
> Before the 1996 crash, ValuJet had a string of mechanical breakdowns, including a 1995 engine explosion on a runway in Atlanta, according to federal investigators and news reports.
>
> Last month, the Times used a first-of-its-kind database to show that Allegiant's planes are four times as likely to break down in midair as those flown by all other major U.S. airlines.

95.     The December 21, 2016 *Times* article also questioned the independence of the Board due to the connections between its members and defendant Gallagher, as revealed in the CtW letter.  The article stated:

> After he took over Allegiant, the airline began doing business with other companies that he had a stake in — firms that had little or nothing to do with aviation.  Investors questioned many of these deals, saying there is no way to tell whether the arrangement is good for the company or just good for Gallagher.
>
> Securities filings show Allegiant paid at least $26 million to companies in which Gallagher is an investor or manager.
>
> The airline paid at least $15 million to lease its headquarters from real estate companies partly controlled by Gallagher, Timothy Flynn and John Redmond.
>
> Flynn served on the Allegiant board from 2006 to 2013; Redmond is a current board member.
>
> It paid $3.2 million to Alpine Labs, a TV production company cofounded by Gallagher, to produce an on-plane game show.
>
> It paid more than $1 million to sponsor a professional truck racing team controlled by Gallagher. His son, Spencer, is one of the team's seven drivers.
>
> These transactions were approved by Allegiant's board members but drew criticism from at least one investor.  The head of CtW Investment Group, which invests money from union pensions, sent two letters in the past 20 months asking whether the board was truly independent of Gallagher.
>
> One board member, Redmond, did outside business with Gallagher while two others — Gary Ellmer and Linda Marvin — worked with him at a different airline in the past, wrote CtW executive director Dieter Waizenegger.
>
> \* \* \*
>
> The board remains the same, and it has not started its own safety committee.

96.     Safety issues at Allegiant continued into 2017, despite the *Times* publicizing the Company's continuing failures.  On March 4, 2017, the *Times* reported that a flight set to take off at St. Pete-Clearwater International Airport had to abort due to a "mechanical problem that left behind debris from the aircraft."

97.     On March 27, 2017, the *Times* published an article detailing a fire in another flight's engine that prompted the airplane to conduct an emergency landing on its way from Orlando, Florida to Dayton, Ohio.  The article stated:

An Allegiant Air flight that departed the Orlando area made an emergency landing in Ohio a week ago after the pilot reported a fire in one of the aircraft's engines at 14,000 feet.

Flight 636 with 163 passengers and crew was about 10 minutes from landing in Dayton, Ohio, just before noon when a cockpit warning light indicated a fire in the aircraft's right engine, according to an internal Allegiant memo obtained by the Tampa Bay Times.

Pilots immediately deployed the engine's fire-suppression system, telling air traffic controllers, "We have an engine failure and a fire."

"We're declaring an emergency," the pilot said, according to an air traffic control recording of the incident. "We have a right engine fire indication and power loss. So yeah, if we could get to the airport as soon as possible, please."

98.    On May 9, 2017, the *Times* published an article that detailed the emergency landing of a flight out of Orlando-Sanford International Airport on April 22, 2017.  The article stated:

An Allegiant Air flight out of Orlando-Sanford International Airport was forced to make an emergency landing on April 22 after it suffered a problem with a critical control surface that caused a worrisome vibration in the aircraft.

Flight 736 took off at 9:13 a.m. headed to Bangor International Airport in Maine with 173 passengers and crew.  During the climb out of central Florida, the pilots reported vibrations with the airframe of the McDonnell Douglas MD-80, according to an internal Allegiant memo obtained by the Tampa Bay Times.

The crew, the memo said, "had concerns with the elevator control."

The captain of the flight declared an emergency and the flight returned to Orlando-Sanford, where it safely landed at 10:08 a.m.  "No immediate corrective actions to policy, procedure or the training program were found to be needed," the email said.

99.    On June 28, 2017, the *Times* announced that its investigative reporting had received the Gerald Loeb Award for Distinguished Business and Financial Journalism. Particularly, the *Times* received the award for its investigative project titled "Breakdown at 30,000 Feet," published November 2, 2016.

100.    On July 14, 2017, the *Times* reported on an incident during a flight from Florida to South Bend, Indiana, where passengers fainted due to malfunctioning air conditioning.  The article, titled "Allegiant Air Flights With No AC Caused Some Passengers to Pass Out," stated:

> Midway through a flight to South Bend, Ind., an Allegiant Air plane turned around and headed back to the St. Pete-Clearwater International Airport. The plane's air conditioning wasn't working, and the cabin was too hot to continue, according to Allegiant. By the time it landed in Pinellas County, multiple people had fainted.
>
> "I don't sweat and I was dripping," said Karen Willey, a Bradenton resident aboard the flight.
>
> The incident is one of dozens of Allegiant flights since June 1 that consumers — and an incident report from a local fire and rescue department — say did not have adequate air conditioning for some or all of the flight. It ultimately caused some passengers to pass out.
>
> On June 22, St. Petersburg Fire and Rescue met the Indiana-bound plane at the gate to provide medical attention. According to the agency's incident report, two people were treated for symptoms related to overheating, and both declined to be taken to the hospital. However, Michele Routh, public relations director for the St. Pete-Clearwater airport, said four passengers were treated for heat-related issues.

101.    On September 26, 2017, the *Times* published an article that revealed an Allegiant airplane made an emergency landing in California after smoke filled the cabin. The article stated:

> Smoke filled the cabin of an Allegiant Air jet after it landed at a California airport on Monday, forcing coughing passengers to cover their faces with shirts and firefighters to board the plane, authorities said.

102.    In sum, the *Times* directed the attention of the Individual Defendants to numerous cancellations, delays, emergency landings, smoke-filled passenger cabins, and aborted takeoffs, due to airplane maintenance and training issues rampant within the Company. Instead of taking corrective or preventative action, the Individual Defendants downplayed the reports, scapegoating the pilot's union, and assured its customers, employees, and the investing public that Allegiant operated a reliable and safe airline. As shown in the *Times*'s articles, the opposite was true.

**The Individual Defendants Make Improper Statements in Allegiant's SEC Filings**

103.    As red flags of a deteriorating safety record plagued Allegiant, Company executives and members of the Board caused or allowed the Company to make assurances in its SEC filings that Allegiant maintained proper maintenance and training in accordance with FAA

regulations to ensure safety throughout its fleet.  What the Individual Defendants failed to disclose in Allegiant's SEC filings and elsewhere was that, due to their deliberate actions and scheme to skirt safety protocol in favor of profits, catastrophe was highly likely and imminent. Allegiant lacked adequate systems to ensure its fleet is properly maintained, jeopardizing the safety of its passengers and staff.

104.    On February 22, 2016, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 with the SEC (the "2015 Form 10-K").  Defendants Gallagher, Sheldon, Brewer, Ellmer, Marvin, Pollard, and Redmond signed the 2015 Form 10-K. The 2015 Form 10-K assured the public that the Company's technicians underwent comprehensive training in accordance with FAA regulations, and that the Company's management supervised all maintenance functions performed by personnel and contractors.  The 2015 Form 10-K stated:

**Aircraft Maintenance**

We have a Federal Aviation Administration ("FAA") approved maintenance program, which is administered by our maintenance department headquartered in Las Vegas. ***Technicians employed by us have appropriate experience and hold required licenses issued by the FAA.  We provide them with comprehensive training and maintain our aircraft in accordance with FAA regulations.***  The maintenance performed on our aircraft can be divided into three general categories: line maintenance, major maintenance, and component and engine overhaul and repair.  Line maintenance is generally performed by our personnel in certain cities of our network and by contractors elsewhere.  We contract with outside organizations to provide major maintenance and component and engine overhaul and repair.  We have chosen not to invest in facilities or equipment to perform our own major maintenance, engine overhaul or component work. ***Our management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations.***  In addition to the maintenance contractors we presently utilize, we believe there are sufficient qualified alternative providers of maintenance services that we can use to satisfy our ongoing maintenance needs.

105.    The 2015 Form 10-K contained certifications by defendants Gallagher and Sheldon pursuant to section 906 of the Sarbanes-Oxley Act of 2002 ("SOX") that the Annual Report fully complied with the requirements of section 13(a) or section 15(d) of the Exchange Act.  Defendants Gallagher and Sheldon further certified that the report did not "contain any

untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

106.    On February 24, 2017, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 with the SEC (the "2016 Form 10-K").   Defendants Gallagher, Sheldon, Brewer, Ellmer, Marvin, Pollard, and Redmond signed the 2016 Form 10-K. The 2016 Form 10-K assured the public that the Company's technicians underwent comprehensive training in accordance with FAA regulations, and that the Company's management supervised all maintenance functions performed by personnel and contractors.   The 2016 Form 10-K stated:

**Aircraft Maintenance**

We have a Federal Aviation Administration ("FAA") approved maintenance program, which is administered by our maintenance department headquartered in Las Vegas.  ***Technicians employed by us have appropriate experience and hold required licenses issued by the FAA.   We provide them with comprehensive training and maintain our aircraft in accordance with FAA regulations.***  The maintenance performed on our aircraft can be divided into three general categories: line maintenance, major maintenance, and component and engine overhaul and repair.  Line maintenance is generally performed by our personnel in certain cities of our network and by contractors elsewhere.   We contract with outside organizations to provide major maintenance and component and engine overhaul and repair.   We have chosen not to invest in facilities or equipment to perform our own major maintenance, engine overhaul or component work.   ***Our management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations.***  In addition to the maintenance contractors we presently utilize, we believe there are sufficient qualified alternative providers of maintenance services that we can use to satisfy our ongoing maintenance needs.

107.    The 2016 Form 10-K contained certifications by defendants Gallagher and Sheldon pursuant to section 906 of SOX that the Annual Report fully complied with the requirements of section 13(a) or section 15(d) of the Exchange Act.  Defendants Gallagher and Sheldon further certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period

covered by this report."

108.    On March 1, 2018, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 with the SEC (the "2017 Form 10-K").   Defendants Gallagher, Sheldon, Brewer, Ellmer, Marvin, Pollard, and Redmond signed the 2017 Form 10-K. The 2017 Form 10-K assured the public that the Company's technicians underwent comprehensive training in accordance with FAA regulations, and that the Company's management supervised all maintenance functions performed by personnel and contractors.  The 2017 Form 10-K stated:

**Aircraft Maintenance**

We have a Federal Aviation Administration ("FAA") approved maintenance program, which is administered by our maintenance department headquartered in Las Vegas.  ***Technicians employed by us have appropriate experience and hold required licenses issued by the FAA.  We provide them with comprehensive training and maintain our aircraft in accordance with FAA regulations.***  The maintenance performed on our aircraft can be divided into three general categories: line maintenance, major maintenance, and component and engine overhaul and repair.  Line maintenance is generally performed by our personnel in certain cities of our network and by contractors elsewhere.  We contract with outside organizations to provide major maintenance and component and engine overhaul and repair.  We have chosen not to invest in facilities or equipment to perform our own major maintenance, engine overhaul or component work.  ***Our management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations.***  In addition to the maintenance contractors we presently utilize, we believe there are sufficient qualified alternative providers of maintenance services that we can use to satisfy our ongoing maintenance needs.

109.    The 2017 Form 10-K contained certifications by defendants Gallagher and Sheldon pursuant to section 906 of SOX that the Annual Report fully complied with the requirements of section 13(a) or section 15(d) of the Exchange Act.  Defendants Gallagher and Sheldon further certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

**The *60 Minutes* Report Reveals Rampant Safety and Maintenance Issues at Allegiant**

110.    On April 13, 2018, CBS News revealed that it intended to air a *60 Minutes* report on Allegiant and its rampant safety and maintenance issues.  According to CBS News, the report, investigated by the Peabody and Emmy award-winning journalist Steve Kroft, would air that Sunday, on April 15, 2018.

111.    In reaction to the announcement of the *60 Minutes* report, the Company's stock lost 8.6% of its value in a single day, marking a loss of $14.20 per share from $165.25 per share on April 12, 2018 to $151.05 per share at market close on April 13, 2018.  This loss totaled $228.1 million in market capitalization.

112.    The *60 Minutes* report, titled "Allegiant Air: the Budget Airline Flying Under the Radar," aired on April 15, 2018.  Similar to the *Times* reporting, CBS News found that Allegiant airplanes "are nearly three and a half times more likely to have serious in-flight mechanical failures than other U.S. airlines."  The *60 Minutes* report stated:

> Allegiant Air is a small, ultra-low-cost carrier based in Las Vegas, that happens to be one of the country's most profitable airlines.  But, according to federal aviation records and interviews with pilots, mechanics and industry experts, it may also be the most dangerous.
>
> The airline flew 12 million passengers last year on its 99 planes to 120 destinations from California to Florida.  But it has had persistent problems since at least the summer of 2015 when it experienced a rash of mid-air breakdowns, including five on a single day.  It was not a fluke.
>
> Public documents show an alarming number of aborted takeoffs, cabin pressure loss, emergency descents and unscheduled landings.  Yet for the most part, Allegiant's difficulties have managed to stay under the radar of the flying public.

113.    In a seven month review, *60 Minutes* investigators scrutinized official, public records with the FAA that showed several incidents of mid-air engine failure, smoke and fumes in the cabin, rapid descents, flight control malfunctions, hydraulic leaks, and aborted takeoffs. Interviewing several aviation safety experts, including John Goglia ("Goglia"), a former National Transportation Safety Board presidential appointee, *60 Minutes* reported:

> For the past seven months, we have been scrutinizing 'service difficulty reports' filed by Allegiant with the FAA.  They are official, self-reported records of problems experienced by their aircraft.  What we found raised some disturbing

questions about the performance of their fleet.  Between January 1st, 2016 and the end of last October, we found more than 100 serious mechanical incidents, including mid-air engine failures, smoke and fumes in the cabin, rapid descents, flight control malfunctions, hydraulic leaks and aborted takeoffs.

John Goglia: Something significant is going on and it should be addressed

We shared the reports with John Goglia who has more than 40 years of experience in the aviation industry, including nine years as a presidential appointee to the National Transportation Safety Board.  Now retired, Goglia remains a respected figure in the aviation industry and occasionally testifies as an expert witness on safety issues.

John Goglia: There's another one, engine fire.

We wanted to know what he thought of Allegiant's 60 unscheduled landings and 46 in-flight emergencies.

Steve Kroft: I mean, is that common for an airline of this size?

John Goglia: Very, very high for an airline of this size. I hate to make comparisons-- but we've seen that before in airlines that are no longer with us that had experienced a number of accidents and killed a bunch of people.  I don't wanna repeat that.  So I try to push on Allegiant to-- to-- clean up their operation.

\* \* \*

John Goglia: I have encouraged my family, my friends and myself not to fly on Allegiant.

114.    The *60 Minutes* report attributed the systemic safety and maintenance issues to a top-down business model and safety culture that favored the bottom line over the safety of Allegiant's fleet.   Goglia and other consulted aviation experts expressed that "Allegiant's problems come from the confluence of its aggressive business model and a safety culture they find to be lagging."   In particular, "[t]he business strategy which has produced 60 straight quarters of profits, occasionally with margins approaching 30 percent, requires the airline to keep costs down and 'push the metal' – keep the planes flying as often as possible."  The *60 Minutes* report pointed to the Company's aging MD-80 fleet, which "require a lot of maintenance and reliable parts are hard to come by."

115.    The cost cutting manifested in a "lack of infrastructure" at the Company, according to Goglia.  Goglia further stated that the Company lacked "feet on the ground" or the "number of mechanics" to address safety issues.  CBS News used the example of a recent flight

to Las Vegas where the engine caught fire, stating:

> We found numerous planes with the same recurring issues and others returned to service before they were ready.  Like Allegiant Flight 533 last July, which was delayed in Cincinnati on its flight to Las Vegas.

> Mercedes Weller and Dan Mannheim, who says he paid $80 for his roundtrip ticket to Vegas, remember the pilot's announcement as they pushed away from the gate three hours behind schedule.

> Mercedes Weller: He came on and he said, "The mechanics have been working on this right engine.  We apologize for that.  We'll get you up in the air as soon as possible."  As we started taxiing, everything was going okay.  And then it's, like, as soon as the wheels came up, the engine blew.

> Mercedes Weller: The force of it was so hard that it-- it popped open the cockpit doors.  And there was smoke in the cabin and fire coming out of that engine.  And I just remember thinking that I would never see my daughter again.

> Weller and Mannheim said the plane had to circle at a low altitude on one engine for about 25 minutes while the airport ground crews cleared debris from the runway for an emergency landing.

> Dan Mannheim: Everyone turned their phones back on.  And I called my family. And—I pretty much tellin' 'em goodbyes.

> Steve Kroft: You thought this was it?

> Mercedes Weller: I text my husband. And I said "If something happens, just know that I've been very happy. And I love you."

> The plane eventually landed safely back in Cincinnati. For their trouble, Allegiant offered to re-book Mercedes and Dan the next day and gave everyone a $150 voucher.

116.    In that same month alone, CBS News found "nine other Allegiant planes that also had to make unscheduled landings during that month," with issues ranging from engine problems and fumes in the cabin, to instrument or flight control problems.   In addition, the airline "canceled or rescheduled 11 separate flights leaving Las Vegas, all for mechanical issues."

117.    CBS News' Steve Kroft also interviewed former pilots about the alarming amount of mechanical issues present at the Company.  Daniel Wells, a former pilot and president of the Teamsters Union 1224 representing Allegiant pilots, asserted that "management of Allegiant seems to denigrate the pursuit of safety" to its pilots.  Mr. Wells expressed the pilots' fear of retaliation for speaking out, as they "know that they would be terminated.  At the very least,

1  disciplined" just for speaking up about their concerns.

2  118.    The *60 Minutes* report detailed the events of June 8, 2015, surrounding the firing

3  of Captain Jason Kinzer, who was terminated after conducting an emergency landing and

4  evacuation when the Allegiant airplane filled with smoke.  Captain Kinzer did what he was

5  trained to do, deploying the emergency chutes and evacuating the airplane.  Passengers only

6  suffered minor injuries as a result.  Daniel Wells relayed that all other pilots would have done the

7  same thing, yet the Company retaliated against Captain Kinzer by firing him six weeks after the

8  incident.

9  119.    Other experts agreed.  CBS News spoke to Loretta Alkalay, who spent thirty

10 years at the FAA "prosecuting enforcement cases in the northeast region."  She expressed

11 concern about the sort of culture the Company was creating by firing a pilot for not preserving a

12 Company asset over the safety of its passengers, stating:

13 
14     Loretta Alkalay: I've never ever heard of an airline firing a pilot for an emergency
       evacuation.

15     Loretta Alkalay has a lot of experience in things like this.  She spent 30 years at
16     the FAA prosecuting enforcement cases in the northeast region.  She was
       particularly annoyed by Allegiant's letter of termination that blamed Kinzer for
17     what it called an "evacuation that was entirely unwarranted" and for not "striving
       to preserve the company's assets."

18     Loretta Alkalay: Yeah, it's really-- it's really outrageous.  And-- and that's where
19     the FAA should have stepped in to look at the safety culture because the message
       to all the other Allegiant pilots is: don't ever have an emergency evacuation if you
20     don't see flames in the cockpit.  I mean, that's-- what other message could you
       get?

21 
22 120.    The *60 Minutes* report used the example of Flight 436 to show the breakdown of

23 the Company's safety culture.  The airplane, leaving Las Vegas, nearly crashed on takeoff when

24 the pilot had trouble controlling it.  The problem was a missing cotter pin holding together

25 essential components for flight control.  The FAA found that "Allegiant and its maintenance

26 contractor, AAR, failed to perform procedures that would have caught the error no less than five

27 times."  The FAA report found "a deliberate and systemic act of non-compliance" endangering

28 thousands of passengers "on more than 200 subsequent Allegiant flights."

121.     More disturbingly, *60 Minutes* determined that "Allegiant is trying to gain a competitive cost advantage by softening safety standards adhered to by the major airlines."  The *60 Minutes* report stated:

> Allegiant's maintenance department tries to talk pilots out of reporting problems with their aircraft to avoid delays and keep the planes moving.
>
> Daniel Wells: What I hear from the Allegiant pilots are-- they get-- a call from maintenance control, from-- who is-- an agent of the company and says, "Y-- you didn't write anything up, did you?"  Meaning you didn't notice any maintenance problems on the airplane.  And that's a very clear-- message to send to pilots that the company is discouraging you from—recording maintenance deficiencies.
>
> Steve Kroft: Is that legal?
>
> Daniel Wells: No, because our captains are required to report any mechanical deficiencies of an aircraft.

122.     In response to CBS News' Freedom of Information Act request for documents related to the FAA's investigation into safety incidents at Allegiant, the Company objected to their release, the only airline to do so.  Goglia commented that this obstruction indicated the Company had "something to hide."

123.     Despite Allegiant's objections, the FAA overruled the Company and released the documents to CBS News.  The investigators for *60 Minutes* scoured the documents, and found that the Company overall "was nearly three and half times more likely to have mid-air breakdowns than American, United, Delta, JetBlue and Spirit."

124.     On this news, Allegiant's market capitalization plunged another 6%, or $9.05 per share, on April 17, 2018, to close at $142 per share compared to the closing of $151.05 per share on April 13, 2018, erasing another $145.4 million in market capitalization in only a couple days.

125.     Following the *60 Minutes* report, Senator Bill Nelson of Florida, a ranking member of the Senate's Commerce Committee, sent a letter to the U.S. Department of Transportation ("DOT") Inspector General Calvin Scovel that called for an investigation into the FAA's enforcement actions of Allegiant.  Senator Nelson demanded a full audit review of the agency's policies and communications with Allegiant.  In response, the DOT Office of Inspector General stated that an audit into the FAA's oversight of Allegiant's maintenance would begin in

June 2018.  This audit continues and will lead to greater scrutiny of Allegiant's operations, resulting in possible costly fines and shutdowns.

## INSIDER SALES BY DEFENDANTS GALLAGHER, SHELDON, REDMOND, AND ELLMER

126.    Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Allegiant's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Allegiant, defendants were privy to material, nonpublic information about the Company's true business health.

127.    While in possession of this knowledge, defendant Gallagher sold 280,463 shares of his personally held Allegiant stock for proceeds of $45,716,133.54.  For example, defendant Gallagher also sold nearly $5 million in stock from the short period between December 2017 and March 2018, just ahead of the airing of the *60 Minutes* investigation, which included a request for comment from defendant Gallagher and the Company's efforts to block CBS News' Freedom of Information Act request.  Further, defendant Gallagher's sales are suspicious given that he sold only 1% of his holdings in the previous three years.  Defendant Gallagher's sales are as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 3,404,739 |
| Shares Sold During Sales Period ("SP") | 280,463 |
| Shares Disposed (Other) During SP | 235,832 |
| Total Shares Held During SP | 3,480,819 |
| Shares Remaining SP | 2,964,524 |
| **Total Proceeds from Sales** | **$45,716,133.54** |

128.    While in possession of this knowledge, defendant Sheldon sold 14,446 shares of his personally held Allegiant stock for proceeds of $2,433,301.54.  Defendant Sheldon's sales were timed to maximize profit from Allegiant's then artificially inflated stock price.  Further, defendant Sheldon's sales are suspicious given that his stock sales represented approximately 36% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 6,812 |
| Shares Sold During SP | 14,446 |
| Shares Disposed (Other) During SP | 6,649 |
| Total Shares Held During SP | 40,432 |
| Shares Remaining SP | 19,337 |
| **Total Proceeds from Sales** | **$2,433,301.54** |
| **% of Total Ownership Sold During SP** | **35.73%** |

129.    While in possession of this knowledge, defendant Redmond sold 7,500 shares of his personally held Allegiant stock for proceeds of $1,679,895.  Defendant Redmond's sales were timed to maximize profit from Allegiant's then artificially inflated stock price.  Further, defendant Redmond's sales are suspicious given that he had no stock sales in the previous three years.  Defendant Redmond's sales are as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 30,750 |
| Shares Sold During SP | 7,500 |
| Shares Disposed (Other) During SP | 11,450 |
| Total Shares Held During SP | 119,010 |
| Shares Remaining SP | 100,060 |
| **Total Proceeds from Sales** | **$1,679,895.00** |

130.    While in possession of this knowledge, defendant Ellmer sold 3,120 shares of his personally held Allegiant stock for proceeds of $519,739.12.  Defendant Ellmer's sales were timed to maximize profit from Allegiant's then artificially inflated stock price.  Further, defendant Ellmer's sales are suspicious given that his stock sales represented approximately 61% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 2,120 |
| Shares Sold During SP | 3,120 |
| Total Shares Held During SP | 5,120 |
| Shares Remaining SP | 2,000 |
| **Total Proceeds from Sales** | **$519,739.12** |
| **% of Total Ownership Sold During SP** | **60.94%** |

131.    The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants' overall scheme to artificially inflate Allegiant's stock price.  As the Company prioritized growth of its low-fare airline at expense of passenger and employee safety, concealing this business model from the investing public, the Individual Defendants sold $50.3 million worth of their personally held stock in the relevant period between August 2015 and April 2018.

132.   In sum, defendants Gallagher, Sheldon, Redmond, and Ellmer sold over $50.3 million worth of stock at artificially inflated prices, as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **GALLAGHER** | 3/9/2016 | 250,000 | $163.50 | $40,875,000.00 |
| **Current CEO & Chairman** | 12/28/2017 | 16,018 | $155.82 | $2,495,988.83 |
| | 12/29/2017 | 1,800 | $155.00 | $279,007.56 |
| | 3/6/2018 | 11,200 | $163.21 | $1,827,952.00 |
| | 3/6/2018 | 900 | $164.57 | $148,113.00 |
| | 3/6/2018 | 545 | $165.27 | $90,072.15 |
| | | **280,463** | | **$45,716,133.54** |
| | | | | |
| **SHELDON** | 8/3/2015 | 2,596 | $219.55 | $569,951.80 |
| **Current CFO** | 8/3/2015 | 1,576 | $219.90 | $346,565.55 |
| | 11/10/2016 | 2,596 | $153.70 | $399,002.60 |
| | 12/9/2016 | 1,206 | $171.40 | $206,708.40 |
| | 12/9/2016 | 600 | $171.48 | $102,885.00 |
| | 10/27/2017 | 2,597 | $137.69 | $357,580.93 |
| | 10/27/2017 | 3,275 | $137.59 | $450,607.25 |
| | | **14,446** | | **$2,433,301.54** |
| | | | | |
| **REDMOND** | 8/3/2015 | 1,500 | $220.85 | $331,275.00 |
| **Current President** | 8/12/2015 | 6,000 | $224.77 | $1,348,620.00 |
| | | **7,500** | | **$1,679,895.00** |
| | | | | |
| **ELLMER** | 6/23/2015 | 520 | $178.82 | $92,986.40 |
| **Current Director** | 11/23/2015 | 480 | $200.00 | $96,000.00 |
| | 12/28/2016 | 285 | $165.76 | $47,241.60 |
| | 3/24/2017 | 580 | $162.00 | $93,960.00 |
| | 5/22/2017 | 135 | $142.91 | $19,293.12 |
| | 12/6/2017 | 1,000 | $148.85 | $148,850.00 |
| | 3/13/2018 | 120 | $178.40 | $21,408.00 |
| | | **3,120** | | **$519,739.12** |
| | | | | |
| **Total:** | | **305,529** | | **$50,349,069.20** |

## DAMAGES TO ALLEGIANT

133.   As a result of the Individual Defendants' improprieties, Allegiant's passengers and employees were endangered and injured due to unsafe conditions with the Company's fleet while the Individual Defendants disseminated improper, public statements concerning the Company's supposedly safe maintenance and training programs.  These improper statements have devastated Allegiant's credibility as reflected by the Company's more than $373.5 million in market

capitalization loss, totaling 14% of the stock's value, when CBS News exposed nationally in April 2018, the lack of adequate safety protocols at the Company.

134.   Allegiant's performance issues also damaged its reputation within the business community and in the capital markets.   In addition to price, Allegiant's current and potential customers consider an airline's ability to keep its passengers safe.   Customers are less likely to take airlines that have a reputation for incidents like mid-air engine failure, smoke and fumes in the cabin, rapid descents, flight control malfunctions, hydraulic leaks, and aborted takeoffs, among other things.   Allegiant's ability to retain and attract customers, or to raise equity capital or debt on favorable terms in the future, is now impaired.   In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

135.   Further, as a direct and proximate result of the Individual Defendants' actions, Allegiant has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)   costs incurred from defending and paying any settlement in the class action lawsuit for violations of federal securities laws;

(b)   costs incurred from defending and paying any settlement in lawsuits filed by passengers injured during Allegiant flights;

(c)   costs incurred from defendants and paying any settlement in wrongful termination lawsuits;

(d)   costs incurred from potential and already paid fines to the FAA or any other regulatory agency in the United States;

(e)   costs incurred from fees for airport emergency services, vouchers, and refunds for passengers on aborted or emergency-landed flights; and

(f)   costs incurred from compensation and benefits paid to the defendants who have breached their duties to Allegiant.

1

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

2      136.    Further, plaintiff brings this action derivatively in the right and for the benefit of

3   Allegiant to redress injuries suffered, and to be suffered, by Allegiant as a direct result of

4   breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding

5   and abetting thereof, by the Individual Defendants.  Allegiant is named as a nominal defendant

6   solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court

7   that it would not otherwise have.

8      137.    Plaintiff will adequately and fairly represent the interests of Allegiant in enforcing

9   and prosecuting its rights.

10      138.    Plaintiff was a stockholder of Allegiant at the time of the wrongdoing complained

11   of, has continuously been a stockholder since that time, and is a current Allegiant stockholder.

12      139.    The current Board of Allegiant consists of the following six individuals:

13   defendants Gallagher, Redmond, Brewer, Ellmer, Marvin, and Pollard.  Plaintiff has not made

14   any demand on the present Board to institute this action because such a demand would be a

15   futile, wasteful, and useless act, as set forth below.

16      140.    As alleged above, defendants Gallagher, Redmond, Brewer, Ellmer, Marvin, and

17   Pollard, consisting of the entire Board, served as directors of the Company during at least a

18   substantial part of the wrongdoing alleged herein, and each faces a substantial likelihood of

19   liability for their participation in the illicit acts alleged herein.  The actions regarding the

20   Company's operations with respect to (among other things) safety and maintenance of its aging

21   airplanes and related equipment that defendants Gallagher, Redmond, Brewer, Ellmer, Marvin,

22   and Pollard caused or allowed to occur continuously and repeatedly were an integral aspect of

23   the Company's core operations.  Additionally, defendants Gallagher, Redmond, Brewer, Ellmer,

24   Marvin, and Pollard breached their fiduciary duties of loyalty by making improper statements in

25   the Company's SEC filings regarding the Company's adherence to safety protocols.  It was these

26   very actions and statements, caused or allowed by defendants Gallagher, Redmond, Brewer,

27   Ellmer, Marvin, and Pollard, that caused the Company to suffer harm (financial, reputational,

28   and other), as set forth herein.  This was in violation of these defendants' fiduciary duties, as well

as the Company's Code.   Defendants Gallagher, Redmond, Brewer, Ellmer, Marvin, and Pollard's unexcused pattern of inattention to their fiduciary duty to ensure the Company was acting appropriately to maintain its fleet of airplanes, leaving them perennially under-maintained, exposed Allegiant, its passengers, and employees to increased risk.   Thus, defendants Gallagher, Redmond, Brewer, Ellmer, Marvin, and Pollard each faces a substantial likelihood of liability for their acts in connection with these actions and statements, rendering demand upon them futile.

141.   Significantly, Allegiant's unique history among other airlines of disregard for the safety and property of its passengers, the repeated denial to implement new safety measures, and the resulting numerous catastrophic incidents (as described herein), demonstrates constructive knowledge by the Board of these issues.   In this case, the Board was made specifically aware by CBS News, the CtW letter, the Union Report, the updated Union Report, and the *Times*, among other publications, of the Company's actions with respect to its maintenance and training practices and lack of safety protocol.   The Board's decision to continue to not follow proper safety and maintenance procedures and requirements, and to instead knowingly cause Allegiant to violate these requirements, and to hamstring efforts to impose and enforce new safety measures as an intentional business strategy, cannot be regarded as a valid exercise of business judgment.

142.   Moreover, this action does not arise from an anomalous incident of misconduct within the Company or from the acts of a rogue employee within the Company.   Rather, as alleged herein, serious safety violations occurred systemically and at every level of the Company as a direct result of the Board's decision to embrace a policy of calculated safety and maintenance violations as the Company's deliberate business strategy.   There is no legitimate "business judgment" involved in devising or carrying out such an illicit policy.   Rather, the Board's actions show that its members engaged in an unexcused pattern of inattention or inaction which amounts to an abdication of their duty to the corporation.   Accordingly, demand on the Board is futile and excused.

143.   Defendants Marvin, Redmond, Ellmer, and Pollard served as members of the Audit Committee.   The Audit Committee's Charter provides that it is responsible for compliance

with legal and regulatory requirements.  Defendants Ellmer, Marvin, Pollard, and Redmond breached their fiduciary duties of due care and loyalty because the Audit Committee, inter alia, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings, caused the Company's internal control failures, and caused or allowed the illicit activity described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

144.  Defendants Gallagher, Redmond, and Ellmer sold Allegiant stock under highly suspicious circumstances.  Defendants Gallagher, Redmond, and Ellmer as Company executives and/or Board members, possessed material, nonpublic company information and used that information to benefit themselves.  Defendants Gallagher, Redmond, and Ellmer sold stock based on this knowledge of material, nonpublic company information regarding the Company's illicit business practice of sacrificing safety, maintenance, and training for profits, and the impending decrease in the value of their holdings of Allegiant as the compounding incidents associated with the airline plagued the Company's reputation.  Accordingly, defendants Gallagher, Redmond, and Ellmer face a substantial likelihood of liability for breach of their fiduciary duty of loyalty.  Any demand upon defendants Gallagher, Redmond, and Ellmer is futile.

145.  Defendants Redmond, Brewer, Ellmer, Marvin, and Pollard are also incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they are all beholden to the Company's CEO and founder, defendant Gallagher, and are incapable of instituting any actions against him on behalf of Allegiant for fear of losing their prestigious Board seats.  Defendant Gallagher currently controls nearly 20% of the total stockholder vote.  As a result, defendant Gallagher exercises significant control over the Company, its directors, its officers, and all key decisions.  Defendants Redmond, Brewer, Ellmer, Marvin, and Pollard will not institute an appropriate action because it would risk losing their prestigious positions on Allegiant's Board.

146.  A majority of the current Board is further incapable of impartially considering a demand to commence and prosecute this action because pursuing such litigation would

jeopardize their long-standing and highly lucrative relationships with Allegiant and defendant Gallagher, resulting in potentially significant loss of investment opportunities within and outside Allegiant, as detailed below:

- **Defendant Marvin**:  Defendant Marvin has a long-standing and lucrative business relationship with defendant Gallagher that has existed since 1988. Defendant Marvin began her career working in aviation alongside defendant Gallagher at WestAir as a Controller until 1994.  Defendant Gallagher was at all times the principal owner of WestAir, from 1983 to 1992, as well as an executive officer and director at the small commuter airline.  When defendant Gallagher moved on to found Mpower Communications Corp. ("Mpower") in 1996, he brought defendant Marvin onboard to serve in various high level positions at his communications company, culminating in her serving as CFO from 1998 to 1999, as well as a Senior Vice President of Finance from 1999 to 2001.  On information and belief, these various positions provided defendant Marvin with millions of dollars in compensation.  Defendant Gallagher went on to form Allegiant, and once again, defendant Marvin followed defendant Gallagher to the Company, serving as Allegiant's CFO from September 2001 to September 2007 and a part-time consultant from September 2007 to May 2008, before taking on her current position as a member of the Board. During the relevant period, defendant Marvin reaped the significant compensation discussed herein, in addition to the millions she was paid during her tenure as CFO and as a consultant.  As noted in the CtW letter, defendants Gallagher and Marvin have a uniquely interdependent business relationship, even living within one mile from each other for over a decade.  Defendant Marvin will remain loyal to defendant Gallagher as a result of the lucrative positions she received and to avoid losing future lucrative opportunities.

- **Defendant Redmond**:   Defendant Redmond has an intertwining business relationship with defendant Gallagher that prevents him from litigating against

defendant Gallagher.   Defendant Redmond is part of a partnership with defendant Gallagher that owned the property the Company leased as its headquarters in Las Vegas, Nevada, owning 11% alongside defendant Gallagher's 30%.  While the Company terminated the lease in May 2015, the Company paid $1.3 million to settle litigation against the owners.   As disclosed in the Company's proxy statement on Form DEF 14A filed with the SEC, both defendants Gallagher and Redmond profited handsomely from their joint ownership of the property leased by Allegiant, as shown in the table below.  Defendant Redmond will remain loyal to defendant Gallagher as a result of these lucrative ventures and to avoid losing future lucrative opportunities.

| Year | Affiliated Individuals | Collective Ownership (%) | Amount Paid |
|---|---|---|---|
| 2017 | - | - | $200,000 |
| 2016 | - | - | $1,700,000 |
| 2015 | Gallagher, Redmond | 41% | $1,200,000 |
| 2014 | Gallagher, Redmond | 41.4% | $3,148,000 |
| 2013 | Gallagher, Redmond | More than 50% | $4,811,000 |
| 2012 | Gallagher, Flynn, Redmond | More than 50% | $2,303,000 |
| 2011 | Gallagher, Flynn, Redmond | More than 50% | $2,284,000 |
| 2010 | Gallagher, Flynn, Redmond, Harrison | 57% | $2,361,000 |
| 2009 | Gallagher, Flynn, Redmond, Harrison | 57% | $1,940,000 |
| 2008 | Gallagher, Flynn, Redmond, Harrison | 57% | $763,000 |
| 2007 | Gallagher, Flynn, Redmond, Harrison | - | $110,000 |
|  |  |  | **Total: $20,820,000** |

- **Defendant Ellmer**:  Defendant Ellmer has also profited significantly due to his preexisting professional relationship with defendant Gallagher.  In particular, defendant Ellmer spent six years from 1988 to 1994 serving as Vice President of Maintenance and Engineering at defendant Gallagher's WestAir.  On information and belief, defendant Ellmer profited from his relationship with defendant Gallagher while at WestAir, and continues to receive significant compensation at Allegiant discussed herein due to his long-standing business relationship with defendant Gallagher.  Defendant Ellmer will remain loyal to defendant Gallagher for fear of losing out on future lucrative positions with defendant Gallagher's ventures.

147.    The principal professional occupations of defendants Gallagher and Redmond are their employment with Allegiant, as CEO and President, respectively, pursuant to which they have received and continue to receive substantial monetary compensation and other benefits as alleged above.  Accordingly, defendants Gallagher and Redmond lack independence from defendants Brewer, Ellmer, Marvin, and Pollard due to their interest in maintaining their executive positions at Allegiant.  This lack of independence renders defendants Gallagher and Redmond incapable of impartially considering a demand to commence and vigorously prosecute this action.  Allegiant paid defendant Gallagher the following compensation:

| Year | Bonus | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $1,500,000 | $800,064 | $20,549 | $2,320,613 |
| 2016 | $2,850,000 | $699,948 | $21,257 | $3,571,205 |
| 2015 | $2,926,633 | $600,071 | $23,782 | $3,550,486 |

Allegiant paid defendant Redmond the following compensation:

| Year | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | - | $1,749,973 | - | $107,152 | $1,857,125 |
| 2016 | $250,000 | $9,379,248 | $474,900 | $71,050 | $10,175,198 |

## **FIRST CAUSE OF ACTION**

### **Against the Individual Defendants for Breach of Fiduciary Duty**

148.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.   The Individual Defendants owed and owe Allegiant fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants owed and owe Allegiant the highest obligation of good faith, fair dealing, loyalty, and due care.

150.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.   More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Allegiant, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

151.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knowingly, recklessly, or with gross negligence: (i) failed to implement a system of internal controls to ensure the safety of Allegiant's passengers and employees; (ii) improperly caused or allowed a business model that prioritized profit margins over public safety; and (iii) made improper and misleading representations in the Company's SEC filings concerning the safety, maintenance, and training programs at the Company.   Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

152.   Director Defendants, as directors of the Company, owed Allegiant the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning Allegiant's lack of safety, maintenance, and training.   The Director Defendants knowingly or recklessly: (i) failed to implement a system of internal controls to ensure the safety of Allegiant's passengers and employees; (ii) improperly caused or allowed a business model that prioritized profit margins over public safety; and (iii) made improper and misleading representations in the Company's SEC filings concerning the safety, maintenance, and training programs at the Company.   Accordingly, the Director Defendants breached their

1  duty of loyalty to the Company.

2  153.  The Audit Committee Defendants breached their fiduciary duty of loyalty by

3  approving the statements described herein which were made during their tenure on the Audit

4  Committee, which they knew or were reckless in not knowing contained improper statements

5  and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of

6  oversight and failed in their duty to appropriately review financial results, as required by the

7  Audit Committee Charter in effect at the time.

8  154.  Defendants Gallagher, Sheldon, Redmond, and Ellmer breached their duty of

9  loyalty by selling Allegiant stock on the basis of the knowledge of the improper information

10  described above before that information was revealed to the Company's stockholders.  The

11  information described above was proprietary, nonpublic information concerning the Company's

12  future business prospects.  It was a proprietary asset belonging to the Company, which

13  defendants Gallagher, Sheldon, Redmond, and Ellmer used for their own benefit when they sold

14  Allegiant common stock.

15  155.  As a direct and proximate result of the Individual Defendants' breaches of their

16  fiduciary obligations, Allegiant has sustained significant damages, as alleged herein.  As a result

17  of the misconduct alleged herein, these defendants are liable to the Company.

18  156.  Plaintiff, on behalf of Allegiant, has no adequate remedy at law.

19  **SECOND CAUSE OF ACTION**

20  **Against the Individual Defendants for Waste of Corporate Assets**

21  157.  Plaintiff incorporates by reference and realleges each and every allegation

22  contained above, as though fully set forth herein.

23  158.  As a result of the wrongdoing detailed herein and by failing to conduct proper

24  supervision, the Individual Defendants have caused Allegiant to waste its assets by paying

25  improper compensation and bonuses to certain of its executive officers and directors that

26  breached their fiduciary duty.

27  159.  As a result of the waste of corporate assets, the Individual Defendants are liable to

28  the Company.

1  160.    Plaintiff, on behalf of Allegiant, has no adequate remedy at law.

2  **THIRD CAUSE OF ACTION**

3  **Against the Individual Defendants for Unjust Enrichment**

4  161.    Plaintiff incorporates by reference and realleges each and every allegation

5  contained above, as though fully set forth herein.

6  162.    By their wrongful acts and omissions, the Individual Defendants were unjustly

7  enriched at the expense of and to the detriment of Allegiant.  The Individual Defendants were

8  unjustly enriched as a result of the compensation and director remuneration they received while

9  breaching fiduciary duties owed to Allegiant.

10  163.    Defendants Gallagher, Sheldon, Redmond, and Ellmer sold Allegiant stock while

11  in possession of material, nonpublic information that artificially inflated the price of Allegiant

12  stock.  As a result, defendants Gallagher, Sheldon, Redmond, and Ellmer profited from their

13  misconduct and were unjustly enriched through their exploitation of material and adverse inside

14  information.

15  164.    Plaintiff, as a stockholder and representative of Allegiant, seeks restitution from

16  these defendants, and each of them, and seeks an order of this Court disgorging all profits,

17  benefits, and other compensation obtained by these defendants, and each of them, from their

18  wrongful conduct and fiduciary breaches.

19  165.    Plaintiff, on behalf of Allegiant, has no adequate remedy at law.

20  **PRAYER FOR RELIEF**

21  WHEREFORE, plaintiff, on behalf of Allegiant, demands judgment as follows:

22  A.    Against all of the defendants and in favor of the Company for the amount of

23  damages sustained by the Company as a result of the defendants' breaches of fiduciary duties,

24  waste of corporate assets, and unjust enrichment;

25  B.    Directing Allegiant to take all necessary actions to reform and improve its

26  corporate governance and internal procedures to comply with applicable laws and to protect

27  Allegiant and its stockholders from a repeat of the damaging events described herein, including,

28  but not limited to, putting forward for stockholder vote, resolutions for amendments to the

Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

        1.    a proposal to strengthen the Company's controls over safety, maintenance, and training protocols;

        2.    a proposal to strengthen the Company's controls over the Company's adherence to FAA and other governmental regulations;

        3.    a proposal to strengthen the Company's oversight of its disclosure procedures;

        4.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

        5.    a provision to permit the stockholders of Allegiant to nominate at least three candidates for election to the Board; and

        6.    a provision to control insider selling;

    C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Allegiant has an effective remedy;

    D.    Awarding to Allegiant restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

    E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

    F.    Granting such other and further relief as the Court deems just and proper.

## **AFFIRMATION**

The undersigned does hereby affirm that the preceding document filed in the above-referenced matter does not contain the social security number of any person.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury.

Dated:  November 27, 2018

/s/ John P. Aldrich

JOHN P. ALDRICH
ALDRICH LAW FIRM, LTD.
7866 West Sahara Avenue
Las Vegas, NV 89117
Telephone: (702) 853-5490
Facsimile: (702) 227-1975
E-mail: jaldrich@johnaldrichlawfirm.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
            soddo@robbinsarroyo.com

Attorneys for Plaintiff

1302477

VERIFICATION

I, Charlotte Woolery, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____ 11-26-18 _____

_____
CHARLOTTE WOOLERY