MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 009634
**MUCKLEROY LUNT, LLC**
6077 S. Fort Apache, Ste 140
Las Vegas, NV 89148
Phone: (702) 907-0097
Direct: (702) 534-6272
Fax: (702) 938-4065
martin@muckleroylunt.com
*Liaison Counsel for Plaintiffs*
(Additional Counsel on Signature Page)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| IN RE ALLEGIANT TRAVEL CO. STOCKHOLDER DERIVATIVE LITIGATION | Master File No.: 2:18-cv-01864 |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Charles Blackburn and Mark Fullenkamp (collectively "Plaintiffs"), by and through their counsel, respectfully submit this memorandum of points and authorities in opposition to Defendants' Motion to Dismiss (the "Motion") Plaintiffs' Amended Verified Stockholder Derivative Complaint (the "Complaint").[1]

## I.    INTRODUCTION

Plaintiffs bring this action to recover damages suffered by nominal defendant Allegiant Travel Co. ("Allegiant") due to Defendants' breaches of fiduciary duty and other wrongful acts. Defendants are (or were) directors and officers of Allegiant, a budget air travel company. ¶ 4.[2] For years, Directors adopted a strategy to save money on safety and maintenance in order to offer low prices to customers. ¶¶ 4-5. Allegiant was rated as the most profitable company in the United States in 2015, but at the same time, it suffered an inordinate number of maintenance incidents. ¶ 5. For example, that year Allegiant's fleet made at least seventy-seven unexpected landings for serious mechanical failures. *Id.* On a single day in June 2015, five Allegiant aircraft failed in midair during a span of four hours. *Id.* Of Allegiant's eighty-six planes, forty-two of them broke down in midair at least once during 2015. *Id.* Allegiant's safety issues continue to this day. *See* ¶¶ 109-110, 124-129.

As a result of these and other serious maintenance problems, Allegiant was the subject of a scathing *60 Minutes* segment that aired on April 15, 2018, causing a steep plunge in the price of Allegiant's common stock. ¶ 10. Just prior to the *60 Minutes* segment, four of the individual defendants, who knew that CBS had been researching and filming the segment, sold $2.3 million worth of Allegiant common stock. ¶ 11. Shortly thereafter, Allegiant stockholders brought a class

[1]    The named defendants are Maurice J. Gallagher, John Redmond, Gregory Anderson, Scott Sheldon, Eric Gust, Charles W. Pollard, Linda A. Marvin, Gary F. Ellmer, and Montie R. Brewer (the "Individual Defendants").

[2]    Citations to "¶ _" refer to the Amended Verified Consolidated Stockholder Derivative Complaint, filed March 24, 2020, ECF No. _.

1

action in this Court against the Company and four defendants, Gallagher, Sheldon, Harfst and Bricker, for violation of federal securities laws. The Court denied the Company's motion to dismiss, ruling that the securities class action complaint met the high standard set by the Private Securities Litigation Reform Act ("PSLRA"). That action recently settled for $4 million.

Plaintiffs filed the Complaint on March 24, 2020. Defendants now move to dismiss by making a litany of boilerplate arguments, including that the Complaint fails to plead both demand futility and sufficient facts to allege non-exculpable breaches of fiduciary duty under Nevada law. None of Defendants' arguments can defeat the many specific allegations of the Complaint, buttressed by the fact that damages are already quantifiable from the payment made by Allegiant in the related securities class action pending before this Court.

First, Plaintiffs have alleged specific facts from which the Court can conclude that a pre-suit demand on Allegiant's Board of Directors (the "Board") would have been futile. Under Delaware's *Aronson/Rales* test, adopted by the Nevada Supreme Court, demand is futile where the Complaint alleges that a majority of the directors are interested in the transaction at issue. The Complaint alleges that at least five of the six Director defendants are interested due to their positions with the Company, roles on the Audit Committee, insider trading or other wrongful action. Further, each defendant faces personal liability because under Nevada law, a director or officer is personally liable for intentional wrongdoing, fraud or violation of law. NRS 78.138(7)(b)(2). The Complaint alleges that the directors intentionally pursued a strategy of sacrificing safety for profits, made false and misleading statements in violation of securities laws, intentionally engaged in insider trading, and committed other wrongful acts.

Defendants' also attempt to avoid liability by arguing that even if demand is excused, the Complaint does not allege a viable claim against them. They argue that there was no intentional misconduct, fraud, or knowing violation of law and, as such, they are protected by Nevada law.

Defendants, however, misstate Nevada law, and the Complaint's allegations are indeed sufficient to state claims against each of the Individual Defendants. The Complaint amply alleges not only the Individual Defendants' active misrepresentation of the Company's failed safety record, especially evident after the investigative report by *60 Minutes*, but also how such misrepresentations harmed the Company and personally benefitted the directors. ¶¶ 103. The complaint is also sufficient because it specifically alleges how the Individual Defendants were on notice of the repeated safety issues facing Allegiant. There is no doubt that the Board was aware of the mission-critical safety and management issues facing Allegiant: the Complaint specifically alleges that the Board received a letter from one its largest stockholders raising the very same issues. ¶¶ 85-88. Where there is a knowing violation of law, Nevada exculpation provisions do not shield the defendants from liability.

In addition to the breach of fiduciary duty claims, Plaintiffs have also set forth with detail claims for insider selling and unjust enrichment based upon insider selling by certain of the Individual Defendants.[3]  Defendants, while admitting there is no authority on point, posit that Nevada would not recognize an insider trading claim because Nevada law is so director-friendly that it would never provide such a remedy. This is contrary to the arguments advanced elsewhere by the Individual Defendants, acknowledging that an intentional breach of fiduciary duty is sufficient for a finding of liability. Insider trading is such a breach. Should Plaintiffs establish the Insider Trading Defendants profited from their misappropriation of non-public information in their stock trades as alleged in the Complaint, a remedy will be at hand for the Court to impose. Moreover, the Parties agree that Nevada corporate law follows Delaware law, and Delaware courts have long recognized that insiders breach their fiduciary duties by misusing corporate information to profit improperly from stock sales. For pleading purposes and prior to discovery, the insider

---

[3]     The Insider Trading Defendants are Gallagher, Anderson, Sheldon Redmond and Ellmer. ¶ 112.

trading claim has been alleged with sufficient particularity: it identifies who made the stock trades based on insider information, the volume of such trades, and when the trades took place. ¶¶ 112-118. Defendants seek to have Plaintiffs *prove* the insider trading claim rather than examine the sufficiency of the allegations set forth in the Complaint.

Plaintiffs have also sufficiently alleged violations of Section 14(a) of the Securities Exchange Act which prohibits active misrepresentations or statements by omission in connection with a proxy solicitation. Here, Plaintiffs allege that Allegiant's 2016 proxy solicitation contained both active misrepresentation and omitted material facts that advanced the directors interests (*e.g.* approval of the Long Term Incentive Plan). ¶¶ 148-149. The 2016 Proxy solicitation not only asked shareholders to secure the Defendants continued positions with Allegiant but asked them advance Defendants' financial interests by approving the Long Term Incentive Plan. ¶ 150. The Complaint alleges that had Defendants disclosed the true state of Allegiant's safety record, neither outcome would have been assured.

For the reasons set forth herein, the Defendants' motion to dismiss should be denied.

## II.     FACTUAL BACKGROUND

Allegiant is the ninth largest commercial airline in the United States and is known as a low-cost or budget airline. ¶ 4. From at least mid-2014 to the present, the Individual Defendants knowingly caused or allowed Allegiant to sacrifice safety in the name of cost cutting and profits. ¶ 38.

### A.     THE INDIVIDUAL DEFENDANTS FAILED TO IMPLEMENT SAFETY CONTROLS, RESULTING IN NUMEROUS SAFETY INCIDENTS

Allegiant operates the oldest commercial aircraft fleet of any major carrier, in which the average age of a plane is twenty-two years, because the Company buys its planes second-, third-, or even fourth-hand. ¶ 68. Older planes require a greater level of care and maintenance to ensure

they are safe, but the Individual Defendants caused Allegiant to cut corners on required maintenance to reap higher profits. *Id.* In 2015, Allegiant aircraft made at least seventy-seven unscheduled landings due to serious mechanical failures. ¶ 70. On June 25, 2015, five of the Company's flights were interrupted by mid-air failures in a four-hour period. ¶ 69. As a result, Allegiant has been under close FAA supervision since October 2015. *Id.*

An incident on June 8, 2015 is illustrative. That day, Captain Jason Kinzer returned Allegiant flight 864 to St. Petersburg, Florida for an emergency landing because passengers and crew smelled smoke in the cabin. ¶ 75. After landing, fire rescue reported smoke emanating from the plane's engine, and, when shutting the engine down did not resolve the burning smell, Captain Kinzer prepared to evacuate the plane and alerted air traffic ground control. ¶¶ 77-78. An identified speaker authorized the evacuation, but another speaker told Captain Kinzer to "hold off your evacuation." ¶ 78. Captain Kinzer repeatedly asked the speaker to identify himself, who failed to do so, and Captain Kinzer evacuated the plane. ¶ 79. Captain Kinzer was terminated because he allegedly "ordered an evacuation that was entirely unwarranted and . . . compromised the safety of your crew and your passengers and led directly to the injuries." ¶ 80. One of Captain Kinzer's flight attendants sent an email to defendant Gallagher questioning the "harshest punishment" for the Captain, "especially hearing from Flight Ops management that the evacuation went as trained," and "all other parties that were involved that day were returned to duty with no additional training." ¶ 82. Captain Kinzer's wrongful termination suit was settled on the verge of trial for an undisclosed sum. ¶ 81.

The Teamsters Aviation Mechanics Coalition has issued multiple reports documenting the safety problems with Allegiant aircraft. In April 2015, the union compiled a report of 65 incidents from September 2014 to March 2015 and concluded that Allegiant had poorly trained mechanics, insufficient spare parts, and a fleet well beyond its service life. ¶ 90. On March 7, 2016, the union

issued an updated report that included 98 separate and preventable maintenance issues between September 2015 and January 2016, including: 35 engine issues, such as failures to start, clogged filters, and two catastrophic engine failures where the engine came apart; four incidents of smoke in the cabin; and three instances of pressurization problems. ¶ 91. This report also identified a failure to properly document shift turnover; improper use of minimum equipment list ("MEL"), a procedure which allows a fleet to operate with certain functions that do not work; and substandard maintenance expertise. ¶¶ 91-92.

Media articles report numerous emergency landings and safety issues involving Allegiant aircraft, with one analysis concluding that Allegiant's planes were four times more likely to fail during flight than those operated by other major U.S. airlines. ¶¶ 94-97. In November 2016, the *Tampa Bay Times* reported on Allegiant's history of midair failures. ¶ 97. The article found the following facts, which Allegiant did not dispute: (i) 42 of its 86 planes broke down in mid-flight at least once in 2015; (ii) after certain systems on Allegiant planes fail, the Company repairs them and puts the plane back in services, only to see the same systems fail again; (iii) the average age of its planes is 22 years old, whereas other carriers' average age is twelve; and (iv) Allegiant relied most heavily on McDonnell Douglas MD-80s, an aging model retired by all but two other major U.S. carriers. ¶¶ 97-98. In response, defendant Gallagher admitted "I can look at what we did (in 2015) and it wasn't acceptable. I don't disagree with the thrust of your numbers. . . . We want to be well-known as being reliable and on-time, and obviously safe, and that's an important part of our brand. And we're going to make sure we do those things." ¶ 99.

Yet the safety incidents have persisted, and systematic issues continue to this day. *See* ¶¶ 109-110, 124-129. For example, in June 2019, federal safety regulators proposed a fine of more than $715,000 against Allegiant for failure to fix properly an engine that put out hotter than acceptable exhaust fumes. ¶ 125. Additionally, Plaintiffs sought records from the FAA pursuant to

a Freedom of Information Act ("FOIA") request concerning FAA actions and/or investigations of Allegiant between March 2015 and November 2019. ¶ 126. Records from one of three offices handling the request shows that, over this period, the FAA recorded 122 unplanned landings, including 52 emergency landings due to maintenance problems; 192 instances where an Allegiant flight aborted takeoff due to maintenance problems; and 141 instances of other maintenance problems, including several FAA violations. ¶¶ 127-129.

**B.   A 60 MINUTES SEGMENT EXPOSES THE TRUTH ABOUT ALLEGIANT'S LACK OF SAFETY**

On April 13, 2018, CBS News announced that it would air a *60 Minutes* segment two days later, criticizing Allegiant's safety and maintenance record. ¶ 102. On this news, Allegiant's stock price fell $14.20 or over 8.5%, representing a decline of over $229 million in market capitalization. *Id.*

On April 15, 2018, the *60 Minutes* segment aired during prime time on CBS and was viewed by over 10.4 million people. ¶ 103. It was titled "Allegiant Air: The Budget Airline Flying Under the Radar" and revealed to the public that: (a) Allegiant's aircraft had a high number of serious mechanical incidents between mid-2015 and October 2017; (b) Allegiant lacks the infrastructure and personnel to adequately maintain their aircraft; and (c) Allegiant discouraged pilots from reporting safety and maintenance issues. ¶ 103. The segment also showed that Allegiant pilots felt that management (including the Individual Defendants) denigrated the pursuit of safety in favor of gaining a competitive cost advantage over major airlines. ¶ 103.

Rather than fixing the safety issues that *60 Minutes* exposed, the Individual Defendants sought to cover them up. Defendant Gust issued a statement on behalf of Allegiant, denying the claims in the *60 Minutes* segment and casting it as a "one-sided narrative [produced] by cherry-picking interviews and ignoring publicly-available facts."  ¶ 105. Gust's statement also claimed that Captain Kinzer had evacuated a plane "though there 'was no smoke, fire, or an aircraft

malfunction,'" even though multiple witnesses had detected fire and smoke in the cabin, which was caused by an aircraft malfunction. ¶¶ 105-106.

The segment increased regulatory scrutiny of Allegiant. On April 16, 2018, U.S. Senator Bill Nelson of Florida, the top Democrat on the Senate Committee on Commerce, Science, and Transportation, called for an investigation into how the FAA handles Allegiant's safety issues. ¶ 107. The Department of Transportation's inspector general ramped an investigation of Allegiant that had commenced in June 2017, which had focused on the FAA's oversight of Allegiant's maintenance. ¶ 108.

**C.    THE INDIVIDUAL DEFENDANTS KNEW OF THE IMPORTANCE OF SAFETY AND MAINTENANCE BUT KNOWINGLY PERMITTED ALLEGIANT TO OPERATE UNSAFE AND INADEQUATELY MAINTAINED PLANES**

Gallagher co-founded ValuJet Airlines ("ValuJet"), which was a low-cost carrier that exclusively purchased used planes, provided sparse training to its employees, and used outside contractors for maintenance and other services. ¶ 40. Due to unacceptable safety practices overseen by Gallagher, a ValuJet flight crashed into the Florida Everglades about ten minutes after takeoff on May 11, 1996, killing all 110 people on board. ¶ 41. The incident led to the revelation of the numerous safety violations at the airline: one ValueJet plane flew 140 times with a leaky hydraulic system, one flew 31 times with malfunctioning weather radar, and another was allowed to fly despite engine rust which later caught fire. ¶ 42. Similarly, the remaining Individual Defendants also have long careers in the airline industry and at Allegiant from which they knew that implementing and maintaining proper safety controls is critical. ¶¶ 44-63.

On January 26, 2016, CtW Investment Group ("CtW"), a stockholder that manages approximately $250 million in pension funds and had a substantial position in Allegiant stock, sent a letter to the Board to bring the safety issues and the Board's oversight role to directors' attention (the "CtW Letter"). ¶ 85. The letter noted the "string of prominent safety incidents involving

Allegiant flights, prompting several FAA investigations," as detailed by multiple media reports, and doubts over the adequacy of disclosures regarding regulatory compliance. ¶ 88. The CtW Letter also highlighted an incident in July 2015 where an Allegiant flight "piloted by two licensed executives, one being [the Company's] director of flight safety" was running low on fuel and could have been "wholly avoidable if the pilots had adequately reviewed, as they are required to before each flight, an FAA Notice to Airmen." ¶ 88.

The CtW Letter called for the establishment of a board safety committee, recognizing that "[a]lmost all of Allegiant's US peers have standalone committees to oversee . . . operational safety and compliance with applicable laws and regulations," especially because "a key element of Allegiant's business model is the reliance on older aircraft, which require more extensive maintenance." ¶ 88. Despite this public warning, the Individual Defendants have failed to create a Safety Committee and have opted to allow the safety and mechanical failures to continue.

### D.   CERTAIN DEFENDANTS SOLD ALLEGIANT STOCK WHILE POSSESSING MATERIAL NON-PUBLIC INFORMATION

Gallagher, Anderson, Sheldon, Redmond, and Ellmer (collectively, the Insider Selling Defendants") sold more than $89.2 million of their personally held Allegiant stock when they were in possession of material non-public information. ¶¶ 113-117.

Gallagher sold 504,845 shares of Allegiant stock between June 2014 and May 2018 for proceeds of approximately $83,073,245. ¶ 113. Anderson sold 3,150 shares between May 23, 2017 and March 13, 2018 for proceeds of approximately $507,238.77. ¶ 114. Ellmer sold 3,420 shares between June 2014 and May 2018 for proceeds of approximately $569,257. ¶ 115. Sheldon sold 20,188 shares between August 3, 2015 and October 27, 2017 for proceeds of approximately $3,349,480. ¶117. Redmond sold 7,500 shares of Allegiant stock between August 3, 2015 and August 12, 2015 for proceeds of nearly $1,679,500. ¶ 116. Over $2.3 million worth of the sales

occurred after the Individual Defendants learned about the subject matter of the *60 Minutes* segment and that it was set to air in the near future. ¶¶ 112-115.

### E.   A MAJORITY OF THE BOARD IS BEHOLDEN TO GALLAGHER

At the time this action was commenced, Allegiant's Board was comprised of six directors: Gallagher, Redmond, Pollard, Marvin, Ellmer, and Brewer. ¶¶ 20, 21, 25-28, 133. Marvin served as an executive under Gallagher at WestAir and MPower and served as CFO of Allegiant alongside Gallagher as CEO. ¶¶ 86, 133. They are longtime friends, having lived within a mile of each other for over a decade. ¶¶ 86, 133. Similarly, Ellmer served alongside Gallagher at WestAir and has no other public board service. ¶¶ 86, 133. Brewer was recommended to the Board by Gallagher in 2009. ¶ 87. Redmond, along with Gallagher, owns Allegiant's headquarters and adjacent property. ¶¶ 86, 133.

## III.   ARGUMENT

### A.   THE COMPLAINT ADEQUATELY PLEADS DEMAND FUTILITY

#### 1.   Legal Standard for Demand Futility

"The derivative form of action permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (internal citations omitted). "Devised as a suit in equity, the purpose of the derivative action [is] to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Id*.

Under Federal Rule of Civil Procedure 23.1, "[a] shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999). "Although Rule 23.1 supplies

the pleading standard for assessing allegations of demand futility, [t]he substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (internal citations and quotation marks omitted).

Nevada rules, like Delaware, impose "heightened pleading imperatives in shareholder derivative suits," requiring a plaintiff to state with particularity "his reasons for not making a demand" upon the board. *Shoen v. SAC Holding Corp.*, 122 Nev. 621, 633-34 (2006), *overruled on other grounds*, *Chur v. Eighth Judicial Dist. Court of Nev.*, 458 P.3d 336, 136 Nev. Adv. Rep. 7 (Nev. 2020). However, Nevada also "requires pleadings to be 'simple, concise, and direct.' Accordingly, 'the pleader is not required to plead evidence.'" *Shoen*, 122 Nev. At 633-644 (quoting NRCP 8(e)).

The Nevada Supreme Court recently confirmed that Nevada has adopted Delaware law to determine whether a complaint pleads demand futility. *Chur*, 458 P.3d at 340 (citing *Shoen*, 122 Nev. at 641); *Kahn v. Dodds* (*In re AMERCO Derivative Litig.*), 127 Nev. 196, 218, (2011) ("To determine whether demand upon the board is excused, [courts] apply standards articulated by the Delaware Supreme Court in *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000); and *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)."). Thus, the Court should apply the tests set forth *Aronson* and *Rales*, as modified by later Delaware decisions.

"The *Aronson* test applies when the alleged wrongs constitute a business decision by the board of directors." *Kahn*, 127 Nev. at 218 (internal quotation marks and citations omitted). Under *Aronson*, to demonstrate demand futility, the complaint must raise a *reasonable doubt* that the directors are disinterested and whether the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 814. The test is in the disjunctive.

*Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000). The *Rales* test applies where the board did not take affirmative action, and focuses solely on whether the board was conflicted. "The *Rales* test, on the other hand, is the appropriate demand futility analysis for when the board considering a demand is not implicated in a challenged business transaction. *Kahn*, 127 Nev. at 218-19.

Because the question of the board's conflict is a factor under both tests, Plaintiff need only establish this prong to plead demand futility, regardless of whether *Aronson* or Rales applies. *See Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995) ("If a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test, then he has demonstrated that demand would have been futile. Thus, the Complaint need only raise a reasonable doubt that a majority of the Allegiant board is not disinterested with respect to the matters raised in the Complaint.

"'[T]he concept of reasonable doubt is akin to the concept that the stockholder has a reasonable belief that the board lacks independence.'" *In re Cray Inc. Derivative Litig.*, 431 F. Supp. 2d 1114, 1121 (W.D. Wash. 2006) (citing *Grimes v. Donald*, 673 A.2d 1207, 1217 n.17 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253 n.13 (Del. 2000)). A reasonable doubt has also been defined as "'a doubt based upon reason and common sense which . . . intelligent, reasonable and impartial people may honestly entertain . . . .'" *Mills v. State of Delaware*, 732 A.2d 845, 851 (Del. 1999). Indeed, the Delaware Supreme Court expressly rejected a more stringent standard holding: "[W]e reject the defendants' proposal that . . . a plaintiff must demonstrate a reasonable probability of success on the merits." *Rales*, 634 A.2d at 934. Under the "reasonable doubt" standard, plaintiffs must allege, with particularity, facts that would give a reasonable shareholder reason to doubt the ability of a board of directors to consider disinterestedly a demand. *Id*. Indeed, the reasonable doubt standard promotes a strong public

policy, since "the derivative suit [is a] potent tool [] to redress the conduct of a torpid or unfaithful management." *Aronson*, 473 A.2d at 811.

Further, reasonable doubt "must be decided by the trial court on a case-by-case basis employing an objective analysis." *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988), *overruled in part on other grounds by Brehm*, 746 A.2d 244. The Court must not dissect the complaint into components nor rely on any one factor in the demand futility analysis, but must take into account the totality of the circumstances. *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990). In evaluating whether a plaintiff has adequately pleaded the requisite reasonable doubt, a court must accept as true each of the complaint's particularized factual allegations and draw every fair inference flowing from those alleged facts in the Plaintiffs' favor. *See, e.g.*, *In re Dow Chem. Co. Derivative Litig.*, No. 4349-CC, 2010 Del. Ch. LEXIS 2, at *20 (Ch. Jan. 11, 2010). Demand is excused because Plaintiffs' particularized factual allegations raise a reasonable doubt regarding the disinterestedness or independence of the Board.

### 2.    Demand is Excused because Defendants Face a Substantial Likelihood of Personal Liability

"[P]laintiffs are entitled to a reasonable inference of interestedness where a complaint indicates a 'substantial likelihood' of liability will be found." *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007). As the Delaware Court of Chancery explained:

> A director cannot consider a litigation demand under Rales if the director is interested in the alleged wrongdoing, not independent, or would face a "substantial likelihood" of liability if suit were filed. *Rales*, 634 A.2d at 936 (internal quotation marks omitted). To show that a director faces a "substantial risk of liability," a plaintiff does not have to demonstrate a reasonable probability of success on the claim. In Rales, the Delaware Supreme Court rejected such a requirement as "unduly onerous." *Id*. at 935. The plaintiff need only "make a threshold showing, through the allegation of particularized facts, that their claims have some merit." *Id*. at 934. This standard recognizes that the purpose of the particularity requirement is not to prevent derivative actions from going forward, but rather "to ensure only derivative actions supported by a reasonable factual basis proceed." *In re Dow Chem. Co. Deriv. Litig.*, 2010 Del. Ch. LEXIS 2, at *6 (Del. Ch. Jan. 11, 2010).

*In re China Agritech, Inc.*, No. 7163-VCL, 2013 Del. Ch. LEXIS 132, at *43-44 (Del. Ch. May 21, 2013).

Further, in Nevada, directors are liable individually if a plaintiff alleges facts sufficient to "(1) rebut the business judgment rule, and (2) constitute a breach of a fiduciary duty involving 'intentional misconduct, fraud or a knowing violation of law,'" which is akin to "'reckless disregard of a legal duty.'" *Chur*, 458 P.3d at 341-42 (Nev. 2020) (quoting NRS 78.138(7); *Black's Law Dictionary* (11th ed. 2019)). Although the Nevada Supreme Court, in *Chur*, clarified that NRS 78.138(7) precludes a finding of liability based solely on gross negligence, *Chur* did not otherwise modify the *Aronson/Rales* standard for demand futility. Therefore, the Complaint need only raise a reasonable doubt that a majority of the Board is not disinterested, based on allegations of raising an inference that the directors had knowledge that their conduct was wrongful.

Here, demand would have been futile because a majority of the Board's members were interested because they all face a substantial likelihood of liability for intentional misconduct, fraud and knowing violation of law. As illustrated below, in addition to the allegations that the entire Board is interested because the Board caused the Company to issue false and misleading SEC filings: (1) Gallagher is interested by virtue of his position as an Allegiant officer and related involvement in this misconduct; (2) the members of the Board's Audit Committee—which includes Marvin, Ellmer, and Pollard—are interested by virtue of their committee-based obligations and conflicting involvement in the misconduct; (3) the Insider Trading Defendants—Gallagher, Redmond, and Ellmer—are interested because they abused their positions of trust and confidence by trading on adverse insider information; and (4) Marvin, Redmond, and Ellmer are interested because of their interwoven business relationship and preexisting relationship with Gallagher.

Further, the Complaint alleges facts sufficient to infer that Defendants acted with the requisite level of intentionality. For example, the Complaint includes copious allegations that Defendants had ample experience in the airline industry and, therefore, fully understood the importance of safety and maintenance. (¶¶ 7, 43, 45, 47, 49, 51, 53, 56, 59, 63.) Moreover, each of the defendants were notice of the safety failures because of the letter sent by one of Allegiant's largest stockholders raising these very same issues. The Complaint alleges insider trading by three of the directors (¶ 133F), and it is reasonable to infer that each knew that trading on inside information is unlawful. The Complaint alleges that director defendants made false and misleading statements to the market in violation of Section 14 of the Securities Exchange Act of 1934 (¶ 8, 119), and it is reasonable to infer that Defendants knew such conduct was unlawful.

### 3.   Gallagher Is Interested

Defendant Gallagher has been the Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Board") of Allegiant since September 2006. ¶ 20. He has also been Chairman of Allegiant Air since 2001. *Id*. In 2015, Gallagher received $3,550,486 in total compensation from Allegiant, bonuses made up $2,926,633 and $600,071 were stock awards. *Id*. In 2016, Gallagher received $3,571,205 in total compensation from Allegiant, bonuses made up $2,850,000 and $699,948 were stock awards. *Id*. In 2017, Gallagher received $2,320,613 in total compensation from Allegiant, bonuses made up $1,500,000 and $800,064 were stock awards. *Id*. Allegiant's 2019 Proxy Statement concedes that Gallagher is not independent. *See Sandys v. Pincus*, 152 A.3d 124 (Del. 2016) (a director that is not independent under exchange rules is likely not independent for demand futility purposes). Indeed, "[u]nder the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller." *In re EZCORP Inc.*, 2016 Del. Ch. LEXIS 14, at *116 (Del. Ch. Jan. 25, 2016).

**4.    The Members of the Audit Committee Face a Substantial Likelihood of Liability for Allegiant's False and Misleading Statements**

Throughout the Relevant Period, defendants Marvin, Ellmer, and Pollard sat on the Audit Committee. ¶¶ 25-27. Courts routinely find that membership on Board subcommittees relating to the alleged wrongdoing supports a pleading-stage finding of demand futility. *See, e.g., In re Intuitive Surgical Shareholder Derivative Litigation*, 146 F. Supp. 3d 1106, 1120 (N.D. Cal. Nov. 16, 2015) (demand was futile as to Audit Committee members where the committee charter "suggests that these directors would have received even more information regarding the regulatory issues than the full board"); *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, No. 8:07-CV-1952-T-26MAP, 2009 U.S. Dist. LEXIS 107531, at *13 (M.D. Fla. Mar. 30, 2009) (demand futile on directors who were Audit Committee members because they were "specifically charged with oversight of…the integrity of the financial statements…[and] compliance…with legal and regulatory requirements"); *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 Del. Ch. LEXIS 33, at *16 (Del.Ch. Feb. 13, 2006) ("[a] claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and otherwise functioning.").

The Audit Committee's responsibilities were to:

- Oversee the quality and objectivity of the Company's financial statements and the independent audit thereof by, among other things, reviewing and appraising the audit efforts of the Company's independent auditors;

- Oversee that management has maintained the reliability and integrity of the Company's accounting policies and financial reporting and disclosure practices;

- Oversee that management has established and maintained adequate systems of disclosure controls and procedures and internal controls over financial reporting;

- Oversee that management has established and maintained processes to assure compliance by the Company with all applicable laws, regulations and corporate policy;

16

- Assist the Board oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditors' qualifications and independence, (iv) the performance of the Company's internal audit function and independent auditors; and (v) the Company's overall risk management profile;

- Review the Company's policies and compliance procedures regarding ethics. ¶ 36.

Audit Committee members are responsible for, among other things, oversight of Allegiant's financial reporting, including reviewing and discussing with management and the independent auditor the Company's financial reports, and reviewing the adequacy and effectiveness of the Company's financial reporting procedures and internal controls. *Id.*

In addition, the Audit Committee members are responsible for monitoring the Company's "compliance with legal and regulatory requirements . . . ." (*Id.*) By virtue of their service on the Audit Committee, Defendants Marvin, Ellmer, and Pollard knew or should have known that the Company's statement about safety and maintenance were materially false and misleading.

At this stage, the appropriate inference is that the Audit Committee Defendants must have been aware that Allegiant's public statements did not comport with reality. *See In re Fitbit, Inc. Stockholder Derivative Litig.*, No. CV 2017-0402-JRS, 2018 Del. Ch. LEXIS 571, at *35 (Del. Ch. Dec. 14, 2018), *aff'd sub nom. Fitbit, Inc. v. Agyapong*, 202 A.3d 511 (Del. 2019) (inferring director knowledge of problems with core product accounting for over 80% of company's revenue). Airline operations represent almost all of Allegiant's revenue, aviation is a highly regulated industry, and the Company experienced a high number of serious mechanical incidents from mid-2015 through October 2017. *See, e.g., Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) (inferring director knowledge of core operations related to "maintenance problems" in highly regulated industry); *Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (inferring management knowledge of severe safety problems with core operations in highly regulated industry).  At the pleadings stage, it is appropriate to infer

Audit Committee knowledge of the pervasive safety and maintenance problems effecting Allegiant's core business.

### 5. The Insider Trading Defendants Are Interested Because They Face a Substantial Likelihood of Liability

With the knowledge that Allegiant's stock price was artificially inflated and that they caused Allegiant to fail to maintain proper safety and maintenance procedures, three of the Director Defendants engaged in illegal insider trading during the relevant period:

| Name | Dates of Sale | No. of Shares | Proceeds |
|------|--------------|--------------|----------|
| Gallagher | 3/9/2016 - 3/6/2018 | 280,463 | $45,716,133.54 |
| Redmond | 8/3/2015 – 8/12/2015 | 7,500 | $1,679,895 |
| Ellmer | 6/23/2015 – 3/13/2018 | 3,120 | $519,739.12 |

¶¶ 113; 115; 116.

Here, the Complaint's allegations support the inference that all of the Insider Trading Defendants knew, at the time of their sales, that the Company's public statements concerning the Company's statement about safety and maintenance were false and misleading. ¶¶ 112-18. Facing such potential liability, the Insider Trading Defendants have a vested interest in not permitting this derivative action to proceed.

The Complaint's allegations also support a reasonable inference that the Insider Trading Defendants acted with scienter because they were aware of material non-public damaging information and intentionally took no action to correct such misinformation. *See, e.g., Silverberg v. Gold*, 2013 Del. Ch. LEXIS 312, at *45, *review denied*, 85 A.3d 88, (Del. Ch. Dec. 31, 2013).

While Allegiant was rated the most profitable airline in 2015 due to its strategy of saving money on safety and maintenance expenses, it made a series of false and misleading statements regarding its safety procedures, purported compliance with FAA regulations, and that safety was the Company's first priority. The Board members, however, were privy to information

demonstrating that the public statements were untrue. The Director Defendants were in position to know that, in 2015, its fleet had to make at least seventy-seven unexpected landings for serious mechanical failures, on June 25, 2015, five Allegiant planes failed midair within the span of four hours, and Allegiant had a fleet of eighty-six planes, and forty-two of them broke down midair at least once in 2015. ¶¶ 5; 68-71. Such allegations are sufficient to raise an inference that the Insider Trading Defendants acted with scienter when they sold their shares based upon material non-public information.

> **6.     Marvin, Redmond, and Ellmer Are Interested Because of Their Interwoven Business and Preexisting Relationship with Gallagher**

Plaintiffs' Amended Complaint details defendants' Marvin, Redmond, and Ellmer has interwoven business and preexisting relationship with Gallagher raising ample reason to doubt their loyalties.

Defendant Redmond is part of a partnership with Gallagher that owned the property that Allegiant leased as its headquarters in Las Vegas. ¶ 127. Redmond owns 11% of the partnership and Gallagher owns 30%. Although the Company terminated the lease in May 2015, it paid $1.3 million to settle litigation against the owners. *Id*. During the term of the lease, defendants Gallagher and Redmond received substantial benefits from their joint ownership in the property leased by Allegiant. *Id*.

Defendant Marvin began her career working in aviation alongside defendant Gallagher at WestAir as a Controller until 1994. *Id*. Defendant Gallagher was at all times the principal owner, an executive officer, and a director of WestAir, from 1983 to 1992. *Id*. When defendant Gallagher moved on to found Mpower Communications Corp. in 1996, he brought defendant Marvin onboard to serve in various high-level positions at his communications company, culminating in her serving as CFO from 1998 to 1999, as well as a Senior Vice President of Finance from 1999 to

2001. *Id.* When defendant Gallagher went on to form Allegiant, and once again, defendant Marvin followed him to the Company, serving as Allegiant's CFO and Principal Accounting Officer from September 2001 to September 2007 and a part-time consultant from September 2007 to May 2008, before taking on her current position as a director of Allegiant. *Id.* Additionally, defendant Ellmer served as Vice President of Maintenance and Engineering at Gallagher's WestAir from 1988 to 1994. *Id.*

### 7.   In total, five of the six Board members are not independent.

Defendants suggest that because the Securities Action is preliminarily approved, the Board does not face substantial likelihood of liability. *Defs. Brf.* at 10. However, demand futility analysis is based on factual circumstances at the time of filing, not when Rule 23.1 motion is considered. *McFarland v. Long*, No. 2:16-cv-00930-RFB-PAL, 2017 U.S. Dist. LEXIS 168998, at *16 (D. Nev. Oct. 6, 2017) ("'Under FRCP 23.1, a shareholder must either demand action from the corporation's directors *before filing a shareholder derivative suit*, or plead with particularity the reasons why such demand would have been futile.'" (quoting *Arduini v. Hart*, 774 F.3d 622, 628 (9th Cir. 2014) (emphasis added)). Rather, the progress made in the Securities Action bolsters that the allegations in the Complaint are sufficient to overcome the demand requirement. *See Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261 (D. Nev. 2019) (sustaining fraud claims regarding Allegiant's statement that "[w]e believe our aircraft are, and will continue to be, mechanically reliable," that Allegiant's "technicians . . . have appropriate experience," Allegiant "provide[d] them with comprehensive training[,]" and that Allegiant could hire "sufficient qualified alternative providers of maintenance services . . . to satisfy . . . maintenance needs.").

### 8.   Plaintiffs are entitled to an inference under the "Core Operations" doctrine

The core operations doctrine allows a court, in certain circumstances, to infer board knowledge of matters relating to a corporation's core product.  *In re Fitbit, Inc.*, 2018 Del. Ch.

LEXIS 571, at  *25 n.179 (Del. Ch. Dec. 14, 2018) ("*Fitbit I*"); *In re Fitbit, Inc.*, 2019 Del.  Ch. LEXIS 14, at *7 (Del. Ch. Jan. 14, 2019) ("*Fitbit II*") ("Moreover, there is no *per se* rule that a court cannot infer scienter based on the core operations doctrine when the presumption that flows from the doctrine is offered along with particularized factual allegations.").  Although the doctrine is not sufficient on its own to satisfy Rule 23.1's pleading standard, when paired with other specific allegations, the core operations doctrine is relevant to pleading demand futility.  *Fitbit I*, 2018 Del. Ch. LEXIS at *25 n.179. (allegations concerning Fitbits core product, combined with other allegations, adequately support an inference that selling shareholders sought to trade on nonpublic information).

Plaintiffs specifically allege that each of the Director Defendants knew of the Company's safety and maintenance problems.  ¶ 131(A-B, E). Plaintiffs also specifically allege that due to their extensive histories in the airline industry, of the importance that safety and maintenance to an airline.  (¶¶ 7, 43, 45, 47, 49, 51, 53, 56, 59, 63.) Further, on or about January 26, 2016, a large stockholder wrote to the Board addressing the significant safety issues plaguing Allegiant.  (¶ 85.) In light of  these specific allegations, the Court should find that the core operations doctrine further strengthens the inference that the Director Defendants' breaches of fiduciary duty were done knowingly, thereby subjecting each Director Defendant to a reasonable risk of liability.

## B.   THE COMPLAINT SETS FORTH WELL-PLEADED THEORIES OF LIABILITY

Since demand is excused under Rule 23.1, the Complaint sufficiently alleges a claim for relief under Rule 12(b)(6). Under Nevada law, the standard for demand futility is "more rigorous than the standard" for alleging substantive claims, and therefore, a complaint that meets the [FRCP] 23.1 standard and otherwise states a claim generally also will suffice under the [FRCP 12(b)(6)] standard." *Shoen v. SAC Holding Corp.*, 122 Nev. 621, 635 (2006) (citation omitted); *accord In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 285 (Del. 2003) (same)

Defendants are entitled to dismissal under Rule 12(b)(6) only where it is clear from the allegations that Plaintiffs would not be entitled to relief under any set of facts that could be proven to support the claim. *Walt Disney*, 825 A.2d at 285. Courts are required to accept as true all well-pleaded factual allegations and give plaintiff the benefit of all inferences that may be drawn from the facts. *Id.*

### 1.    Breach of Fiduciary Duty

The breach of fiduciary duty claim arises under the same facts that excuse demand. It is well-settled that when a complaint contains allegations sufficient to excuse demand under *Aronson*, it "*a fortiori* rebuts the business judgment rule for the purpose of surviving a motion to dismiss pursuant to Rule 12(b)(6)." *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007). Thus, the SAC states a claim as to the Director Defendants.

Similarly, the Complaint states claims against Anderson, Sheldon, and Gust. Like the Director Defendants, defendants Anderson, Sheldon, and Gust knew of the importance to an airline's bottom line of maintaining proper safety procedures and the consequences of failing to do so. ¶¶ 46-51. Yet they employed improper reporting practices at Allegiant, such that maintenance issues were pervasive, perpetuating the safety issues with the Company's aircraft to this day. ¶¶ 70-84, 90-92, 127(a)-(c), 128(a)-(c) (safety incidents in 2015); ¶¶ 94-98, 127(d)-(f), 128(d)-(h) (incidents in 2016 and 2017); ¶¶ 109-110, 125, 127(g)-(h), 128(i)-(n) (incidents after *60 Minutes* report); ¶ 129 (FAA violations in 2018). As such, these defendants knowingly breached their duty of loyalty. *See Marchand v. Barnhill*, 212 A.3d 805, 824 (Del. 2019) (breach of loyalty where "no reasonable compliance system" was "established as to the obviously most central consumer safety and legal compliance issue facing the company").

Defendants argue that the FAA has allowed Allegiant to operate despite the issues raised in the incident reports, but this is not persuasive. The propriety of FAA's oversight of Allegiant's

maintenance is the subject of an investigation by the Department of Transportation's inspector general. ¶ 108.

### 2.   Breach of Fiduciary Duty for Insider Trading

#### a.   A Common Law Claim for Insider Trading Exists

As an initial matter, Defendants question whether there is a cause of action for insider selling, claiming that jurisdictions that recognize this claim rely on "dated case law." Defendants' Brief In Support of Dismissal ("Def. Br."), ECF No. 21 at 14 & n.30 (citing *Brophy v. Cities Service, Inc.*, 70 A.2d 5 (Del. 1949)). But the Delaware Supreme Court has affirmed that *Brophy* remains good law, "irrespective of arguably parallel remedies grounded in federal securities law." *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 840 (Del. 2011); *see also In re Fitbit, Inc. Stockholder Deriv. Litig.*, 2018 Del. Ch. LEXIS 571, at *32 (Del. Ch. Dec. 14, 2018) ("Public policy will not permit an employee occupying a position of trust and confidence toward his employer to abuse that relation to his own profit, regardless of whether his employer suffers a loss.").

The theory of breach underlying Delaware's *Brophy* claim is long recognized under Nevada law as well: "Directors breach their fiduciary duty if they 'exploit an opportunity that belongs to the corporation.'" *Bedore v. Familian*, 122 Nev. 5, 12 n.25 (2006) (quoting *Leavitt v. Leisure Sports Inc.*, 103 Nev. 81, 87 (1987)). "The fiduciary is not to benefit at the expense of the corporation and those interested therein; he may not use his power for his personal advantage to the detriment of the corporation and its creditors, 'no matter how meticulous he is to satisfy technical requirements.'" *In re W. World Funding, Inc.*, 52 B.R. 743, 763 (Bankr. D. Nev. 1985), *aff'd in part, rev'd in part sub nom. Buchanan v. Henderson*, 131 B.R. 859 (D. Nev. 1990), *rev'd,* 985 F.2d 1021 (9th Cir. 1993) (quoting *Pepper v. Litton*, 308 U.S. 295, 311 (1939)). Delaware law recognizes that remedies under the federal securities laws are only available for the buyers or

sellers of the company's stock, not to the company whose information is misappropriated by a fiduciary.[4] Here, Plaintiffs seek to impose a constructive trust on proceeds from stock sales executed by the Insider Selling Defendants who traded while in possession of material non-public information. ¶ 143; *see Locken v. Locken*, 98 Nev. 369, 372 (1982) ("A constructive trust will arise and affect property acquisitions under circumstances where: (1) a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice.").

Defendants argue that because Nevada "has enacted some of the most director-friendly statutes," it is unlikely to adopt a common law claim of insider trading. Def. Br. at 15. However, a claim for insider trading is entirely consistent with Nevada law, which imposes liability for intentional misconduct, fraud or a knowing violation of law. *See Silverberg on behalf of Dendreon Corp. v. Gold*, 2013 Del. Ch. LEXIS 312, at *30 (Del. Ch. Dec. 31, 2013) (scienter required).

### b.   The Insider Selling Defendants Are Liable

To state a breach of fiduciary duty claim for insider trading, the complaint must allege that: (1) the corporate fiduciary possessed material, nonpublic information; and (2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information. *See e.g., Silverberg*, 2013 LEXIS 312, at *30

Throughout the relevant period, the Insider Selling Defendants sold nearly $89.2 million worth of stock, knowing that safety deficiencies belied Allegiant's true financial condition. ¶¶ 113-117. In particular, Gallagher, Anderson, and Ellmer sold $2.3 million worth of Allegiant stock one month before the *60 Minutes* segment aired, when they were aware that the segment was

---

[4]   Defendants' cases regarding double recovery are not persuasive in Nevada. *Daisy Sys. Corp. v. Finegold*, 1988 U.S. Dist. LEXIS 16765, at *5 (N.D. Cal. Sept. 19, 1988) (California statute provided exclusive basis for insider trading); *In re Cray Inc.*, 431 F. Supp. 2d 1114, 1132-33 (W.D. Wash. 2006) (*Brophy* no longer relevant because private causes of action exist under Rule 10b-5).

being produced. ¶¶ 11, 113-115. Defendants dispute the sufficiency of the claims by pointing to the five-year period covered by the complaint, but courts have affirmed a claim of insider trading in similar circumstances. *See In re Finisar Corp. Deriv. Litig.*, 2012 U.S. Dist. LEXIS 97807, at *64 (N.D. Cal. July 12, 2012) ("individual transactions" not identified, yet insider trading claim sustained where plaintiffs alleged knowledge of backdating); *In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1018 (N.D. Cal. 2007) ("plaintiff alleges that the insider defendants sold stock in certain amounts over a ***nine-year period***" during which directors knew revenue was overstated) (emphasis added).

### 3.    Unjust Enrichment

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Tsambis v. Irvine*, 2018 LEXIS 108163, at *23 (D. Nev. June 28, 2018) (quoting *Topaz Mut. Co., Inc. v. Marsh*, 108 Nev. 845 (1992)). The Insider Selling Defendants must disgorge profits they received by trading on the basis of material non-public information. *See Kahn*, 23 A.3d at 838 ("Even if the corporation did not suffer actual harm, equity requires disgorgement of that profit [from insider trading].").

### 4.    Proxy Claim

Section 14(a) of the Securities Exchange Act "disallow[s] the solicitation of a proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an omission of a material fact that makes any portion of the statement misleading." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000). Here, the 2016 proxy statement solicited shareholder approval of the 2016 Long Term Incentive Plan while misrepresenting the Board's actual activities with respect to risk management and safety. ¶¶ 111, 148. The Audit Committee is tasked with, among other things, maintaining the reliability and integrity of Allegiant's financial

statements and ensuring the adequacy of its disclosure controls and procedures. ¶ 36. The entire

Board must exercise oversight of the Company's overall risk management profile. ¶ 36.

Yet the 2016 proxy statement failed to disclose that the Board did not employ even the

most basic safety standards, thereby increasing Allegiant's risk of liability for airplane incidents.

*See* ¶¶ 94. 111; *see In re Countrywide Fin. Corp. Deriv. Litig.*, 544 F. Supp. 2d 1044, 1076-77

(C.D. Cal. 2008) (Section 14(a) claim stated as to proxy statement that "failed to disclose that

Company abandoned its underwriting standards, thus exposing itself to an undisclosed level of

heightened risk"). The SAC alleges that the cost-cutting measures on required maintenance

allowed the Individual Defendants to report profits and thus receive excessive compensation. ¶ 68;

*Countrywide*, 544 F. Supp. 2d at 1077 ("true operational and financial state" of the company is

"material to shareholders during a proxy vote because of its impact on the Company's balance

sheet"). Therefore, the Section 14(a) claim rests on a basis other than mere mismanagement or

breach of fiduciary duty. *See In re Wells Fargo & Co Shareholder Deriv. Litig.*, 282 F. Supp. 3d

1074, 1103 (N.D. Cal. 2017) ("[T]he thrust of Plaintiffs' complaint is that Defendants knew of,

but failed to disclose, a . . . business practice that put the company at material risk[.]").

## IV.    CONCLUSION

For these reasons, Plaintiffs respectfully request that Defendants' Motion to Dismiss the

Second Amended Verified Stockholder Derivative Complaint be denied.

DATED:  May 26, 2020                                    Respectfully submitted,

                                        /s/ *Martin A. Muckleroy*
                                       MARTIN A. MUCKLEROY, ESQ.
                                       Nevada Bar No. 009634
                                       **MUCKLEROY LUNT, LLC**
                                       6077 S. Fort Apache, Ste. 140
                                       Las Vegas, NV 89148
                                       Telephone: (702) 907-0097
                                       Facsimile: (702) 938-4065
                                       Email: martin@muckleroylunt.com

                                       *Liaison Counsel for Plaintiffs*

                                       DAVID J. STONE, ESQ.
                                       **BRAGAR EAGEL & SQUIRE, P.C.**
                                       885 Third Avenue, Suite 3040
                                       New York, NY  10022
                                       Telephone:  212-308-5858
                                       Facsimile:  212-486-0462
                                       Email: stone@bespc.com

                                       MELISSA FORTUNATO, ESQ.
                                       **BRAGAR EAGEL & SQUIRE, P.C.**
                                       101 California Street, Suite 2710
                                       San Francisco, CA 94111
                                       Telephone: (415) 365-7140
                                       Email:  mfortunato@bespc.com

                                       MATTHEW M. HOUSTON, ESQ.
                                       BENJAMIN I. SACHS-MICHAELS, ESQ.
                                       **GLANCY PRONGAY & MURRAY LLP**
                                       712 Fifth Avenue
                                       New York, New York 10019
                                       Telephone: (212) 935-7400
                                       E-mail: mhouston@glancylaw.com
                                                bsachsmichaels@glancylaw.com

                                       ROBERT V. PRONGAY, ESQ.
                                       PAVITHRA RAJESH, ESQ.
                                       **GLANCY PRONGAY & MURRAY LLP**
                                       1925 Century Park East, Suite 2100
                                       Los Angeles, California 90067
                                       Telephone: (310) 201-9150
                                       Facsimile: (310) 210-9160
                                       E-mail: rprongay@glancylaw.com
                                                lportnoy@glancylaw.com

1

*Co-Lead Counsel for Plaintiffs*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28