MARK E. FERRARIO, ESQ.
Nevada Bar No.: 1625
JACOB D. BUNDICK, ESQ.
Nevada Bar No.: 9772
**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone:  702-792-3773
Facsimile:   702-792-9002
Email:        ferrariom@gtlaw.com
                  bundickj@gtlaw.com

DANIEL J. TYUKODY, ESQ. (*Admitted Pro Hac Vice*)
California Bar No.: 123323
**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone:  310-586-7723
Facsimile:   310-586-7800
Email:        tyukodyd@gtlaw.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT COURT OF NEVADA

| | |
|---|---|
| IN RE ALLEGIANT TRAVEL CO. STOCKHOLDERS DERIVATIVE LITIGATION | Master File No.:  2:18-cv-01864<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

/ / /
/ / /
/ / /
/ / /

1

Nominal Defendant Allegiant Travel Co. ("Allegiant" or the "Company") and the Individual Defendants respectfully submit this Reply brief in response to Plaintiffs' Opposition brief ("Opposition" or "Opp.") and in support of their Motion to Dismiss ("Motion" or "MTD").[1]

## I.   INTRODUCTION

The Opposition only confirms the fact that the Complaint does not satisfy the requirements of Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure, and therefore should be dismissed. The Opposition fails to respond to many of the legal arguments made in Defendants' Motion, and instead largely repeats what the deficiently pled Complaint already says. Opp. at 4-10. When it does address the law, the Opposition misconstrues the principal cases, and ignores significant case law authority for which it has no adequate response.

The Opposition relies heavily upon a factual misstatement that is contradicted by the Complaint itself. The Opposition's "Factual Background" section begins by saying that "Allegiant operates the oldest commercial aircraft fleet of any major carrier, in which the average age of a plane is twenty-two years . . . ." Opp. at 4 (citing ¶ 68, which references Allegiant's *former* reliance "on *McDonnell Douglas MD-80s*"). However, the very first page of the Complaint says that "[a]s of May 23, 2018, Allegiant operated a fleet of *99 Airbus aircraft*." ¶ 2. *See also* ¶ 133(B) (referring to the fact that "the Company purchased new aircraft"). That is because Allegiant—under the direction of its Board—replaced Allegiant's entire fleet of planes during the period addressed in the Complaint, an obviously important fact in a case grounded in management and the Board's supposed indifference to safety. This issue was discussed in Defendants Motion (MTD at 6); however, the Opposition completely ignores it, pretending it does not know what the Complaint itself alleges.

---

[1] All "¶" citations refer to the Complaint. Throughout this brief, all emphasis is added unless otherwise stated, and we omit internal citations from cited cases.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

While Plaintiffs might now regret the Complaint's candor in describing how Allegiant replaced its entire fleet of planes, it does help in cutting to the chase of what really matters in this case, because it bears upon the "ancient history" argument discussed in the Motion. MTD at 6-7. In essence, Plaintiffs contend that Allegiant did not operate a safe airline during 2015-18, a proposition with which Defendants fundamentally disagree.[2] However, even if one were to accept Plaintiffs' false premise, one would still have to answer the question, "What more could management and the Board have done to resolve these issues than by completely replacing the airline's entire fleet of planes?" Much of the Complaint and Opposition reads like an attempt to recover for accidents that Plaintiffs say they believe could have happened, but that never actually did.

One cannot undo the past, but what Allegiant's Board could do is address the supposed consequences of what was done in the past. Here, the Opposition is correct in saying that the alleged "damages are already quantifiable from the payment made by Allegiant in the related securities class action pending before this Court" (Opp. at 2), referring to the $4 million settlement of the *Brendon* Securities Class Action.[3] The Opposition does not contest the fact that at $4 million, the settlement in *Brendon* is in the bottom quartile of all securities class action settlements for 2019. MTD at 10 n.15.

In attempting to explain why demand should be excused, the Opposition uses the terms "challenged transaction" or "transaction at issue" (Opp. at 2, 11-12) without identifying what "transaction" it is exactly talking about. However, it can be only one thing, which is a demand made upon the Board for the Company to take legal action

---

[2] Among these are the Opposition's acknowledgment that senior Allegiant executives occasionally piloted Allegiant's planes (*see* Opp. at 9), and the fact that there is no allegation of a death or serious injury on any Allegiant flight during the lengthy time period addressed in the Complaint, as well as no allegation that the FAA—Allegiant's primary regulator—ever had a significant issue with Allegiant's safety or maintenance practices.

[3] Contrary to what the Opposition asserts, the Court did not "sustain[] fraud claims" in the Securities Class Action (Opp. at 20)—it merely decided that some of the statements in that Complaint survived the relevant pleading standard. While Defendants disagreed with that determination, such is the nature of litigation, and the case then promptly settled for a modest amount with no admission of liability.

against the Individual Defendants based upon the *Brendon* settlement. As repeatedly recognized by the Nevada Supreme Court, the decision whether or not to pursue such litigation is at the very core of a board's function. *See Shoen v. SAC Holding Corp.*, 122 Nev. 621, 632 (2006) ("In managing the corporation's affairs, the board of directors may generally decide whether to take legal action on the corporation's behalf.").[4] Nothing in the Complaint, or in the Opposition's attempted defense of it, comes close to establishing that Allegiant's Board is incapable of making that decision, particularly in light of the Nevada Supreme Court's recent decision in *Chur v. Eighth Judicial Dist. Ct.*, 458 P.3d 336 (Nev. 2020).

## II.     *CHUR* COMPELS DISMISSAL OF THE COMPLAINT

The primary reason why Plaintiffs say demand should be excused is that the members of the Board supposedly face a "substantial likelihood" of personal liability, thus making them not disinterested. ¶ 132; Opp. at 13-14. It has long been Nevada law that "[i]nterestedness because of *potential liability* can be shown *only in those rare cases* where defendants' actions were so egregious that a *substantial likelihood* of directory liability exists." *Shoen*, 122 Nev. at 640. This core principle was recently reemphasized in *Chur*, a case the Opposition completely misconstrues.

The Nevada Supreme Court accepted *Chur* pursuant to a writ of mandate, primarily to resolve an issue arising from its own *dicta* in *Shoen,* which had been interpreted as establishing a "gross negligence" exception to the scope of director protection afforded by Nevada's exculpatory statute, NRS 78.138(7). *Chur*, 458 P.3d at 339. *Chur* has three essential holdings: (i) NRS 178.138(7) provides the "*sole avenue* to hold directors and officers individually liable" (*id.* at 340); (ii) there is no "gross negligence" exception to the exculpatory statute (*id.* at 342); and (iii) the

---

[4]  *See also In re Las Vegas Sands Corp. Deriv. Litig.*, 2009 Nev. Dist. LEXIS 11 at *2 (Nev. Eighth Dist. Ct. Nov. 4, 2009) ("In Nevada … the board of directors of a Corporation has full control over the affairs of the Corporation. *See* NRS 78.120(1). This would, of necessity, include the power to instigate litigation on behalf of the corporation.").

statutory language regarding "*intentional* misconduct, fraud or a *knowing* violation of law" is to be interpreted in a way that affords Nevada directors the greatest protection: "We conclude that the claimant must establish that the director or officer had *knowledge the alleged conduct was wrongful* in order to show a 'knowing violation of law' or 'intentional misconduct' pursuant to NRS 78.138(7)(b)." *Id*.

All three of *Chur*'s holdings are implicated here. Although the Opposition acknowledges that allegations of "gross negligence" no longer suffice (Opp. at 14), it fails to address the fact that the Complaint's allegations do not even rise to that level. In addition, *Chur*'s emphatic rejection of the Nevada Supreme Court's own judicial gloss that seemingly created a "gross negligence" exception limiting director protection under the exculpatory statute, strongly suggests that the Court would not approve of yet another judicial creation in the form of a newly recognized common law cause of action for insider trading, which would be used, as is being attempted here, to limit the scope of director protection under the exculpatory statute. Finally, the Opposition's description of what it considers to be "intentional" or "knowing" conduct is completely inconsistent with how *Chur* held those words should be interpreted. According to the Opposition, Defendants should have liability for having "*intentionally pursued a strategy* of sacrificing safety for profits" (Opp. at 2), or for having "*Knowingly Permitted*" Allegiant to have operated an unsafe airline (Opp. at 8). Summarizing Plaintiffs' position, the Opposition posits that "the Complaint alleges facts sufficient to infer that the Defendants acted with the requisite level of intentionality. For example, the Complaint includes copious allegations that Defendants had ample experience in the airline industry, and therefore fully understood the importance of safety and maintenance." Opp. at 15.[5]

---

[5] The importance of safety has never been in dispute. Thus, the Opposition's discourse on the "core operations" theory (Opp. at 20-21) is largely a waste of ink. Defendants readily acknowledge that safety is among the core operations of an airline. Indeed, some of the Individual Defendants piloted Allegiant's planes as the Opposition acknowledges. Opp. at 9 (quoting ¶ 88). Pilots are not indifferent to the safety of the planes they are flying.

What the Opposition posits as sufficient to prevent Nevada directors from having the protection the exculpatory statute affords them simply amounts to consciousness of their own actions. In this case, that consists of adopting a business strategy (reliance on older planes during Allegiant's early years) with which Plaintiffs disagree. It is hard to think of anything more inconsistent with *Chur*, which quoted with approval the following language from the Tenth Circuit's decision in *In re ZAGG Inc. S'holder Deriv. Action*, 826 F.3d 1222, 1233 (10th Cir. 2016):

> Under the narrower interpretations of intentional and knowing that do not require knowledge of wrongfulness, a director would not be protected so long as the director knew what his or her actions were—such as signing a document with knowledge of its contents. But that state of mind would be present for virtually any conduct that could lead to the director's liability to the corporation or its stockholders . . . . The exculpatory statute would be an empty gesture. To give the statute a realistic function, it must protect more than just directors (if any) who did not know what their actions were; it should protect directors who knew what they did but not that it was wrong.

*Chur*, 458 P.3d at 341-42 (quoting *ZAGG*, 826 F.3d at 1232-33).

There are no allegations in the Complaint establishing that any Director knew there was anything wrongful about his or her actions, or for that matter, even what specific actions are being challenged. Fundamentally, the Complaint is based on a disagreement over what business strategy best served Allegiant's interest during prior years of operation. A disagreement over business strategy, which at most invokes the duty of care, cannot be reconciled with *Chur*'s interpretation of the exculpatory statute.

/ / /

/ / /

/ / /

### III. THE COMPLAINT FAILS TO ALLEGE ADEQUATELY THAT A MAJORITY OF THE BOARD IS EITHER CONFLICTED OR FACES A "SUBSTANTIAL LIKELIHOOD" OF PERSONAL LIABILITY

The parties agree that the Court should apply the *Aronson/Rales* standard in assessing demand futility.  Under *Aronson*, "The Plaintiff has the burden to plead with *particularized facts*, allegations and circumstances that create a reasonable doubt in the trial court's mind that the challenged transactions constituted a valid exercise of business judgment." *In re Las Vegas Sands Corp. Deriv. Litig.,* 2009 Nev. Dist. LEXIS 11 at *18.  Under *Rales*, where there is no challenged transaction at issue, "to show interestedness, a shareholder must allege that a majority of the board members would be 'materially affected, either to [their] benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders.'  Allegations of mere threats of liability through approval of the wrongdoing … do not show sufficient interestedness to excuse the demand requirement." *Shoen*, 122 Nev. at 639-40.  In applying either test, the court is required to give full force and effect to Nevada's statutory adoption of the business judgment rule, where "allegations of mere participation in the wrongdoing are insufficient to excuse the demand requirement . . .[because] even a bad decision is generally protected by the business judgment rule's presumption that the directors acted in good faith . . . ." *Id.* at 636.

Defendants' Motion pointed out that the Complaint is ambiguous as to whether it is challenging any actual decision by the Board, but for the most part seems to be based on an alleged failure to act, suggesting that *Rales* applies.  MTD at 8-10.  However, there are some parts of the Complaint that suggest Plaintiffs are challenging an actual decision of the Board such as the assertion that "all Director Defendants . . . face a substantial likelihood for breaching their fiduciary duties for . . . approving the Company's dangerous cost-cutting measures'" ¶ 133(B).  In response to the Motion's argument that the Complaint does not identify any actual

"dangerous cost-cutting measures" that were approved by the Board (MTD at 12-13), the Opposition has nothing to say at all.

Another ambiguity arising from the Complaint and the Opposition is what director duties are supposedly at issue. The Complaint itself sounds like it is entirely based upon an alleged breach of the duty of care. While the Opposition claims that the Complaint asserts a breach of the duty of loyalty (Opp. at 22) there are no facts alleged in the Complaint supporting that incorrect legal conclusion. A breach of the duty of loyalty requires pleading "an extreme set of facts . . . premised on the notion that disinterested directors were *intentionally disregarding* their duties." *Dent v. Ramtron Int'l Corp.*, 2014 Del Ch. LEXIS 110, at *7 (Del. Ch. June 30, 2014). That is not what the Complaint alleges, as it acknowledges that Allegiant replaced its entire fleet of planes under the Directors' watch.[6] ¶¶ 2, 71-72, 133(B). There is also no allegation that any Director "stood on both sides" of a transaction,[7] meaning that this case presents a straightforward duty of care claim.

In connection with the duty of care claim, the Opposition's statement that Defendants' arguments consist of a "litany of boilerplate" (Opp. at 2) is almost amusing, because one of Defendants' main arguments has been that the Complaint's demand futility arguments consist of nothing more than insufficiently particularized legal boilerplate. MTD at 3, 6-7, 11-13. Other than repeating what is alleged in the Complaint—including demand supposedly being excused because Marvin lived close to Gallagher, or that 25 years ago Gallagher and Ellmer worked at the same company, or that five years ago Gallagher and Redmond were minority limited partners in a partnership that lost money while renting Allegiant its headquarters (Opp. at 10)—the Opposition simply has no response, and ignores the specific case

---

[6] That makes this case entirely unlike *Marchand v. Barnhill,* 212 A.3d 805, 824 (Del. 2019), where the allegation was there had been no reasonable attempt at implementing a compliance system "as to the obviously most central consumer safety and legal compliance issues facing the company." Opp. at 22.

[7] *See, e.g., In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005) ("The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders.").

law authority discussed in the Motion establishing that these allegations are patently insufficient. *See* MTD at 11-13. Instead of addressing these issues, the Opposition engages in a lengthy description of the duties of the Audit Committee (Opp. at 14, 16-18), which is quite odd given that the Complaint does not allege any financial impropriety that would call into question the role of the Audit Committee.

The primary purpose of what the Motion called Plaintiffs' "miscellaneous" arguments (MTD at 14) is to allege that a majority of the Board is "beholden" to Gallagher. An instructive case in this regard is *Las Vegas Sands*, where the Nevada Supreme Court recognized that the Las Vegas Sands was a controlled corporation majority owned by Sheldon Anderson, who owned 68.9% of the stock, and as a result "always had significant influence in the choice of directors and in decisions which the Board of Director makes." *Las Vegas Sands*, 2009 Nev. Dist. LEXIS 11 at *5. As the Court noted, if that alone were enough, then the demand futility inquiry would end, but it is not enough. Instead, in order to "establish a lack of independence, the shareholders must show that the directors are 'beholden' to one or more 'interested' directors so that under that influence, their discretion to act independently would be sterilized." *Id.* at *13. The Court in *Las Vegas Sands* called the "investment decisions [at issue] . . . when viewed in hindsight and in the short term were a near disaster," *id.* at *19, and yet it still held that demand was not excused. The Complaint contains no allegations that even rise to the level of what the Nevada Supreme Court found to be insufficient in *Las Vegas Sands*, and rather than a "disaster," the Complaint recognizes that "Allegiant was rated the most profitable airline in 2015." ¶ 5.

IV. **NEVADA DOES NOT RECOGNIZE A COMMON LAW CAUSE OF ACTION FOR INSIDER TRADING, AND THIS CASE ILLUSTRATES WHY THAT IS AS IT SHOULD BE**

The Opposition acknowledges that there is no recognized common law cause of action for insider trading under Nevada law (Opp. at 24), and thus the question is

8
REPLY ISO MOTION TO DISMISS

ACTIVE 50855268v8

whether this Court should be the first to recognize such a cause of action in Nevada. As discussed in the Motion, the modern trend is *not* to recognize such a cause of action (MTD at 16-17), and doing so here would be completely inconsistent with the essential thrust of *Chur*, which eliminated the Nevada Supreme Court's own judicial creation limiting the scope of director protection under the exculpatory statute. In light of *Chur*, it is highly unlikely the Nevada Supreme Court would approve of yet another judicial creation which would be similarly used, as Plaintiffs attempt here, to limit the protections afforded Nevada directors under the exculpatory statute.

A primary legal rationale for not recognizing such a common law cause of action is that insider trading does no harm to the corporation itself. MTD at 16-17. The Opposition's quote from *Bedore v. Familian*, 122 Nev. 5, 12 n.25 (2006) that "[d]irectors breach their fiduciary duty if they exploit *an opportunity that belongs to the corporation*" (Opp. at 23) only illustrates that point. The corporation itself has no legally justifiable "opportunity" to engage in illegal insider trading, any more than an individual director does. For example, a corporation that was in the market buying back its own stock, would face insider trading liability if it did not cease such purchases when it came into possession of material inside information. If Pfizer was in the market buying back its own stock, and it discovered the vaccine for Covid-19, it would have to cease such purchases until after it made a public announcement of its discovery.

In the unlikely event that Nevada were to recognize a common law cause of action for insider trading, the allegations in the Complaint would surely not qualify. Plaintiffs urge the Court to adopt Delaware law in recognizing this new cause of action, but have no answer to Defendants' argument that Delaware requires a showing that "*each sale* by *each* individual defendant was entered into and completed *on the basis of, and because of,* adverse material non-public information." *Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003). The Opposition completely ignores *Guttman*, because Plaintiffs recognize that their Complaint falls woefully

9
REPLY ISO MOTION TO DISMISS

short of satisfying its standards. Instead of the Delaware standard, the Opposition proposes a new test, where a common law insider trading claim would be considered to be pled with "sufficient particularity [if] it identifies who made the stock sales based on insider information, the volume of such trades, and when the trades took place." Opp. at 4. Note the lack of any requirement that the complaint allege what inside information an individual was in possession of at the time of trading—instead it's just who traded, the volume, and the dates.

Even under that ridiculously low pleading standard, the Complaint flunks the Opposition's own test. The Opposition glides over the fact that the Complaint alleges four different amounts of insider trading: $6.4 million (¶ 122); $50.85 million (¶¶ 5, 122); $89.2 million (¶¶ 113-17); and $91.5 million (¶ 118). The Opposition settles in on $89.2 million (Opp. at 9), which is a number that does not even appear in the Complaint, but instead comes from the calculations Defendants made in their Motion, based on the allegations in paragraphs 113-17. There is no dispute that Gallagher accounts for over 93 percent of the total Insider Seller Defendants' alleged sales ($83.1 out of $89.2 million—*see* MTD at 19), and the Complaint's allegations regarding Gallagher's insider trading consist of the following: "between *June 2014 and May 2018*" he sold stock "at artificially-inflated prices." ¶ 113. That is it. There is no description of *any* specific sale over that roughly four-year period, or what inside information was supposedly in Gallagher's possession at the time of any sale. Moreover, it cannot be the case that the supposed "inside" information consisted of knowledge that Allegiant was unsafe, when the Complaint alleges that there was widespread public knowledge of that supposed fact. *See* ¶¶ 6-10, 64-110; Opp. at 4-9.

Having rejected the sufficiency of the insider trading allegations in *Brandon*, the Court is already familiar with the multitude of reasons why the Complaint's allegations, which are even less detailed than what was alleged in the Securities Class Action, are insufficient to satisfy the federal pleading standard. *See* MTD at 18-21.

Because Nevada does not recognize a common law cause of action for insider trading, and because, in the unlikely event Nevada were to recognize such a cause of action, the Complaint's allegations fall far short of what Nevada would be likely to require, the Complaint fails to establish how any Individual Defendant faces a substantial likelihood of personal liability in connection with alleged insider trading.[8]

## V.  THE OPPOSITION CONFIRMS THE SECTION 14(A) CLAIM LACKS ANY FACTUAL BASIS

The Opposition devotes minimal space to the derivative Section 14(a) claim, which is subject to an especially high pleading standard under the Reform Act and Rule 23.1's particularity requirements.  *See* MTD at 19.  Plaintiffs' conclusory allegation that a 2016 proxy statement "misrepresented the Board's actual activities with respect to risk management and safety" (¶ 114) does not come close to satisfying this high standard, largely because the challenged proxy statement does not say anything about risk management or safety.  MTD at 19-20.

The Motion challenged Plaintiffs to explain what specific misrepresentations or omissions were made in the proxy statement.  *Id.* at 20.  In response, Plaintiffs paraphrase the same boilerplate allegations made in the Complaint without providing any additional facts.  Opp. at 25-26.  Plaintiffs contend that the Board generally "exercise[s] oversight of the Company's overall risk management profile" and that "the 2016 proxy statement failed to disclose that the Board did not employ even the most basic safety standards."  *Id.*  That seems to deliberately miss the point, as there would be no reason for the 2016 proxy statement to discuss airplane safety and maintenance in the context of shareholders voting on a compensation plan.[9]

---

[8] The Opposition also confirms that Plaintiffs' unjust enrichment cause of action is merely a back-door effort to cast the "insider trading" theory as an equitable claim: "The Insider Selling Defendants must disgorge profits they received by trading on the basis of material non-public information." Opp. at 24. This claim fails for the same reasons discussed above.

[9] *See* Ex. 5 (5-12-16 Schedule 14A).

The Opposition also fails to address *Hutton v. McDaniel*, 264 F. Supp. 3d 996, 1018 (D. Ariz. 2017), which is far more on point than any of Plaintiffs' cases,[10] and which held that plaintiffs failed to identify how allegedly omitted pieces of information regarding safety risks "would cure any specific false or misleading statement" in a director election proxy statement. Thus, the Opposition only confirms the fact that the Complaint fails to satisfy the heightened pleading standard applicable to Section 14(a) claims.

## VI. CONCLUSION

The Complaint should be dismissed with prejudice.

Respectfully submitted this 25th day of June, 2020.

**GREENBERG TRAURIG, LLP**

By  /s/ *Jacob D. Bundick*
MARK E. FERRARIO, ESQ.
Nevada Bar No.: 1625
JACOB D. BUNDICK, ESQ.
Nevada Bar No.: 9772
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135

DANIEL J. TYUKODY, ESQ.
(*Admitted Pro Hac Vice*)
California Bar No.: 123323
**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
*Attorneys for Defendants*

---

[10] *In re Wells Fargo & Co. Shareholder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1102-03 (N.D. Cal. 2017) (upholding Section 14(a) claim where "Plaintiffs identified specific statements in the proxy statements that they allege are false or misleading," including "extensive and detailed allegations suggesting that the Director Defendants knew about [an] illegal account-creation scheme"); *Countrywide Fin. Corp. Deriv. Litig.*, 544 F. Supp. 2d 1044, 1076-77 (C.D. Cal. 2008) (upholding Section 14(a) claims where Plaintiffs "identify statements in . . . proxy materials that they allege are affirmatively false and misleading" regarding the company's general financial condition, which "would be among the most important information looked to by investors").

# **CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of June, 2020, a true and correct copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of filing will be served on all parties by operation of the Court's EM/ECF system, and parties may access this filing through the Court's CM/ECF system.

                                            */s/ Andrea Flintz*
                                            an employee of Greenberg Traurig, LLP

**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002