MARK E. FERRARIO, ESQ.
Nevada Bar No.: 1625
JACOB D. BUNDICK, ESQ.
Nevada Bar No.: 9772
**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone:  702-792-3773
Facsimile:  702-792-9002
Email:        ferrariom@gtlaw.com
                  bundickj@gtlaw.com

DANIEL J. TYUKODY, ESQ. (*Admitted Pro Hac Vice*)
California Bar No.: 123323
**GREENBERG TRAURIG LLP**
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone:  310-586-7723
Facsimile:  310-586-7800
Email:        tyukodyd@gtlaw.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT COURT OF NEVADA

| | |
|---|---|
| IN RE ALLEGIANT TRAVEL CO. STOCKHOLDERS DERIVATIVE LITIGATION | Master File No.:   2:18-cv-01864 <br><br> **MOTION TO DISMISS THIRD AMENDED VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> *[Filed concurrently with Request for Judicial Notice and Declaration of Jacob D. Bundick]* |

/ / /

/ / /

*(Left margin, vertical text)* **GREENBERG TRAURIG, LLP** 10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135, Telephone: (702) 792-3773, Facsimile: (702) 792-9002

Nominal Defendant Allegiant Travel Co. ("Allegiant" or the "Company"), and Individual Defendants—Maurice J. Gallagher, Jr., John Redmond, Gregory Anderson, Scott Sheldon, Eric Gust, Charles W. Pollard, Linda A. Marvin, Gary F. Ellmer, and Montie R. Brewer (the "Individual Defendants" and collectively with Allegiant, "Defendants")— respectfully submit this Motion to Dismiss ("Motion") Plaintiffs' Third Amended Verified Consolidated Stockholder Derivative Complaint ("TAC"), pursuant to Federal Rules of Civil Procedure 8, 12(b)(6), and 23.1, as well as the Private Securities Litigation Reform Act (the "Reform Act" or "PSLRA"), 15 U.S.C. § 78u-4 (2012).

This Motion is based on the files and pleadings in this matter, the accompanying Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice, the concurrently filed Declaration of Jacob D. Bundick, and such oral argument as the Court may permit.

Respectfully submitted this 5th day of April, 2021.

**GREENBERG TRAURIG, LLP**

By      */s/ Jacob D. Bundick*
        MARK E. FERRARIO, ESQ.
        Nevada Bar No.: 1625
        JACOB D. BUNDICK, ESQ.
        Nevada Bar No.: 9772
        10845 Griffith Peak Drive, Suite 600
        Las Vegas, NV 89135

        DANIEL J. TYUKODY, ESQ.
        (*Admitted Pro Hac Vice*)
        California Bar No.: 123323
        **GREENBERG TRAURIG LLP**
        1840 Century Park East, Suite 1900
        Los Angeles, CA 90067

        *Attorneys for Defendants*

/ / /

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Like its predecessor, the TAC fails to state a claim under Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure, primarily because it fails to adequately plead demand futility, thus depriving Plaintiffs of standing.[1]  The TAC also fails to adequately plead the alleged causes of action for breach of fiduciary duty, a purported violation of Section 14(a) of the 1934 Securities Exchange Act, insider trading, and unjust enrichment.

The Court ordered the dismissal of Plaintiffs' Second Amended Complaint ("SAC") pursuant to its Order of December 18, 2020 (the "Order").  The Order provided Plaintiffs with a roadmap of the kinds of specific factual allegations they needed to make in order to survive a future motion to dismiss.  However, the TAC fails to address any of the Order's key requirements, something that can be readily determined simply by looking at the redline of the TAC against its predecessor.[2]  The TAC reads like virtually the same complaint the Court dismissed, with its minor additions consisting of adding still more conclusory statements about Defendants' purported state of mind, which are the same kind of allegations that the Court held to be insufficient in the SAC.  Merely adding more of the same does nothing to address the central focus of the Court's Order, which concerned the SAC's conclusory nature and lack of specificity.

In addressing the breach of fiduciary duty claim, for example, the Court said that the allegations "do not show a substantial likelihood of director liability" because "the SAC fails to specify *which* cost-cutting measures or deficient

---

[1] *See Shoen v. SAC Holding Corp.*, 122 Nev. 621, 634 (2006) (a "shareholder's failure to sufficiently plead compliance with the demand requirement deprives the shareholder of standing."); *Smaellie v. City of Mesquite*, 393 P.3d 660 (Nev. 2017) (standing is a jurisdictional mandate).

[2] The redline of the TAC against the SAC is attached as Exhibit A to the concurrently filed Declaration of Jacob D. Bundick, as set forth in the concurrently filed Request for Judicial Notice.  All "¶" citations in this brief refer to the redlined TAC attached as Exhibit A, because as discussed within, the TAC itself has no paragraph numbers.  Throughout this brief, all emphasis is added unless otherwise stated, and we omit internal citations from cited cases.

procedures the board approved, nor does it tie *any particular cost-cutting decision* to a likelihood of liability as a result." Order at 7-8. That is still the case in the TAC. Typical of Plaintiffs' additions is what was added to paragraph 104, which now goes on to say that "the Board cannot now claim that its members were unaware of the direct impact that their cost-cutting measures were having on safety and maintenance." What specific "cost-cutting measures" Plaintiffs have in mind, and what specific effects they had on "safety and maintenance" are nowhere addressed.

Similarly, in addressing the Section 14(a) claim, the Court said "[t]he SAC fails to allege any of [Section 14(a)'s] elements with any particularity [and] does not even identify any specific misstatement or describe why it is material." Order at 9. That remains the case after Plaintiffs' nominal additions to this claim in the TAC, which basically consists of the assertion that "the 2016 Proxy failed to disclose that the Board had instituted other cost-cutting measures that had material and negative impacts on the Company's safety and maintenance programs" without saying what those specific cost-cutting measures were, and how they supposedly affected safety. ¶ 111.

The same lack of specificity pervades the insider trading claim, which the Court dismissed, citing the lack of any "particularized facts" regarding an insider's knowledge at the time of sale. Order at 12. All that was added in the TAC in further support of this claim consists of conclusory statements that Defendants were "in possession of material inside information" at the time of the sale. ¶¶ 113-17. Shockingly, the TAC *still* can't land on a consistent number in terms of dollar value of the trades supposedly at issue, as it still alleges four different amounts (*see infra* at 19), notwithstanding Defendants having pointed out this inconsistency in their motion to dismiss the SAC. More importantly, none of the issues the Court identified in its Order as a basis for dismissing these claims—including the "small fraction" of Gallagher's and Ellmer's sales relative to their total holdings in advance of the *60 Minutes* broadcast, or "explaining what was nonpublic and when in relation

GREENBERG TRAURIG, LLP
10845 Griffin Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

3

to particular sales of stock" (Order at 12), are addressed in the TAC. The same is true for the unjust enrichment claim which, as pointed out in the Order, "appear[s] to be based on the insider trading claim." The Court pointed out that "plaintiffs made no demand futility allegations as to this claim specifically" (Order at 13), and that too is still the case.

Not only does the TAC read as though the Order never existed, but there is a casualness to its preparation that illustrates an unwillingness to make anything more than a token effort. For example, there are no paragraph numbers in the TAC; instead, paragraphs are separated by a series of bullet points. While mistakes happen, the fact that in the six weeks separating the filing of the TAC and the filing of this motion to dismiss, no one on Plaintiffs' side bothered to review what had been filed and correct the error perfectly symbolizes the TAC's indifferent approach to responding to the Court's Order. The TAC's carelessness extends to other more substantive matters as well. For example, the TAC continues to inconsistently allege both that Allegiant had one of the youngest fleets in the nation, and one of the oldest, despite that inconsistency being a focus of Defendants' prior motion to dismiss. Similarly, the TAC continues to state that after the CtW Investment Group letter, Defendants "failed to reshape or expand the Board" (¶ 89), while simultaneously conceding that the Board *was expanded* to seven members by the addition of Ponder Harrison (¶ 133). The allegation asserting that demand would be futile as to the members of the Audit Committee because they "knowingly approved the filing and dissemination of [inaccurate] financial statements" (Ex. A, p. 52) remain exactly the same, despite the Court saying that the "allegation is conclusory and not supported anywhere in the SAC." Order at 13. As the Court pointed out in its Order, neither the SAC (or now the TAC), nor the now settled securities class action upon which this derivative case is largely based, alleged any financial impropriety at all. In fact, all of the Individual Defendant demand futility allegations that the Court found to be patently insufficient in the SAC, remain virtually unchanged in the TAC. The

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

4

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

principal difference between the two complaints is that these allegations were moved from one part of the complaint to another, and therefore show up as a "change" only in the redline, even though nothing of substance changed.

Plaintiffs' unwillingness to do anything more than the bare minimum in response to the Court's Order is actually a good thing for Allegiant shareholders, as the TAC only confirms the appropriateness of a dismissal with prejudice, and with it an end to this wasteful litigation.  This was always a ridiculous case, founded upon the absurd theory that the officers and directors of an airline did not care about passenger safety.  Cases like this illustrate why the business judgment rule, and Nevada's statutory scheme concerning director protections, exist in the first place.[3]

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The TAC is a standard kind of derivative case that often follows on the heels of a securities class action, in this case *Brendon v. Allegiant Travel Co., et al.*, No. 2:18-cv-01758 (D. Nev.) ("*Brendon*" or the "Securities Class Action").  The TAC continues to refer to *Brendon* by its former name *Checkman*, despite being corrected on this point by the Court in its Order, and by Defendants in connection with their motion to dismiss the SAC.  The TAC also still refers to "*Checkman*" as "pending final approval of a $4 million settlement" (¶ 12), when in fact the Court granted final approval to the *Brendon* settlement on May 14, 2020.[4]  The TAC does not dispute Defendants' point in the motion to dismiss the SAC that a $4 million settlement puts *Brendon* in the bottom quartile of all such cases for 2019.[5]  The only thing the TAC

---

[3] *See* NRS 78.138(3) (statutory presumption of good faith); NRS 78.138(8) (statutory presumption that the business judgment rule applies to "all cases, circumstances and matters."); *Shoen*, 122 Nev. at 632 (under Nevada law, a corporation's board ordinarily has "full control over the affairs of the corporation," including the decision to sue or not sue on its behalf); *Wynn Resorts, Ltd. v. Eighth Judicial Court of State*, 399 P. 3d 334, 343 (Nev. 2017) ("Nevada's statutory business judgment rule precludes courts from reviewing the substantive reasonableness of a board's business decision"; "a court that applies the business judgment rule will not 'second-guess' a particular decision . . . if the requirements of the business judgment rule are satisfied").

[4] *See* Ex. B (Federal Securities Action Order Granting Final Approval of Class Action Settlement).

[5] *See* Ex. D (Cornerstone Research *2019 Review and Analysis of Securities Class Action Settlements* at 19 Appendix 1) ($5.6 million average settlement in bottom quartile).

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

adds that was not alleged in the SAC is a statement that it was not revealed what Gallagher's "contribution" to the settlement was.  ¶¶ 12, 133.  However, why that should make any difference is not explained.

Besides *Brendon*, the only other cases where the TAC alleges harm to Allegiant arise from the settlement of a passenger injury lawsuit, and the settlement of an employment dispute.  ¶ 123.[6]  In none of these cases is it alleged that the amounts of the settlements were material to Allegiant.  Thus, it is impossible for Plaintiffs to make a convincing legal argument that demand should be excused because the Individual Defendants face a "substantial likelihood" of personal liability.  These allegations remain unchanged from the SAC, and Plaintiffs still fail to explain how such personal liability could arise.

Like the SAC, the TAC still reads like *Brendon*-redux, with large portions quoting an April 15, 2018 *60 Minutes* broadcast (the "Broadcast") that was critical of Allegiant's alleged safety and maintenance practices.  ¶¶ 95-106.  However, almost everything in the Broadcast was a repeat of what had been extensively, publicly discussed in the *Tampa Bay Times* and other media sources.  As the Court stated in connection with dismissing the insider trading claims, "the SAC fails to plausibly allege nonpublic material information because news outlets have reported on safety problems at Allegiant for years."  Order at 12.

There remains a sense of ancient history to the TAC, as most of what Plaintiffs argue should have been done previously, has indisputably already been done, including the complete changeover of Allegiant's fleet of planes.  A main point stressed in the Broadcast in describing incidents going back to 2014 was the age of Allegiant's fleet of planes; however, even the Broadcast acknowledged that Allegiant was then in the process of replacing its fleet.  The second paragraph of

---

[6] The TAC alleges that Allegiant settled an employment lawsuit (¶¶ 12, 75-84), and settled a personal injury lawsuit (¶¶ 12, 94), two ordinary events for an airline with thousands of employees that in ordinary times flies millions of passengers a year.  (The TAC notes that Allegiant "operates the ninth largest commercial airline in the United States."  ¶ 4.)

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada  89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

the TAC confirms that Allegiant completed that changeover, alleging that "[a]s of *May 23, 2018*, Allegiant operated *a fleet of 99 Airbus* aircraft." ¶ 2; *compare* ¶ 72 ("*as of 2015*, Allegiant was one of only three U.S. carriers still using the *MD-80* as part of its regular fleet until *the Company recently retired them on December 3, 2018*.").[7]

The TAC also repeats without change the SAC's allegations regarding the letter from CtW, which was an advisor to the Teamsters' pension fund.  These allegations consist of large block quotes from the letter culminating in the accusation that the Individual Defendants "failed to reshape or expand the Board." ¶ 89.  But in fact, as the TAC itself admits, Allegiant's six-member Board at the time of the CtW letter was subsequently expanded.  ¶ 133 ("At the time of filing this Complaint, Allegiant's Board consists of seven directors . . . .").

As before, the TAC once again describes the contents of incident reports that Plaintiffs allegedly obtained from the FAA via a Freedom Of Information Act request.  ¶¶ 124-29.  However, these allegations only serve to undermine Plaintiffs' case, as they show that the FAA continued to allow Allegiant to fly despite any issues raised in these reports.  All airlines experience mechanical problems, and while the industry strives for perfection, it is an ever-vanishing horizon.  The airline industry is heavily regulated and scrutinized; indeed, that is how Plaintiffs got these reports, which obviously are publicly available.  It takes considerable arrogance for a derivative plaintiff to say that its view of safety should take precedence over that of the FAA and Allegiant's Board.

What is more important about the TAC's factual allegations is what is not there.  Namely, *there is no allegation that the FAA, Allegiant's primary regulator, ever had serious concerns about Allegiant.*  Nor is there any allegation that anyone

---

[7] Notwithstanding this admission that Allegiant had a fleet of new planes, the TAC continues with an inconsistent holdover paragraph from the SAC alleging that "Allegiant currently operates the oldest commercial aircraft fleet in the United States.  The current average age of a plane in Allegiant's fleet is twenty-two years." ¶ 68.

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

was killed or seriously injured on an Allegiant flight during the five-year period addressed in the TAC.[8]  Much of the TAC reads like an attempt to recover for accidents that the TAC asserts could have happened, but that never did.

## III.   THE TAC'S FAILURE TO ADEQUATELY PLEAD EITHER DEMAND FUTILITY OR VIABLE CLAIMS

### A.   The Heightened Standard for Pleading Demand Futility and the Business Judgment Rule in Nevada.

Federal Rule of Civil Procedure 23.1 imposes a "heightened pleading standard" for any federal derivative action, requiring a plaintiff to "state with *particularity*: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority . . . and (B) the *reasons for* not obtaining the action or *not making the effort*." Fed. R. Civ. P. 23.1.  Rule 23.1 "requires substantially more than Rule 8(a) notice pleading," and "[m]ere allegations of improper motives are especially inadequate when the challenged action is not *facially* suspect . . . ."  *Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 68 (D.C. Cir. 1988) (emphasis in original).[9]  As stated in the Court's Order, "[Rule] 23.1 requires that 'a shareholder must either demand action from the corporation's directors before filing a shareholder suit, or plead with particularity the reasons why such demand would have been futile.'").  Order at 4 (quoting *Arduini v. Hart*, 774 F.3d 622, 628 (9th Cir. 2014)).

---

[8] An arguable exception is an allegation that a passenger claimed to have experienced "head, neck, and brain injuries" from a flight in 2016 that encountered "severe turbulence" which Allegiant settled for a confidential amount.  ¶ 94.  The TAC does not allege that the aircraft involved was mechanically unsafe, or that the pilots acted improperly, and from the facts alleged it is impossible to determine the true severity of the passenger's injuries.

[9] *See also La. Mun. Police Employees' Retirement Sys. v. Wynn*, 829 F.3d 1048, 1058 (9th Cir. 2016) (Rule 23.1 imposes a "heightened pleading standard"); *In re Am. Apparel, Inc.*, 2015 U.S. Dist. LEXIS 191466, at *37 (C.D. Cal. Apr. 28, 2015) ("Because of the extraordinary nature of a shareholder derivative suit, Rule 23.1 establishes stringent conditions for bringing such a suit.") (citing *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008)); *In re Am. Int'l Grp., Inc. Deriv. Litig.*, 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010) (Rule 23.1 raises the "pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under [FRCP] 12(b)(6)"); *Heit v. Baird*, 567 F.2d 1157, 1160 (1st Cir. 1977) (Rule 23.1 "represents a deliberate departure from the relaxed policy of 'notice' pleading promoted elsewhere in the Federal Rules. The requirement places an initial burden on the stockholder 'to demonstrate why the directors are incapable of doing their duty,' and failure to meet this burden requires dismissal of the suit").

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

Rule 23.1's rigorous procedural pleading requirement fits hand in glove with Nevada's substantive standard for pleading demand futility, which protects "clearly discretionary directorial conduct and corporate assets by discouraging unnecessary, unfounded, or improper shareholder actions." *Shoen,* 122 Nev. at 633; *see also Aronson v. Lewis*, 473 A.2d 805, 809 (Del. 1984) (demand requirement is "a rule of substantive right designed to give a corporation an opportunity to rectify an alleged wrong without litigation, and to *control any litigation* which does arise"); *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 96 (1991) (only pleading of "extraordinary conditions" excuses demand).

### B.   The TAC's Continued Failure to Adequately Allege that a Majority of the Board is Incapable of Making a Decision Protected by the Business Judgment Rule.

As the Court observed in its Order, there are two generally recognized standards for assessing demand futility, the selection of which depends on whether a plaintiff's core allegations are grounded in actual action by the board, or by the board's alleged failure to act. The first involves the *Aronson* test which asks whether "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) [whether] the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814; *see* Order at 5. The second involves the *Rales* test (after *Rales v. Blasband*, 634 A.2d 927 (1993)), which focuses upon the conflict issue alone, because its essence is the alleged failure to act by the board (so there is no "challenged transaction" to judge). *See Rales,* 634 A.2d at 934 ("the *particularized factual allegations* . . . [must] create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand"); Order at 5.

In its Order, the Court determined that the *Aronson* test applied to the breach of fiduciary duty and Section 14 claims, because they challenged supposed alleged

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

9

actual business decisions by the board; and that the *Rales* test applied to the insider trading and unjust enrichment claims.   Order at 5.   Defendants will address the claims in the order in which the Court did in its Order.

### 1.   <u>The Breach of Fiduciary Duty Allegations are Deficient.</u>

In its Order dismissing the SAC's breach of fiduciary duty claims pursuant to the *Aronson* test, the Court cited *Shoen* for the principle that "[a]llegations of mere threats of liability . . . do not show sufficient interestedness to excuse the demand requirement."   122 Nev. at 639-40.   Rather, "interestedness because of potential liability can be shown only in *those rare cases* where defendants' actions were *so egregious* that a *substantial likelihood* of director liability exists."   *Id.* at 640; *see also In re Sagent Tech.*, 278 F. Supp. 2d 1079, 1089 (N.D. Cal. 2003) ("A plaintiff may not 'bootstrap allegations of futility' by pleading merely that 'the directors . . . would be reluctant to sue themselves.'"); Order at 6.

The Court's Order went on to cite Nevada's exculpatory statute, stating that "Under Nevada law, 'a director or officer is not individually liable . . . for any damages as a result of any act or failure to act in his or her capacity as a director or officer unless' the presumption of the business judgment rule is rebutted and '[i]t is proven that' the act or failure to act was a breach of fiduciary duty that 'involved intentional misconduct, fraud or a knowing violation of law.'"   Order at 6 (quoting NRS 78.138(7)).

The Order then went on to cite the Nevada Supreme Court's recent decision in *Chur v. Eighth Judicial Dist. Ct.*, 458 P.3d 336 (Nev. 2020), which held that "[t]o show 'intentional misconduct' or a 'knowing violation of law,' a 'claimant must establish that the director or officer had knowledge that the alleged conduct was wrongful.'"   Order at 6 (quoting *Chur*, 458 P.3d at 340).   *Chur* also held that NRS 78.138(7) "provides the *sole avenue* to hold directors and officers individually liable for damages arising from official conduct," while characterizing its prior statement in *Shoen* suggesting that "gross negligence" might suffice for pleading "intentional

GREENBERG TRAURIG, LLP
10845 Griffin Peak Drive
Suite 600
Las Vegas, Nevada  89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

---

10

misconduct" as dicta that had unfortunately led some state and federal courts astray. *Chur*, 458 P.3d at 340.

To say that Plaintiffs fail to satisfy the standard under *Chur* and NRS 78.138(7) would be an understatement.[10]  The primary reason the TAC offers as to why demand is supposedly futile is that "the director defendants approved lax safety procedures and 'dangerous cost-cutting safety measures,' and thus face a substantial likelihood of liability for their actions."  Order at 7 (quoting ECF No. 20 at 43).  In concluding that these constituted "'mere threats of liability' that are not sufficient to excuse demand," the Court cited the fact that the SAC "*fails to specify which cost-cutting measures* or deficient procedures the board approved, *nor does it tie any particular cost-cutting decision to a likelihood of liability as a result*.  Not every cost-cutting decision or deficient procedure gives rise to a substantial likelihood of liability."  Order at 7-8. This was the Order's central holding, yet the TAC fails to respond to it in any meaningful way.  Instead, the TAC merely repeats the same kind of conclusory statements that the Court rejected as insufficient, such as:

- "the Board cut corners on safety and maintenance" (¶ 7);

- "the Board cannot now claim that its members were unaware of the direct impact that their cost-cutting measures were having on safety and maintenance" (¶ 104);

- "the Board . . . instituted other cost-cutting measures that had material and negative impacts on the Company's safety and maintenance programs" (¶ 111);

---

[10] Simply mouthing the right words is insufficient to satisfy Rule 23.1's particularity requirement.  *See, e.g., Gaubert*, 863 F.2d at 68 (under Rule 23.1, "mere allegations or conclusory statements regarding directors' dual allegiances, self-interest, or control by others is insufficient"); *In re Kauffman Mut. Fund Actions*, 479 F.2d 257, 263-64 (1st Cir. 1973) (1973) ("it is clear that the 'particularity' [required by Rule 23.1] must appear in the pleading itself; the stockholder may not plead in general terms, hoping that, by discovery or otherwise, he can later establish a case").

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- "the Individual Defendants were involved in cutting operational costs leading to the safety issues" (¶ 133).

These cookie-cutter statements deliberately avoid answering the basic questions posed by the Court, namely what specific cost-cutting measures are supposedly at issue, and what was the specific supposed deleterious effect upon Allegiant following these alleged measures?

Under the "substantial likelihood" test, particularly as read in light of *Chur*, it is impossible to believe that any Individual Defendant faces the prospect of personal liability outside the scope of the exculpatory statute. Any other conclusion would be wholly speculative. *See Herbst Gaming, Inc. v. Heller*, 122 Nev. 877, 887 (Nev. 2006) ("Alleged harm that is speculative or hypothetical is insufficient.").[11]

## 2.    __The Section 14 Allegations are Deficient.__

The second claim that the Court said is to be decided under the *Aronson* test is the TAC's Section 14(a) claim. Order at 5.

Section 14(a) claims are derivative in nature and subject to especially high pleading standards because they must satisfy both Rule 23.1's particularity pleading requirement, and the Reform Act's stringent pleading requirements.[12] The Reform Act requires that "the complaint shall . . . state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind" and "shall specify *each statement* alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity *all facts* on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)-(2).

---

[11] *See also In re Facebook, Inc., IPO Secs. & Deriv. Litig.*, 922 F. Supp. 2d 445, 474-75 (S.D.N.Y. 2013) (derivate action was premature for failing to allege non-speculative damages); *In re Cray Inc.*, 431 F. Supp. 2d 1114, 1133 (W.D. Wash. 2006) (damages allegations "must be more than speculative and conclusory").

[12] *See Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005) ("the PSLRA pleading requirements apply to claims brought under Section 14(a) and Rule 14a-9").

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

Section 14(a) claims have a similarly high pleading standard. *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022-23 (9th Cir. 2000) (requiring "a high degree of meticulousness" to plead a Section 14(a) claim); *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000) (dismissing Section 14(a) claims because while plaintiff's "general allegations are plainly sufficient under the Federal Rules of Civil Procedure, they fail under the Reform Act"). "To prevail on a Section 14(a) claim, 'a plaintiff must demonstrate that the misstatement or omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction.'" Order at 9 (quoting *Desaigoudar*, 223 F.3d at 1022). The TAC satisfies neither of these requirements.

The TAC's substantive Section 14(a) allegations have not changed in any material way from those the Court found to be deficient in the SAC. In its Order, the Court rejected allegations "that defendants 'caused Allegiant to cut corners on required maintenance to reap higher profits' and that a settled lawsuit against Allegiant claimed that a radar system should have detected turbulence and 'passengers should have been warned.'" Order at 8 (quoting from Plaintiffs' opposition brief). All the TAC does is repeat ad nauseum the same conclusory statement to the effect that "the Board cut corners on safety and maintenance . . . [and] Board members were fully aware of the negative impact these cost-cutting measures had on the Company and the risks they posed to passengers . . . ." ¶ 7.[13]

---

[13] *See also* ¶ 104 ("the Board touted in its proxy statements that is members' experience in the airline industry left them particularly well-situated to provide oversight of safety and maintenance issues. Given this public statement, the Board cannot now claim that its members were unaware of the direct impact that their cost-cutting measures were having on safety and maintenance. Nor can they deny that they were aware of safety issues plaguing the Company's aircraft as it is the central issue of any aviation company."); ¶ 111 (proxy failed to disclose "that the Board had instituted other cost-cutting measures that had material and negative impacts on the Company's safety and maintenance programs"); ¶ 120 ("The Individual Defendants touted in the Company's proxy statements that their long experience in the airline industry left them particularly well-suited to oversee the safety and maintenance aspects of the Company."); ¶ 133 (pre-suit demand would be futile because "the Individual Defendants were involved in cutting operational costs leading to safety issues.").

GREENBERG TRAURIG, LLP
10845 Griffin Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

13

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

These simply regurgitate the SAC's unsupported assertion that the Individual Defendants' conduct could be considered "intentional" or "knowing" based upon their airline industry experience, which the Court held was "unreasonable to infer[.]" Order at 8. Thus, just like the SAC, the TAC "does not even identify any specific misstatement or describe why it is material." Order at 9.

The TAC also fails to make the case that the alleged material misstatement or omission "was an essential link in the accomplishment of the proposed transaction," which in this case was the solicitation of votes in favor of the Company's 2016 Long-Term Incentive Plan ("2016 LTIP"). Instead, it simply repeats the conclusory paragraph the Court found to be insufficient the last time around, namely, "The proxy statement was an essential link in the Individual Defendants' ability to receive incentive compensation under the 2016 LTIP." ¶ 150.

The TAC does not explain what the unidentified misrepresentations or omissions were—*i.e.*, what "actual activities" of the Board are being challenged with the specificity required to state a Section 14(a) claim—much less how they were part of an "essential link" in shareholders voting on a compensation plan that was *not* itself linked to Allegiant's safety and maintenance practices.[14] This is plainly insufficient. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (under Section 14(a), "a plaintiff cannot simply allege that an omission was material to properly allege falsity; rather, plaintiffs must show that the omission actually renders *other* statements misleading") (emphasis in original); *Hutton v. McDaniel*, 264 F. Supp. 3d 996, 1018 (D. Az. 2017) (Section 14(a) claim "must specify the reason or reasons why the statements made by [the defendants] were misleading or untrue, not simply why the statements were incomplete.").[15]

---

[14] *See* Ex. E (5-12-16 Schedule 14A at pp. 25-50).

[15] *See also New York City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) ("To state a claim under § 14(a) and Rule 14a-9, a plaintiff must establish that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.").

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*Hutton* is instructive. In that case, a manufacturer made a large food recall after the FDA made findings of "unsafe and unsanitary conditions" following state and federal facility inspections. *Id.* at 1006. Notwithstanding that, the court dismissed plaintiff's Section 14(a) misrepresentation claims pertaining to food safety, which were based upon the proxy statement's reference to "management's responsibility to manage risk." *Id.* at 1017-18. The court held that the plaintiff "failed to allege how disclosure of the . . . omitted pieces of information would cure any specific false or misleading statement in the 2016 Proxy Statement." *Id.* at 1019. That is obviously true here as well. Moreover, the case for dismissal is even stronger here because Plaintiffs still do not even bother alleging what portion of the proxy contained a false statement or omission, and the TAC contains no allegation that the FAA had serious compliance issues with Allegiant.

Plaintiffs' Section 14(a) also fails because it is grounded in allegations of mismanagement and breach of fiduciary duty regarding "the Board's actual activities with respect to risk management and safety." ¶ 148. However, "[u]nder Ninth Circuit law, Section 14(a) claims may not be premised solely on alleged mismanagement or breach of fiduciary duty." *In re Wells Fargo & Co. Shareholder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1102 (N.D. Cal. 2017); *see also Desaigoudar*, 223 F.3d at 1024 (Section 14(a) is inapplicable to claims of mismanagement or breach of fiduciary duty). The Section 14(a) allegations are indistinguishable from the breach of fiduciary duty allegations articulated at paragraphs 135-39 of the TAC, which contend, for example, that the Directors "allowed . . . weak policies to remain [in place] thereby harming the Company and its customers and crew." ¶ 138. Thus, the TAC fails to plead adequately the elements of a Section 14(a) claim.

/ / /

/ / /

/ / /

/ / /

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

3.    **The Insider Trading Allegations are Deficient.**

a.    *Nevada is Unlikely to Recognize a Common-Law Claim for Insider Trading.*

The Court determined that the *Rales* test applies to both Plaintiffs' insider trading and unjust enrichment claims. Order at 5. The Court also stated that the unjust enrichment claim appeared to be based on the insider trading claim. Order at 13.

In their motion to dismiss the insider trading claim alleged in the SAC, Defendants made two primary arguments, the first being that Nevada's Supreme Court would be highly unlikely to recognize a common-law cause of action for insider trading, and the second being that in the unlikely event the Nevada Supreme Court did recognize such a cause of action, Plaintiffs' conclusory pleading would not suffice. Defendants recognize that the Court did not agree with them on the first point (Order at 11) but did as to the second point (Order at 12). Defendants also recognize the inherent uphill battle involved in changing the Court's mind on the first point; however, in the interests of preserving the record, Defendants incorporate by reference their prior arguments, and also direct the Court's attention to the Nevada Supreme Court's recent decision in *Guzman v. Johnson*, 2021 Nev. LEXIS 12 (Nev. Mar. 25, 2021).

In its Order, the Court cited the Nevada Supreme Court's decision in *In re Amerco Deriv. Litig.*, 252 P.3d 681 (Nev. 2011) and stated that "*Amerco*'s use of *Shoen*'s definition of the fiduciary duty of loyalty, together with the statutory requirement in NRS § 78.138(7)(b), *does not require injury* as an element." Order at 11. Thus, the Court disagreed with Defendants' contention that Nevada requires the element of injury for a breach of fiduciary duty claim. Order at 10. However, in *Guzman*, the Nevada Supreme Court stated that "A breach of fiduciary duty customarily has three elements: (1) existence of a fiduciary duty, (2) breach of the duty, and (3) *damages as a result of the breach*." 2021 Nev. LEXIS at *5 (citing cases).

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*(sidebar)*
GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

In *Guzman*, the Nevada Supreme Court eliminated the "inherent fairness" standard, holding that NRS 78.138(7) precludes courts from using that judicially created doctrine.  The Court in *Guzman* began by saying, "As we recently explained in *Chur* . . . NRS 78.138(7) supplies the *sole avenue* to hold directors and officers individually liable for damages arising from official conduct."  *Id.* at *1 (emphasis supplied by the Court in *Guzman*).  It concluded by saying that "we abrogate *Foster v. Arata*, 74 Nev. 143, 325 P.2d (1958), and *Shoen v. SAC Holding Corp.*, 122 Nev. 621, 640 n.61 . . . to the extent those cases adopted a standard that conflicts with NRS 78.138(7) and *Chur . . . .*"  *Id.* at *7.  Thus, a continued reliance upon *Shoen* in defining the contours of director fiduciary liability seems misplaced.

As previously argued, insider trading causes no harm to the corporation (as opposed to the counterparty to the insider's trade), and thus an insider's supposedly illicit trade does not "put[] his or her interests over the interests *of the corporation and its shareholders.*"  Order at 11.  The corporation has no inherent interest in the insider trading transaction, and does not experience damages as a result, regardless of any policy considerations regarding insider trading, which recent decisions by Nevada's Supreme Court suggest it would be inclined to leave to the legislative and executive branches of government.

The recognition of a common-law cause of action for insider trading is also somewhat of a relic from the past.  The founding case for recognizing this cause of action in Delaware is over 70 years old.  *See Brophy v. Cities Service, Inc.*, 70 A.2d 5 (Del. 1949).  It was decided decades before the U.S. Supreme Court first recognized an implied private right of action under Section 10(b) and Rule 10b-5 in *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n.9 (1971),[16] and well before securities class actions under Section 10(b) were approved

---

[16] *See also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976) (Although § 10(b) does not by its terms create an express civil remedy for its violation, and there is no indication that Congress, or the Commission when adopting Rule 10b-5, contemplated such a remedy, the existence of a private cause of action of violations of the statute and the Rule is now well established.") (citing *Bankers Life*, 404 U.S. at 13 n.9).

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

by the U.S. Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), by virtue of its adoption of the fraud-on-the-market presumption of reliance that satisfied the "commonality" requirement of FRCP 23(b)(3).

While *Brophy* may have made sense in its day, in modern times, and particularly in jurisdictions where courts were writing on a clean slate, they have generally rejected a common-law cause of action for insider trading.[17]  Moreover, while Nevada frequently follows Delaware law, that is not always the case.  *See In re DISH Network Deriv. Litig.,* 401 P.3d 1081, 1087-88 (Nev. 2017) (declining to adopt Delaware rule on special litigation requests to dismiss derivative claims, in part "[b]ecause Nevada's business judgment rule prevents courts from substituting their own notions of what is or is not sound business judgment");  *Hamm v. Carson City Nuget*, 85 Nev. 99, 99 (1969) ("Whatever choice we make for Nevada that is supportable by case authority elsewhere . . . the controlling consideration is public policy and whether the court or the legislature should declare it.").

The parties and the Court all agree that there is currently no precedent for recognizing a common-law cause of action for insider trading in Nevada. Defendants therefore respectfully reiterate their argument that in light of *Chur*, and now in light of *Guzman*, it would be highly unlikely that Nevada's Supreme Court would accept yet another newly created common-law doctrine that could be used to limit the protections afforded by NRS 78.138(7)(b).

### b.    The TAC Does Not Allege Any Facts Supporting Insider Trading.

In the event Nevada were to recognize a common-law cause of action for insider trading, that cause of action would still not be sufficiently pled here based

---

[17] *See, e.g.,* 3A William Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 1174 (2002) ("most courts considering the issue have rejected a common-law corporate cause of action against directors and officers for insider trading"); *Daisy Sys. Corp. v. Finegold*, 1988 U.S. Dist. LEXIS 16765, at *13-15 (N.D. Cal. Sept. 19, 1988) (concluding California legislature intended statutory scheme to be exclusive basis for insider trading remedies).

GREENBERG TRAURIG, LLP
10845 Griffin Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

on the TAC's vague factual allegations, which are virtually identical to the SAC's allegations.  Jurisdictions which recognize a common-law cause of action for insider trading require allegations showing that "*each sale* by each individual defendant was entered into and completed *on the basis of, and because of*, adverse material non-public information." *Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003).  To say that is not alleged in the TAC would be an understatement, because there is still *not one specific sale* alleged in the entirety of the TAC, much less an allegation as to what any specific Defendant *knew at the time of the sale* which rendered it illegal.

The Court previously held that "[t]he plaintiffs have not alleged with *particularized facts* that the information about Allegiant's safety problems was material and nonpublic," nor did they "allege any facts showing that the directors made . . . trades because they were 'motivated, in whole or in part, by the substance of that information.'"  Order at 12 (quoting *In re Oracle Corp.*, 867 A.2d at 934). Plaintiffs have failed to cure either defect in the TAC.  Instead of pleading specific knowledge, by a specific Defendant, linked to a specific sale, the TAC is again awash in generalities, as exemplified by the fact that the TAC still cannot even make up its mind as to the total amount of insider trading that is allegedly at issue.  This amount is once again alternatively described in the TAC as: $6.4 million (¶ 122); $50.85 million (¶¶ 11, 112); $89.2 million (¶¶ 113-17 [totaling all Individual Defendant allegations]); and $91.5 million (¶ 118).  The TAC still seems oblivious to these discrepancies, although they were pointed out in Defendants' previous motion to dismiss.

The TAC's factual allegations fail to adequately plead a common-law cause of action for insider trading for the same reasons previously recognized by the Court in ruling on the last motion to dismiss (Order at 12), as well as in *Brendon*, where the Court held the similar insider trading allegations in that case were inadequately pled under federal law.  Ex. C (*Brendon* Order) at 16-17.  Under federal law, insider

GREENBERG TRAURIG, LLP
10845 Griffin Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

19

trading allegations are only sufficient when they "allege 'unusual' or 'suspicious' stock sales." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).  In *Brendon*, the Court's Order recognized that "less weight should be given to the timing of the sales when the class period is prolonged."  Ex. C (*Brendon* Order) at 16 (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d, 1079, 1092 (9th Cir. 2002) and *Yates v. Mun. Mortg. & Equity LLC,* 744 F.3d 874, 891 (4th Cir. 2014) ("[A] lengthy class period makes it difficult to infer intent from the mere fact of a stock sale, as it is not unusual for insiders to trade at some point during their tenure with a company.")).  In this case, the TAC covers a *five-year* period.  ¶¶ 113-17.

Although there are five "Insider Selling Defendants" as defined in the TAC— Gallagher, Anderson, Sheldon, Redmond, and Ellmer (¶ 112)—only three— Gallagher, Redmond, and Ellmer—are Directors.  The TAC's allegations about each of the three Directors is virtually the same as in the SAC:

> **Ellmer**:  Elmer is alleged to have "worked with airplanes for forty-five years," beginning as a helicopter mechanic and air tanker flight engineer in the U.S. Marine Corps (¶ 57); he joined the Board in 2008 (¶ 58).  Over a four-year period from June 2014 to May 2018, he is alleged to have sold roughly a half-million dollars of stock, with a mere $21,000 of that occurring a month before the Broadcast aired.  ¶ 115.

> **Redmond**:  Redmond is alleged to have been a director since 2014 (¶ 21) and is alleged to have sold around $1.7 million of stock during a short period of time in *2015* and *nothing since*.  ¶ 116.

> **Gallagher**:  Gallagher is alleged to have been CEO and Chairman of the Board since 2006 (¶ 20) and is said to have sold roughly $83 million of stock over a nearly four-year period (June 2014 to May 2018).  ¶ 113.  These sales account for just 8.6% of Gallagher's total holdings (Ex. C [*Brendon* Order] at 16), an amount which numerous courts have held to be inherently nonsuspicious.[18]

---

[18] *See, e.g., Vantive*, 283 F.3d at 1093-96 (no strong inference of scienter where chairman sold 74% of holdings, CEO sold 17%, CFO sold 32% and COO did not sell any shares); *Ronconi*, 253 F.3d at 435-36 (no strong inference of scienter where general counsel sold 98%, CFO sold 17%, and CEO 10%).

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada  89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

For each of these three Directors, the additions to the TAC consist of another generic statement that they were each "specifically in possession of material inside information in that [they] knew 60 Minutes was preparing to air a report," and that they were "aware of FAA violations," but the TAC provides no facts, let alone particularized facts, supporting these bare conclusions.  ¶¶ 113-116.

As for the supposedly suspicious timing of sales in connection with the Broadcast, other than Gallagher, the only Director who allegedly sold shares in the month before the Broadcast is Ellmer, and his sale amounted to a mere $21,000. ¶ 115.  Moreover, in terms of the demand futility analysis, as the Court pointed out, "[e]ven if th[e] allegations as to Gallagher and Ellmer was sufficient, Gallagher and Ellmer do not comprise a majority of the board."  Order at 12.  Further, and as noted in the prior motion to dismiss, the Court in *Brendon* rejected the adequacy of similar allegations, observing that Gallagher's alleged sales of over $2 million (¶ 113) amount to a mere 0.43% of his total holdings, and "[t]he years-long class period and numerous events alleged during the class period . . . suggest that the timing was not suspicious.  The months-long time period when the plaintiffs allege that Gallagher knew of the CBS investigation underlines how the lengthy class period weighs against scienter."  Ex. C (*Brendon* Order) at 16.  These relatively modest sums, by just two Directors, are inherently non-suspicious.[19]  The TAC also still contains no allegations about the total number of shares owned by any of the Insider Selling Defendants, or anything about their past trading history.  *Id.* at 17 ("the plaintiffs do not allege facts in the complaint showing how Gallagher's trading during the class period compared to trading before the class period.").[20]  Thus, even were the Court

---

[19] *See, e.g., Ronconi*, 253 F.3d at 435 (no inference of scienter where two insiders who made alleged representations sold small percentages of their shares); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (no inference of scienter where officers "sold a relatively small portion of their total holdings and traded in a manner consistent with prior practice").

[20] As for the Officer Defendants who sold, Anderson, who started with Allegiant in 2010 (¶ 46), sold around a half-million dollars of stock between May 2017 and March 2018 (¶ 114).  Sheldon, who started with Allegiant in 2004, and became CFO in 2010, and COO in 2014 (¶ 23), allegedly sold about $3.3 million between August 2015 and October 2017 (¶ 117).  The Complaint notes that stock awards were a substantial component of Sheldon's compensation.  ¶ 23.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

to recognize a new common-law cause of action in Nevada for insider trading, notwithstanding what Defendants believe to be the importance of *Chur* and *Guzman* to this issue, the TAC still fails to adequately plead such a cause of action.

### 4. **The Unjust Enrichment Allegations Remain Deficient.**

The TAC's unjust enrichment claim[21] is unchanged and based entirely upon allegations of insider trading, claiming the Insider Selling Defendants "knew but did not disclose publicly, that the Company had improper safety and airplane maintenance practices . . . [and] was being scrutinized by the FAA and several investigatory news organizations." ⁋ 141. That unchanged allegation still does not help Plaintiffs at all. All airlines are constantly being "scrutinized by the FAA," as they should be. The supposedly "improper safety and maintenance practices" consist of Plaintiffs' opinions and are unsupported by anything that the FAA has ever said or done vis-à-vis Allegiant.

The unjust enrichment claim remains merely a back-door attempt to assert a common-law insider trading cause of action under a different name, and as the Court recognized in its Order, "[e]ven when applying the demand futility arguments for insider trading to this claim, the plaintiffs fail to establish that demand would have been futile . . . ." Order at 13.

### 5. **The TAC Fails to Raise a Reasonable Doubt About Any Director's Lack of Independence, or Inability to Consider a Demand.**

The last section of the Court's analysis in its Order consisted of its determination regarding director independence, something Gallagher allegedly lacked because he "faces a substantial likelihood of liability in the securities class action," and that Marvin, Redmond, and Ellmer allegedly lacked because they were

---

[21] Under Nevada law, a cause of action for unjust enrichment requires that (i) the plaintiff have conferred a benefit on the defendant; (ii) the defendant appreciated such benefit; (iii) the defendant accepted and retained the benefit; and (iv) the circumstances are such that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff. *See Certified Fire Prot., Inc. v. Precision Constr., Inc.*, 283 P.3d 250, 257 (Nev. 2012). These elements are also not adequately alleged in the TAC.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

supposedly "beholden" to Gallagher.   Order at 14-15.   Here too, nothing of substance changed between the SAC and the TAC.   In fact, in the cases of Marvin, Redmond, and Ellmer, other than where these allegations appear in the complaint, literally nothing changed between the SAC and the TAC.   *Compare* SAC ¶ 133(G) *with* TAC ¶ 133(A)(2).   While Defendants could repeat the extensive case law discussion relevant to Marvin, Redmond, and Ellmer discussed in their motion to dismiss the SAC, in the interests of brevity Defendants incorporate those arguments by reference.   Defendants' essential point is succinctly summarized by the Court's holding that, "Even if Gallagher were interested, the plaintiffs' allegations about the relationships of Marvin, Redmond, and Ellmer with Gallagher are not sufficient to allege they were beholden to him." Order at 15 (citing *Bream ex. Rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 [Del. 2004] ["Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."]).[22]

Regarding Gallagher, the Court evaluated allegations about his alleged lack of independence pursuant to the *Rales* test (Order at 14), and cited *Shoen* for the proposition that "a director who has divided loyalties in relation to, or who has or is entitled to receive specific financial benefit from, the subject transaction, is an interested director."   Order at 14 (quoting *Shoen*, 137 P.3d at 1182).   The Court also said that "'In order to show lack of independence, the complaint of a stockholder-plaintiff must create a reasonable doubt that a director is not so "beholden" to an interested director . . . that his or her "discretion would be sterilized.""'   Order at 14 (quoting *Bream*, 845 A.2d at 1050, and *Rales*, 634 A.2d at 936).

---

[22]Despite the fact that it is only the board as of the time of the filing of the original complaint that is relevant to the demand futility analysis, *see Wynn*, 829 F.3d at 1058, for some inexplicable reason the TAC goes on to make demand futility allegations as to Allegiant's newly appointed director, "non-party Harrison." ¶ 133.  Since these allegations are not relevant to the Court's analysis, Defendants ignore them, other than to say that they are indistinguishable from the allegations the Court found to be insufficient regarding Marvin, Redmond, and Ellmer.

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

The Court concluded that pursuant to these tests, Gallagher is not interested and maintains his independence.  Order at 15 ("plaintiffs have not pleaded with particularized facts that Gallagher faced a substantial likelihood of liability due to the securities class action.").

In response, Plaintiffs added nothing of substance.  The new allegations regarding Gallagher in the TAC basically consist of the repeated assertion that he was intimately involved in creating Allegiant's strategy, as one would expect any CEO would be.  ¶ 133 A, Ex. A at pp. 45-47.  In addition, the TAC now also asserts that "securities fraud claims were sustained against" Gallagher (¶ 133 A, Ex. A at p. 47), which the Court obviously knows to be untrue.  Securities fraud allegation against Gallagher in *Brendon* were not "sustained," as all that happened was the Court denied defendants' motion to dismiss, following which the case settled. Besides this, the only other "new" allegation relevant to Gallagher is the assertion that the "Company concedes that Gallagher is not an independent director" in its 2019 proxy statement.[23]  ¶ 133 A, Ex. A at p. 45.  However, this allegation is not really new, as the Order cites Plaintiffs' argument opposing Defendants' motion to dismiss the SAC, contending that "'Allegiant's 2019 Proxy Statement concedes that Gallagher is not independent.'"  Order at 14 (quoting Plaintiffs' opposition brief).  In response, the Court said that "plaintiffs did not indicate how the 2019 proxy statement suggests that Gallagher is not independent [and] plaintiffs did not quote from this proxy statement or cite to any exhibit or part of the SAC in making this assertion, and the SAC does not appear to reference a 2019 proxy statement." Order at 15.

The latter statement is practically the only thing from the Court's Order that Plaintiffs took to heart, as the TAC frequently refers to the 2019 proxy and

---

[23] *See* Ex. F (4-30-19 Schedule 14A).  Plaintiffs refer to a "May 17, 2019" proxy statement but no proxy statement was filed with the SEC on that date.  Plaintiffs appear to mean the Schedule 14A filed on April 30, 2019, which includes the language quoted in the TAC.  ¶¶ 20-21, 133.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffin Peak Drive
Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1   statements that Gallagher (as well as Redmond) are not "independent . . . *[u]nder*
2   *NASDAQ rules* . . . ." ¶ 20; *see also* ¶ 21 (same, Redmond) & ¶ 133 A (the
3   "Company concedes that Gallagher is not an independent director").[24]   However,
4   the standard for determining "independence" for purposes of a demand futility
5   analysis, is totally different from the standards determining "independence" under
6   the rules applicable to the various exchanges.   *See, e.g., Jacobi v. Ergen*, 2016 U.S.
7   Dist. LEXIS 35345, at *21 n.86 (D. Nev. Mar. 17, 2016) ("the independence
8   standards of [NASDAQ or the SEC] and the independence standard for the
9   demand-futility analysis are unrelated"); *Chester Cnty. Emples. Ret. Fund v. Ergen*,
10   2017 U.S. Dist. LEXIS 119568, at *10 n.37 (D. Nev. July 31, 2017) ("Under the
11   NASDAQ standard, any inside director would be considered not independent,"
12   which is "not the applicable standard for analyzing demand futility"); *Stockman-*
13   *Sann v. McKnight*, 2013 U.S. Dist. LEXIS 187245, at *25 (C.D. Cal. Mar. 25,
14   2013) ("The independence standards of the NYSE and the independence standards
15   for demand futility analyses are unrelated.").

16       In short, there is nothing to the TAC's allegations creating a reasonable
17   doubt as to why Allegiant's directors supposedly cannot fairly consider a
18   shareholder's demand under NRS 178.138, particularly as read in light of recent
19   Nevada Supreme Court precedent.   Indeed, the statutory business judgment rule
20   Nevada adopted, as interpreted by its Supreme Court, seems to have been
21   tailormade to address cases precisely like this one.

22   / / /
23   / / /
24   / / /
25   / / /
26
27   [24] *See* Ex. F (4-30-19 Schedule 14A at p. 15) ("Our board of directors has determined that all of
28   our directors, other than Maurice J. Gallagher, Jr. and John Redmond, are independent under the rules of the Nasdaq Stock Market.").

## IV.   **CONCLUSION**

The TAC fails to satisfy either the requirements for pleading demand futility, or the substantive elements any of the causes of action alleged.  Plaintiffs therefore lack standing, and the case should now be dismissed with prejudice.

Respectfully submitted this 5th day of April, 2021.

**GREENBERG TRAURIG, LLP**

By   */s/ Jacob D. Bundick*
MARK E. FERRARIO, ESQ.
Nevada Bar No.: 1625
JACOB D. BUNDICK, ESQ.
Nevada Bar No.: 9772
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135

DANIEL J. TYUKODY, ESQ.
(*Admitted Pro Hac Vice*)
California Bar No.: 123323
**GREENBERG TRAURIG LLP**
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

*Attorneys for Defendants*

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

# CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of April, 2021, a true and correct copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of filing will be served on all parties by operation of the Court's EM/ECF system, and parties may access this filing through the Court's CM/ECF system.

*/s/ Andrea Flintz*

an employee of Greenberg Traurig, LLP

MOTION TO DISMISS VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT