EXHIBIT "C"

EXHIBIT "C"

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CHARLES BRENDON[1] and DANIEL CHECKMAN, Individually and on Behalf of All Others Similarly Situated,

     Plaintiffs

v.

ALLEGIANT TRAVEL COMPANY, et al.,

     Defendants

Case No.: 2:18-cv-01758-APG-BNW

**Order Granting in Part and Denying in Part Defendants' Motion to Dismiss**

[ECF No. 45]

This is a securities fraud class action lawsuit against Allegiant Travel Company, the owner of Allegiant Air (collectively, Allegiant). The First Amended Complaint (FAC) alleges that Allegiant used second-hand aircraft to fly travelers. Beginning in 2015, Allegiant experienced numerous aircraft maintenance and repair issues with its second-hand aircraft, resulting in cancellations, delays, emergency landings, and aborted takeoffs. During this time, Allegiant and its officers assured investors and the public that the airline and its fleet were safe and reliable. In April 2018, the CBS television network broadcast a story on Allegiant's maintenance and repair issues, and Allegiant's stock price dropped precipitously.

Plaintiffs Charles Brendon and Daniel Checkman sued Allegiant and its officers (Maurice J. Gallagher, Jr., Scott Sheldon, Steven E. Harfst, and Jude I. Bricker) on behalf of all persons who traded in Allegiant securities between June 8, 2015 and May 9, 2018. The plaintiffs allege that the defendants violated section 10(b) of the Securities Exchange Act of 1934 (the Exchange

---

[1] The First Amended Complaint names Brendon as lead plaintiff, but he is not included in the caption. ECF No. 34 at 1. So the clerk is directed to amend the caption to include Brendon.

Act), 15 U.S.C. § 78j(b), and Securities and Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-5.  The plaintiffs also assert control person liability against the individual defendants under section 20(b) of the Exchange Act.  The defendants move to dismiss the FAC, challenging falsity, scienter, and loss causation.  I grant the motion with respect to some of the allegedly fraudulent statements because the plaintiffs fail to plead falsity or scienter.  However, I deny the motion with respect to other statements, and I grant plaintiffs leave to amend.

## I.    BACKGROUND

Allegiant used second-hand aircraft to transport passengers from under-served airports to leisure destinations like Las Vegas.[2] ECF No. 34 at 17.  Allegiant was profitable because it served airports with lower fees, faced little competition, and flew second-hand aircraft that cost a fraction of new models. *Id.* at 17-21.  These aircraft required "far greater maintenance than newer planes," however, so maintenance expenses were a "material component of Allegiant's operating costs." *Id.* at 20.  The plaintiffs allege that Allegiant understaffed its maintenance department, hired inexperienced and unqualified maintenance personnel, failed to adequately train its maintenance employees, and had a culture that "compromised maintenance . . . for profits." *Id.* at 3, 21-39.  In support of their allegations, the plaintiffs include statements from former Allegiant maintenance personnel. *Id.* at 11-14, 21-39.

In 2015 and early 2016, local news sources across the country reported "horror stories of Allegiant aircraft experiencing flight delays, emergency landings, aborted takeoffs, and smoke in the cabin," which "intensified as Allegiant's maintenance issues seemed to become more

---

[2] I accept the plaintiffs' factual allegations as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.").

1  prevalent." *Id.* at 39.  On January 8, 2016, the *Tampa Bay Times* reported that an Allegiant

2  maintenance employee quit after two weeks because Allegiant had a "worrisome culture," failed

3  to follow procedures, and misused FAA rules. *Id.* at 43.  Allegiant denied the allegations,

4  claiming that its maintenance personnel were "highly-trained." *Id.*  The following day, Allegiant

5  announced Harfst's resignation as the airline's Chief Operating Officer (COO), explaining that

6  "the Company will use this leadership change as an opportunity to refocus on operational needs

7  and areas for improvement." *Id.* at 44.

8         Later that month, Gallagher (Allegiant's CEO) and Bricker (the new COO), participated

9  in a conference call about Allegiant's fourth quarter 2015 financial results. *Id.*  During the call,

10  an analyst asked about recent "operational challenges" reflected in news stories, Allegiant's plan

11  to correct the challenges, and whether the challenges were overhyped by the media or

12  represented "safety issues." *Id.*  Bricker responded, in relevant part, "[i]t's a safe operation.  Last

13  year, it was a safe operation, and this year as well." *Id.* at 45.  Gallagher pointed to ongoing

14  union negotiations as a potential reason for the stories, stressed the airline's safety programs, and

15  emphasized that "as [Bricker] said, we are safe." *Id.*  The plaintiffs allege that Bricker and

16  Gallagher's statements that Allegiant was safe were false or misleading due to Allegiant's

17  maintenance practices. *Id.* at 54.

18         The next month, Allegiant issued its 10-K annual report for 2015. *Id.* at 51.  Gallagher

19  and Sheldon (Allegiant's CFO) signed the report, which stated that "[w]e believe our aircraft are,

20  and will continue to be, mechanically reliable." *Id.* at 51-52.  The form also included a section on

21  aircraft maintenance. *Id.*  In relevant part, this section of the 10-K stated that Allegiant's

22  "technicians . . . have appropriate experience," Allegiant "provide[d] them with comprehensive

23  training[,]" and that Allegiant could hire "sufficient qualified alternative providers of

maintenance services . . . to satisfy . . . maintenance needs." *Id.* Allegiant repeated this statement in its 2016 and 2017 10-Ks. *Id.* at 55, 57-58. The plaintiffs allege that these statements were false or misleading due to Allegiant's maintenance practices. *Id.* at 54, 56-58.

Gallagher sent letters to Allegiant's shareholders in 2016 and 2017. *Id.* at 53-56. In those letters, he assured investors that Allegiant placed its "focus on safety and reliability," had a "proven, seasoned model," and that safety was its "core fundamental." *Id.* Similarly, Allegiant's Code of Ethics stated that the company was required to: (i) remain "honest, fair and accountable in all business dealings"; (ii) "provide safe working conditions" to employees; (iii) "be a responsible and responsive corporate citizen in a moral, ethical and beneficial manner" to society and the local community; and (iv) "pursue growth and earnings objectives while adhering to ethical standards." *Id.* at 53. The plaintiffs allege that these statements were false or misleading due to Allegiant's maintenance practices. *Id.* at 54, 56-57.

In 2017, the CBS television network submitted Freedom of Information Act (FOIA) requests to the Federal Aviation Administration (FAA) for Allegiant's maintenance records. *Id.* at 59. The FAA released the records over Allegiant's objection. *Id.* at 60. On April 13, 2018, CBS announced that it would air a report criticizing Allegiant's safety and maintenance record on *60 Minutes* that weekend. *Id.* Allegiant shares fell 8.59% on "unusually heavy volume." *Id.* at 7, 60. The CBS report claimed that "(i) Allegiant aircraft had a high number of serious mechanical incidents from mid-2015 through October 2017; (ii) Allegiant lack[ed] the infrastructure and personnel to adequately maintain their aircraft; (iii) Allegiant discouraged employees from reporting safety and maintenance issues; and (iv) Allegiant had a poor safety culture." *Id.* Following the broadcast on April 15, 2018, Allegiant shares fell more than 3% on "unusually heavy volume." *Id.* at 8, 69. On May 9, 2018, the U.S. Department of Transportation

1 (DOT) announced that it would audit FAA oversight of Allegiant's maintenance practices. *Id.*

2 Allegiant shares fell over 2% on the news. *Id.* at 70.

3          Allegiant did not pay Gallagher a salary during the relevant time period. ECF No. 53-5 at

4 5.[3]  Instead, 82.4% of Gallagher's 2015 total compensation was comprised of a nearly $3 million

5 cash bonus tied to Allegiant's operating margin. *Id.*; ECF No. 34 at 4.  The 2015 bonus was "far

6 above [Gallagher's] usual payout" as Allegiant's profits increased from $87 million to $220

7 million. ECF No. 34 at 4.

8          Gallagher also traded in Allegiant stock throughout the plaintiffs' proposed class period.

9 On March 9, 2016, Gallagher sold $47,774,700 of Allegiant stock. *Id.* at 59.  In January 2018,

10 Allegiant "announced that Gallagher had set up a 10b5-1 stock trading plan, which it became

11 aware [of] as of December 30, 2017." *Id.*  Between December 28, 2017 and January 17, 2018,

12 Gallagher sold $33,232,408.01 of Allegiant shares through the plan. *Id.*  Gallagher then exercised

13 stock options to sell an additional $2,066,137.15 in Allegiant stock on March 6, 2018. *Id.*

14 **II.     DISCUSSION**

15          Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive

16 device or contrivance" related to the purchase or sale of securities when the use violates the

17 regulations promulgated by the SEC. 15 U.S.C. § 78j(b).  Under SEC Rule 10b-5, it is unlawful

18 for any person "[t]o make any untrue statement of fact or to omit to state a material fact

19 necessary in order to make the statements made, in the light of the circumstances under which

20 they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  "To recover damages for violations

21

22 ─────────────

23 [3] I must consider "documents incorporated into the complaint by reference" in assessing the plaintiffs' securities fraud claims. *Tellabs*, 551 U.S. at 322.  The FAC references Allegiant's disclosure of Gallagher's compensation, so I take judicial notice of the relevant proxy statement filed with the SEC. ECF No. 53-5.

of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017).

At the pleading stage, a complaint alleging violations of Section 10(b) of the Exchange Act and SEC Rule 10b–5 must meet both the heightened pleading requirements for fraud claims under Federal Rule of Civil Procedure 9(b) and the "exacting pleading requirements of the Private Securities Litigation Reform Act" (PSLRA), 15 U.S.C. § 78u-4(b)(2)(A). *Id.* Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The defendants argue that the FAC should be dismissed because the plaintiffs failed to adequately allege material misrepresentation, scienter, and loss causation.

### A. Material Misrepresentation

The defendants argue that the plaintiffs failed to plead an actionable false statement because: (1) under *In re Merck & Co. Securities Litigation*, 432 F. 3d 261 (3d Cir. 2005), an actionable false statement cannot be based upon previously disclosed public information, and (2) the alleged misrepresentations consist of inactionable puffery or mismanagement claims. The plaintiffs respond that defendants improperly rely on a fact-intensive affirmative defense to support dismissal and that their alleged misstatements are actionable.

/ / / /

6

1.     **1.** *Merck*

2     In *Merck,* the Third Circuit held that a *Wall Street Journal* article analyzing Merck's

3 opaquely disclosed accounting practices could not form the basis of a false statement because the

4 efficient market hypothesis suggests the market would have already incorporated the information

5 into Merck's share price. 432 F. 3d at 270-71. Similarly, the truth-on-the-market defense

6 excuses a "failure to disclose material information . . . where that information has been made

7 credibly available to the market by other sources." *In re Apple Computer Securities Litigation*,

8 886 F.2d 1109, 1115 (9th Cir. 1989). However, "any material information which insiders fail to

9 disclose must be transmitted to the public with a degree of intensity and credibility sufficient to

10 effectively counter-balance any misleading impression created by the insiders' one-sided

11 representations." *Id.* at 1116. Accordingly, "the truth-on-the-market defense is intensely fact-

12 specific, so courts rarely dismiss a complaint on this basis." *In re Amgen Inc. Sec. Litig.*, 544 F.

13 Supp. 2d 1009, 1025 (C.D. Cal. 2008).

14     The defendants argue that the facts underlying the *60 Minutes* report had already been

15 reported by local news sources, thus requiring dismissal under *Merck.* Even assuming that

16 *Merck* is the law in the Ninth Circuit, however, the plaintiffs allege a key fact distinguishing this

17 case from *Merck*: the CBS broadcast reported undisclosed Allegiant maintenance records

18 obtained by the FOIA request. To the extent that the defendants raise a truth-on-the market

19 defense, the plaintiffs plead facts showing that the local news reports that emerged before the *60*

20 *Minutes* report were not comprehensive or credible enough to counterbalance Allegiant's alleged

21 misrepresentations. I therefore deny the defendants' motion to dismiss on this ground.

22 / / / /

23 / / / /

## 2.   False or Misleading Statements

The plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" to adequately plead material misrepresentation. 15 U.S.C. § 78u–4(b)(1).  "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

With respect to opinion statements, "when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (quotation omitted). "[W]hen a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that the supporting fact [the speaker] supplied [is] untrue." *Id.* (quotation omitted) (alterations in original).

However, a "mildly optimistic, subjective assessment hardly amounts to a securities violation," so I must distinguish material misrepresentations from "puffery." *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  "Statements by a company that are capable of objective verification are not puffery and can constitute material misrepresentations." *Id.* (quotation omitted).  And, "general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys.*, 865 F. 3d at 1143 (quotation omitted).  "For example, reassuring investors that 'everything [was] going fine' with FDA approval when the company knew FDA approval would never come

8

was materially misleading." *Id.* (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

Additionally, Section 10(b) is not a cause of action for corporate mismanagement. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).  But the plaintiffs can plead a cognizable claim if they allege both corporate mismanagement and false or misleading public statements. *See Reese v. Malone*, 747 F.3d 557, 581 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights*, 856 F.3d 605.

### a. 10-K Statements

Allegiant's 2015 10-K stated that "[w]e believe our aircraft are, and will continue to be, mechanically reliable." *Id.* at 52.  Allegiant's 2015, 2016, and 2017 10-Ks stated that Allegiant's "technicians . . . have appropriate experience," Allegiant "provide[d] them with comprehensive training[,]" and that Allegiant could hire "sufficient qualified alternative providers of maintenance services . . . to satisfy . . . maintenance needs." ECF No. 34 at 52, 55, 57-58.  These statements regarding Allegiant's reliability, staffing, and training are capable of objective verification. *See Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (representation that defendant conducted "extensive training and safety programs" was actionable).  The plaintiffs sufficiently allege that these statements were false and misleading because "Allegiant maintenance technicians were inexperienced and insufficiently trained," resulting in substandard repairs and false certification that maintenance had been performed, and "Allegiant's maintenance department was grossly

understaffed," resulting in rushed repairs and false certifications that maintenance had been performed.[4] ECF No. 34 at 54, 56-58.  I thus deny the motion with respect to these statements.

### b.  January 2016 Statement

In a statement responding to a *Tampa Bay Times* article on Allegiant's maintenance practices, Allegiant also claimed that its maintenance personnel were "highly-trained." ECF No. 34 at 43.  In their opposition to the motion, the plaintiffs ask me to infer this statement is false, but they do not specify this statement was false or misleading in the FAC, as required by the PSLRA. 15 U.S.C. § 78u–4(b)(1).  So I grant the motion with respect to this statement. However, I grant the plaintiffs leave to amend because it is not clear that amendment would be futile. *Sonoma Cty. Ass'n of Retired Employees v. Sonoma Cty.*, 708 F.3d 1109, 1118 (9th Cir. 2013) ("As a general rule, [d]ismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by any amendment.") (quotation omitted).

### c.  Code of Ethics

Allegiant's Code of Ethics stated that the company was required to: (i) remain "honest, fair and accountable in all business dealings"; (ii) "provide safe working conditions" to employees; (iii) "be a responsible and responsive corporate citizen in a moral, ethical and beneficial manner" to society and the local community; and (iv) "pursue growth and earnings objectives while adhering to ethical standards." *Id.* at 53.  A code of conduct is "inherently aspirational," however, and "expresses opinions as to what actions are preferable, as opposed to

---

[4] I am not inferring that Allegiant's claim that its aircraft "are, and will continue to be, mechanically reliable" was false or misleading because the statement was removed from subsequent 10-Ks. *See Welgus v. Trinet Group, Inc.*, 2017 WL 6466264, *8 (N.D. Cal. Dec. 18, 2017) ("[I]f the law viewed a company's editing or removal of language from an SEC filing as a tacit admission that the language was false when made, no public company would ever remove disclosures from its filings.").  Rather, the plaintiffs explain the statement was false because of understaffing and insufficient training.

1   implying that all staff, directors, and officers always adhere to its aspirations." *Retail Wholesale*

2   *& Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th

3   Cir. 2017). In *Retail Wholesale*, the Ninth Circuit concluded that a similar code of conduct

4   contained no statements that were "capable of being objectively false." *Id.* at 1277. The

5   plaintiffs thus fail to allege that Allegiant's Code of Ethics contained actionable

6   misrepresentations, so I grant the motion to dismiss with respect to these statements. I deny

7   leave to amend because amendment would be futile: the statements in the Code of Ethics are not

8   capable of being objectively false.

9                       **d. Statements Regarding Focus on Safety**

10         In annual shareholder letters, Gallagher assured investors that Allegiant placed its "focus

11   on safety and reliability," had a "proven, seasoned model," and that safety was its "core

12   fundamental." ECF No. 34 at 53-56. These statements are not capable of objective verification

13   and thus cannot be material misrepresentations. *See Plumley v. Sempra Energy*, 2017 WL

14   2712297 at *7 (S.D. Cal. June 20, 2017) ("The Court finds that the FAC's alleged fraudulent or

15   misleading statements regarding its commitment to or prioritization of safety, and all similarly

16   alleged statements, are too nonspecific and unmeasurable to state a claim for securities fraud.").

17   I thus grant the motion with respect to these statements.

18         Similarly, the FAC includes a June 8, 2015 statement that safety was "always

19   [Allegiant's] number one priority" in the section containing false statements. ECF No. 34 at 51.

20   The plaintiffs do not explain why this statement was false in either the FAC, as required by the

21   PSLRA, or their opposition to the motion. I do not grant the plaintiffs leave to amend to specify

22   this false statement with particularity because amendment would be futile: the statement is not

23   objectively verifiable.

1

#### e. Investor Call Statements

2    During a January 2016 investor call, an analyst asked about the recent "operational

3  challenges" reflected in media stories, Allegiant's plan to correct the challenges, and whether the

4  challenges were overhyped by the media or represented "safety issues." ECF No. 34 at 51.

5  Bricker responded, in relevant part, that "[i]t's a safe operation. Last year, it was a safe

6  operation, and this year as well." *Id.* Gallagher added that "as [Bricker] said, we are safe." *Id.*

7  The plaintiffs allege these statements were false because Allegiant's maintenance practices

8  "created an unsafe operation." *Id* at 54.

9    These statements are actionable because they address specific questions on aspects of

10  Allegiant's operation (Allegiant's maintenance issues) that Gallagher and Bricker allegedly knew

11  to be performing badly. Alternatively, the statements could be characterized as opinion

12  statements with an embedded fact. Gallagher and Bricker express their opinion that Allegiant is

13  safe, but embedded in their opinion is a factual denial of the analyst's series of questions on

14  Allegiant's operational challenges. The plaintiffs adequately allege that the supporting fact was

15  untrue because the FAC alleges that the operational challenges reflected safety issues rather than

16  media hype. I therefore deny the motion as to these statements on the grounds of falsity.

17  **B. Scienter**

18    The defendants argue that the plaintiffs fail to plead scienter because neither the

19  allegations of former employees (FEs) nor Gallagher's stock sales suggests a strong inference of

20  scienter. The plaintiffs respond that they adequately allege scienter because: (1) the FE

21  allegations confirm defendants' recklessness as to Allegiant's maintenance practices and safety;

22  (2) the core operations doctrine permits an inference that the defendants were aware of

23  Allegiant's maintenance and safety issues; (3) Gallagher's stock sales and formation of a 10b5-1

1  stock trading plan permit an inference of scienter; (4) Gallagher's bonus structure incentivized

2  fraud; and (5) Harfst's unexpected resignation further supports scienter.

3        Under the PSLRA, the plaintiffs must "state with particularity facts giving rise to a strong

4  inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

5  The "required state of mind is a mental state that not only covers intent to deceive, manipulate,

6  or defraud, but also deliberate recklessness." *In re Quality Sys.*, 865 F.3d at 1144 (quotation

7  omitted).  "[D]eliberate recklessness is an extreme departure from the standards of ordinary care

8  . . . which presents a danger of misleading buyers or sellers that is either known to the defendant

9  or is so obvious that the actor must have been aware of it." *Schueneman v. Arena Pharm., Inc.*,

10 840 F.3d 698, 705 (9th Cir. 2016) (quotation omitted).  To assess whether the FAC meets this

11 standard, I "must ask: When the allegations are accepted as true and taken collectively, would a

12 reasonable person deem the inference of scienter at least as strong as any opposing inference?"

13 *Tellabs*, 551 U.S. at 326.  Consequently, I address each allegation and then analyze them

14 collectively to determine whether the plaintiffs have adequately alleged scienter.

15                    **1.  Former Employee Allegations**

16        The plaintiffs must describe the FEs whose statements are introduced to establish

17 scienter "with sufficient particularity to establish their reliability and personal knowledge." *In re*

18 *Quality Sys.*, 865 F.3d at 1144 (quotation omitted).  "[T]hose statements which are reported by

19 confidential witnesses with sufficient reliability and personal knowledge must themselves be

20 indicative of scienter." *Id.* at 1144-45 (quotation omitted).  Confidential witness accounts "from

21 before the class period [are] relevant because it can confirm what a defendant should have

22 known during the class period." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018)

23 (quotation omitted).

1    The FAC describes each FE "with sufficient particularity to support the probability that a

2    person in the position occupied by the source would possess the information alleged." *In re*

3    *Quality Sys.*, 865 F.3d at 1145.  The FAC specifies job titles, locations, responsibilities, dates of

4    employment, and supervisors for each FE. ECF No. 34 at 11-14.  The FEs provide detailed

5    allegations regarding maintenance understaffing, maintenance personnel with insufficient

6    training and experience, and false maintenance reporting. *Id.* at 21-39.  The FEs corroborate each

7    other across Allegiant stations and seniority levels, thus bolstering their reliability.  At least one

8    FE may have departed before the class period, but information from before the class period is

9    relevant.

10    Most of the FEs occupied front-line maintenance positions, but the FEs allege that senior

11    management (including the individual defendants) knew of the maintenance issues.  For

12    example, two of the FEs allege direct contact with individual defendants in daily briefings on the

13    "status of aircraft" and "monthly reliability meetings to discuss new and ongoing reliability

14    issues and mechanical problems with the fleet." *Id.* at 34, 38.  The FEs also allege that

15    Allegiant's open office floor plan allowed the individual defendants to learn of the maintenance

16    issues. *Id.* at 14.  Additionally, senior executives reported on maintenance issues at board

17    meetings that Gallagher attended. *Id.* at 7.  These "particularized allegations that defendants had

18    actual access to the disputed information, . . . raise a strong inference of scienter." *City of*

19    *Dearborn Heights*, 856 F.3d at 620 (quotation omitted).

20    **2.  Core Operations Doctrine**

21    I may infer "that facts critical to a business's core operations . . . are known to a

22    company's key officers." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008).

23    Allegations regarding management's role in a company may support scienter in three

14

circumstances: "(1) 'in any form,' as part of a holistic analysis; (2) on their own, 'where they are particular and suggest that defendants had actual access to the disputed information'; and (3) on their own 'in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.'" *Webb*, 884 F.3d at 854 (quoting *S. Ferry*, 542 F.3d at 785-86).

The FAC contains particularized allegations from the FEs that the individual defendants knew of the airline's maintenance issues. *See, e.g.*, ECF No. 34 at 7, 14, 34, 38.  Additionally, Allegiant's 10-Ks (signed by Gallagher and Sheldon) stated that "management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations." *Id.* at 52, 55, 58.  In the investor call, Gallagher and Bricker responded to at least one question on "operational challenges," suggesting that they were familiar with the airline's maintenance issues. *Id.* at 44-45.  These particularized allegations support scienter on their own, but it would also be "absurd" to suggest that the management of any airline, much less an airline experiencing significant operational challenges, would not be aware of pervasive maintenance issues like those alleged by the plaintiffs.

### 3. Stock Trading

"Unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter." *In re Quality Sys.*, 865 F.3d 1130 at 1146.  I must consider three factors: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).  When the proceeds from stock sales are "astronomical . . . , less weight should be given to the fact that they may represent a small portion of the defendant's holdings."

15

1  *Id.* ($900 million stock sale representing 2.1% of defendant's holdings was suspicious).

2  Similarly, less weight should be given to the timing of the sales when the class period is

3  prolonged. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002); *see also*

4  *Yates v. Mun. Mortg. & Equity, LLC,* 744 F.3d 874, 891 (4th Cir. 2014) ("[A] lengthy class period

5  makes it difficult to infer intent from the mere fact of a stock sale, as it is not unusual for insiders to

6  trade at some point during their tenure with a company.").

7       Stock sales conducted pursuant to a pre-determined Rule 10b5-1 trading plan may "rebut

8  [ ] an inference of scienter." *Metzler*, 540 F.3d at 1067 n.11.  However, when "executives enter

9  into a trading plan during the Class Period and the Complaint sufficiently alleges that the

10  purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense

11  to scienter allegations." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d

12  297, 309 (2d Cir. 2015).

13       The stock sales at issue here represented between .43% and 8.6% of Gallagher's

14  Allegiant holdings, but netted him $83,073,245.16.  Although the percentage of Gallagher's

15  holdings was modest, the size of the proceeds may support an inference of scienter.  With respect

16  to timing, the plaintiffs allege that the first stock sale was suspicious because it took place two

17  days after Allegiant responded to allegations that it was unsafe. ECF No. 34 at 59.  The plaintiffs

18  allege that the other two sales and the creation of the 10b5-1 trading plan were suspicious

19  because they took place during the five- to eight-month period when Gallagher allegedly knew

20  that CBS was investigating Allegiant. *Id.*  The years-long class period and the numerous events

21  alleged during the class period, however, suggest that the timing was not suspicious.  The

22  months-long time period when the plaintiffs allege that Gallagher knew of the CBS investigation

23  underlines how the lengthy class period weighs against scienter.  And, the FAC does not allege

that Gallagher formed the stock trading plan to take advantage of the inflated stock price.

16

Finally, the plaintiffs do not allege facts in the complaint showing how Gallagher's trading during the class period compared to trading before and after the class period. Weighing these factors together, Gallagher's stock sales and 10b5-1 trading plan formation do not support a strong inference of scienter on their own. But I consider them in my collective analysis, and I grant the plaintiffs leave to amend to add further allegations in support of scienter, if they exist.

The FAC contains allegations regarding only Gallagher's stock sales, but both parties argue in the briefing that Bricker and Sheldon's stock sales lend support to their position on the motion. I do not consider these sales as they are not alleged in the complaint. But I grant leave to add those allegations.

### 4. Bonus Structure

"A strong correlation between financial results and . . . cash bonuses for individual defendants may occasionally be compelling enough to support an inference of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004 (9th Cir. 2009). The complaint must specify how the bonus compares to prior bonuses and the company's bottom line, however. *Id.* at 1005. "Generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements" applicable to securities fraud actions. *Id.* (quotation omitted).

The plaintiffs argue that Gallagher's bonus structure incentivized fraud because it was tied to the company's operating margin. ECF No. 51 at 20. But the FAC does not include sufficient factual allegations to support an inference of scienter from that fact. For example, it alleges only that the 2015 bonus was "a figure far above his usual payout." ECF No. 34 at 4. I grant the plaintiffs leave to amend these allegations because it is not clear that amendment would be futile.

/ / / /

### 5.  Harfst Resignation

To support an inference of scienter, the plaintiffs "must allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco*, 552 F.3d at 1004.  "Absent allegations that the resignation at issue was uncharacteristic . . . or was accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Id.*

Harfst unexpectedly resigned his position as COO one week after a media report on a former Allegiant mechanic's allegations against the company.  Additionally, the press release announcing his departure suggested the resignation was tied to operational challenges at the company.  The plaintiffs' factual allegations suggest that the resignation was accompanied by suspicious circumstances, and thus support an inference of scienter.

### 6.  Collective Analysis

Taken together, the FE accounts, core operations doctrine, and Harfst's resignation support a strong inference of scienter.  However, I must determine whether this inference is at least as strong as any other opposing inference.  As defendants point out, the FE accounts "support the proposition that Allegiant's senior management paid a great deal of attention to airline safety and maintenance." ECF No. 56 at 9.  The individual defendants participated in daily conference calls, monthly reliability meetings, quarterly Town Hall events, and annual leadership conferences to discuss staffing, reliability, and mechanical issues. ECF No. 34 at 6-7. Allegiant utilized all seven voluntary safety systems suggested by the FAA. *Id.* at 43, 45. Additionally, senior executives occasionally piloted Allegiant aircraft. *Id.* at 40.  These

18

allegations permit an opposing inference that the individual defendants believed Allegiant was safe. This inference is stronger than the plaintiffs' proposed inference, so the plaintiffs fail to plead scienter with respect to Bricker and Gallagher's claims that Allegiant ran a safe operation. I thus grant the motion with respect to the statements in the investor call, but I grant leave to amend because it is not clear that amendment would be futile.

But the allegations do not permit an opposing inference that the individual defendants were unaware of Allegiant's specific maintenance understaffing and training issues. The FE accounts, core operations doctrine, and other factual allegations raise a strong inference that the individual defendants were at the very least deliberately reckless as to these issues and the related false or misleading statements in Allegiant's 10-Ks. This strong inference is at least as strong as any opposing inference, so the plaintiffs adequately plead scienter with respect to the specific statements in Allegiant's 10-Ks (signed by Gallagher and Sheldon). I thus deny the motion with respect to these statements.

**C. Loss Causation**

The defendants argue that the plaintiffs do not adequately plead loss causation because: (1) the *60 Minutes* report was not an adequate corrective disclosure because it revealed nothing new; (2) the stock drop following the purported corrective disclosure was not material; and (3) the corrective disclosure was not sufficiently connected to the alleged fraud. The plaintiffs respond that: (1) the *60 Minutes* report exposed new information and shed new light on existing public information; (2) the stock drop was material because of the trading volume and decline in share price; and (3) the corrective disclosure is not required to mirror the alleged fraud.

To adequately plead loss causation, the plaintiffs "must allege that the defendant's share price fell significantly after the truth became known." *Metzler*, 540 F.3d at 1062 (quotation

omitted).  A series of corrective disclosures, when "viewed in tandem," may be sufficient if

"[t]he combined force of these statements . . . suggest that the market was alerted to" the relevant

misrepresentations. *Id.* at 1064 n.8.  Additionally, a corrective disclosure relying on public

information may be adequate so long as it brings to light an implication of the previously

disclosed information of which the market was not aware. *In re Gilead Scis. Sec. Litig.*, 536 F.3d

1049, 1053-54 (9th Cir. 2008).  However, the announcement of a government "investigation,

standing alone, is insufficient to establish loss causation." *Loos v. Immersion Corp.*, 762 F.3d

880, 883 (9th Cir. 2014).  The plaintiffs are not required to prove loss causation at the pleading

stage, but they "must properly allege it." *Metzler*, 540 F.3d at 1062.

The plaintiffs sufficiently allege that the "truth became known" over three partial

disclosures.  First, CBS announced the subject of the *60 Minutes* report on April 13, 2018,

resulting in the first stock drop.  Second, CBS aired the report on April 15, resulting in a second

stock drop.  The report is an adequate corrective disclosure because it revealed new information

to the market and brought to light the systemic nature of Allegiant's maintenance issues.  Finally,

the DOT announced an investigation of FAA's oversight of Allegiant on May 9, 2018, resulting

in the third stock drop.  The announcement of a government investigation alone is insufficient to

establish loss causation, but here the CBS and DOT disclosures together alerted the market to

Allegiant's systemic maintenance issues.

The three stock drops, ranging from 2% to 8.59%, on heavy trading volume following the

partial disclosures constitute a significant fall in share price.  The defendants cite dicta from

*Metzler* to argue that the plaintiffs fail to plead loss causation because the stock price recovered,

but dismissal is inappropriate on these grounds. *See Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d

966, 985 (N.D. Cal. 2015).  The plaintiffs thus adequately allege loss causation.

### D. *Janus*

The defendants argue that Sheldon and Harfst did not make any false statements under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). The plaintiffs respond that Sheldon made false statements because he signed Allegiant's 10-Ks and that Harfst made false statements because he exercised sufficient control over Allegiant's false statements. The defendants concede in their reply that Sheldon's liability is adequately alleged because he signed Allegiant's 10-Ks, but still contest Harfst's liability.

In *Janus*, the United States Supreme Court held that a person can be held liable under Section 10(b) of the Exchange Act only if he is the "maker of a statement." *Id.* at 142-43. "[T]he maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it." *Id.* at 144. "Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker." *Id.* "Courts have consistently held that the signer of a corporate filing is its 'maker,' because signing a filing implies 'ultimate control' over its contents." *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *3 (N.D. Cal. Mar. 26, 2015). Although *Janus* addressed two distinct legal entities, district courts in the Ninth Circuit "regularly apply *Janus* to corporate officers." *In re Solarcity Corp. Sec. Litig.,* 274 F. Supp. 3d 972, 1006 (N.D. Cal. 2017) (holding that Janus applies to corporate officers).

Harfst did not sign the 10-Ks and departed Allegiant before they were issued. The plaintiffs allege that each of the defendants "was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company . . . and/or . . . approved or ratified these statements in violation of the federal securities laws." ECF No. 34. But that conclusory allegation does not meet the heightened pleading standard under Federal

21

1   Rule 9(b).  The plaintiffs thus do not allege facts showing that Harfst had authority over any of

2   the 10-K statements, so I dismiss the Section 10(b) claim against him.

3        **E.  Section 20(a)**

4        Section 20(a) of the PSLRA establishes joint and several liability for controlling persons

5   who aid and abet securities violations. 15 U.S.C. § 78t(a).  To establish control person liability,

6   the plaintiffs must allege "a primary violation of federal securities law" and that "the defendant

7   exercised actual power or control over the primary violator." *Zucco*, 552 F.3d at 990 (quotation

8   omitted).  "This inquiry is normally an intensely factual question." *Id.* (quotation omitted).

9   "Courts have found general allegations concerning an individual's title and responsibilities to be

10   sufficient to establish control at the motion to dismiss stage." *In re Energy Recovery Inc. Sec.*

11   *Litig.*, 2016 WL 324150, at *25 (N.D. Cal. Jan. 27, 2016) (quotation omitted).  The plaintiffs

12   allege a violation of securities laws and that Gallagher, Sheldon, and Bricker, as corporate

13   officers, exercised control over the primary violator.  However, Harfst cannot be liable under

14   Section 20(a) because he departed Allegiant before it issued the 10-Ks, which contain the only

15   remaining actionable statements in this case. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d

16   731, 771 (S.D.N.Y. 2017) ("[C]orporate officers cannot be liable as control persons for the

17   period after they left the [c]ompany.") (quotation omitted).  So I deny the motion to dismiss with

18   respect to the Section 20(a) claim against Gallagher, Sheldon, and Bricker, but I grant the motion

19   with respect to the claim against Harfst.

20   **III.   SUMMARY**

21        I grant the motion and dismiss the claims that are based on Allegiant's January 2016

22   statement that its maintenance personnel were highly-trained, the Code of Ethics, Gallagher's

23   letters to shareholders, Allegiant's June 8, 2015 statement, and statements in the investor call.  I

deny the motion with respect to the statements in Allegiant's 10-Ks. I grant the plaintiffs leave

to amend if they can adequately allege that Allegiant's January 2016 statement that its mechanics

were "highly-trained" was false or misleading and include additional factual allegations

supporting scienter.

**IV.    CONCLUSION**

IT IS THEREFORE ORDERED that the defendants' motion to dismiss **(ECF No. 45) is**

**GRANTED IN PART and DENIED IN PART**.

IT IS FURTHER ORDERED that the claims against Steven E. Harfst in the First

Amended Complaint are dismissed without prejudice.

IT IS FURTHER ORDERED that plaintiffs Charles Brendon and Daniel Checkman may

file an amended complaint by October 18, 2019.

IT IS FURTHER ORDERED that the clerk of the court shall amend the caption of this

case to include lead plaintiff Charles Brendon.

DATED this 9th day of September, 2019.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE